# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KENNETH SMITH, | ) | |
| | ) | No. |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case Number of State Court |
| | ) | Conviction:  01 CF 363 |
| TARRY WILLIAMS, | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR WRIT OF *HABEAS CORPUS*

David Jiménez-Ekman
Anne P. Ray
Katharine R. Ciliberti
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois  60654-3456
(312) 222-9350

*Attorneys for Petitioner*
*Kenneth Smith*

Dated:  January 13, 2015

**TABLE OF CONTENTS**

I.     INTRODUCTION. ...................................................................................................1

II.    THE PARTIES .....................................................................................................4

III.   PROCEDURAL HISTORY ................................................................................5

IV.   STATEMENT OF FACTS. ................................................................................7

      A.     The Pre-Trial Proceedings. .......................................................................7

            1.     The Trial Court Excludes Significant Evidence Tending To Show The DeCicco Group Had A Motive To Target The Burrito Express On The Night At Issue. ...............................................7

            2.     The Trial Court Refuses To Exclude The Testimony Of Petitioner's Alleged Accomplices, Who The State Called Solely To Introduce Their Recanted, Out-Of-Court Statements Implicating Petitioner...................................................9

      B.     The Trial: The State's Theory Of The Case...........................................9

            1.     Two Masked Men Enter The Burrito Express On March 6, 2001 In An Apparent Attempted Robbery, Resulting In Briseno's Death...............9

            2.     Police Arrive Within Minutes And Discover A "Bloody" Crime Scene. ...............................................................................12

            3.     Police Go Over The Crime Scene With "A Fine Tooth Comb," But Find No Evidence Linking Petitioner Or His Alleged Accomplices To The Crime Charged. ...............................................12

            4.     Police Elicit A "Confession," Implicating Petitioner, From Justin Houghtaling, Who Later Recants Entirely.................................15

            5.     David Collett Takes A "Plea Of Convenience," Despite No Evidence Whatsoever Of His Involvement In The Burrito Express Shooting. ...............................................................................25

      C.     The Trial: Petitioner's Defense. ............................................................28

            1.     Additional Evidence Indicates That Neither Petitioner Nor His Alleged Accomplices Were At The Crime Scene On The Night At Issue. ...............................................................................28

            2.     Significant Evidence Proves That The DeCicco Group Committed The Crime Charged.................................................31

i

D. The Trial: The State Attempts To Rebut The Evidence Of The DeCicco Group's Guilt. ........................................................................................47

E. The Verdict And Sentence. ...................................................................50

F. The Direct Appeal. ...............................................................................50

V. LEGAL STANDARD. ......................................................................................57

VI. THE COURT SHOULD GRANT *HABEAS* RELIEF BECAUSE PETITIONER'S CONVICTION IS CONTRARY TO, AND IS AN UNREASONABLE APPLICATION OF, SUPREME COURT AUTHORITY ESTABLISHING THAT DUE PROCESS REQUIRES THE STATE TO PROVE GUILT BEYOND A REASONABLE DOUBT. ...................................................................58

A. The Appellate Court's Decision Upholding Petitioner's Conviction Was Contrary To The Supreme Court's Clearly Established Precedent In *Jackson v. Virginia*, Which Requires The Reviewing Court To Determine That The State Proved Guilt Beyond A Reasonable Doubt. ..................................60

1. The Appellate Court's Conclusion That Houghtaling's Prior Inconsistent Statements Were Sufficient To Support Petitioner's Conviction Is Contrary To *Jackson v. Virginia*. .........................................60

2. Independently, The Appellate Court's Conclusion That Evidence Of The DeCicco Group's Guilt Did Not Require Reversal Because It Did Not "Overwhelm" The Evidence Of Petitioner's Guilt Improperly Shifted The State's Burden To The Defense And Is Therefore Contrary To *Jackson v. Virginia*. ...............................................76

B. Alternatively, In Light Of The Extensive Evidence Of The DeCicco Group's Guilt, The Appellate Court's Decision Upholding Petitioner's Conviction Was An Unreasonable Application Of *Jackson v. Virginia*. ...............78

1. *Jackson v. Virginia* Requires A Reviewing Court To Consider The Sufficiency Of The Evidence In Light Of All Of The Evidence Presented. ...............................................................................78

2. The Appellate Court Unreasonably Applied *Jackson* Because It Did Not Properly Determine Whether There Was Constitutional Reasonable Doubt In Light Of The Evidence Against The DeCicco Group. ...............................................................................81

3. Had The Appellate Court Considered The Evidence Of The DeCicco Group's Guilt Together With The State's Evidence Against Petitioner, It Would Have Concluded That There Were Serious Questions As To Petitioner's Guilt Giving Rise To Reasonable Doubt As A Matter Of Law. ...................................................88

VII.    INDEPENDENTLY, THE COURT SHOULD GRANT *HABEAS* RELIEF
        BECAUSE THE ILLINOIS COURTS DEPRIVED PETITIONER OF HIS DUE
        PROCESS RIGHT TO PRESENT A COMPLETE DEFENSE UNDER THE
        SIXTH AND FOURTEENTH AMENDMENTS............................................................97

        A.    The Exclusion Of Evidence Tending To Show The DeCicco Group – Not
              Petitioner – Robbed The Burrito Express Deprived Petitioner Of His
              Constitutional Right To Present A Complete Defense, Contrary To The
              Interests Of Justice, And, Alternately, In Conflict With Supreme Court
              Authority................................................................................................................98

              1.    Petitioner's Constitutional Rights Were Violated By The Illinois
                    Courts' Exclusion Of The Proffered Testimony Of Anderson,
                    Quinones, And Solarz, Which Would Have Established A Key
                    Element Of Petitioner's Defense – The DeCicco Group's
                    Connection To, And Motive To Rob, The Burrito Express....................100

              2.    Petitioner's Constitutional Rights Were Violated By The Illinois
                    Courts' Exclusion Of Trumble's Proffered Testimony That Hiland
                    Confessed To A Lawyer To Get Legal Advice, Which Tended To
                    Show That Hiland's Confessions Were True...........................................110

        B.    The Trial Court Violated Petitioner's Constitutional Right To Present A
              Complete Defense When It Prevented Him From Introducing Evidence
              That Would Have Undermined The State's Case, And The Appellate
              Court's Decision To Uphold The Conviction In Light Of These Errors
              Was An Unreasonable Application Of *Davis v. Alaska* And *Delaware v.
              Van Arsdall*.......................................................................................................116

              1.    Excluding Evidence That Would Have Impeached Pardo's
                    Description Of The Green Jacket Violated Petitioner's Right To
                    Present A Complete Defense Because It Prevented The Jury From
                    Properly Appraising The Reliability Of Pardo's Testimony. .................118

              2.    The Trial Court's Limitation Of Houghtaling's Cross-Examination
                    Unfairly Interfered With Petitioner's Right To Present A Complete
                    Defense. ...............................................................................................121

              3.    The Trial Court Violated Petitioner's Right To Present A Complete
                    Defense By Unfairly Curtailing Questions Regarding The
                    Interrogation Techniques Used By Police When Questioning
                    Houghtaling............................................................................................126

VIII.   *HABEAS* IS WARRANTED BECAUSE THE CUMULATIVE EFFECT OF THE
        TRIAL ERRORS DEPRIVED PETITIONER OF A FAIR TRIAL. ..............................128

        A.    The Trial Court Erred By Allowing The State To Introduce Highly
              Prejudicial And Irrelevant Evidence....................................................................129

1.      The Admission Of McMullan's Incriminating Out-of-Court Statement That She Saw Petitioner With A Revolver Was Prejudicial Error...........................................................129

2.      The Admission Of Collett's Out-of-Court Statements Was Prejudicial Error.................................................................132

3.      The Admission of Evidence Of Drug Use By Petitioner And His Acquaintances Was Prejudicial Error. ...................................137

4.      The Admission Of Photographs From Briseno's Autopsy Was Highly Prejudicial. ...................................................139

B.      The Cumulative Effect Of The Trial Errors Deprived Petitioner Of A Fair Trial, And The Appellate Court's Conclusion To The Contrary Was An Unreasonable Application Of *Taylor v. Kentucky* And *Chambers v. Mississippi*.............................................................140

1.      The Cumulative Effect Of Trial Errors May Result In A Fundamentally Unfair Trial. ....................................141

2.      The Appellate Court's Decision Denying Petitioner's Cumulative Error Claim Should Be Reviewed *De Novo*, Or, In The Alternative, It Was An Unreasonable Application Of *Chambers* And *Taylor*...........142

CONCLUSION........................................................................144

iv

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alvarez v. Boyd*,
   225 F.3d 820 (7th Cir. 2000) .........................................................................141, 143

*Anderson v. Sternes*,
   243 F.3d 1049 (7th Cir. 2001) .......................................................................141

*Blackston v. Rapelje*,
   769 F.3d 411 (6th Cir. 2014) ....................................................................... passim

*Brecht v. Abrahamson*,
   507 U.S. 619 (1993)........................................................................................139

*Brinegar v. United States*,
   338 U.S. 160 (1949)........................................................................................58

*Bruton v. United States*,
   391 U.S. 123 (1968)........................................................................................129, 140

*Burks v. United States*,
   437 U.S. 1 (1978)............................................................................................97

*California v. Green*,
   399 U.S. 149 (1970)........................................................................................58, 60

*Chambers v. Mississippi*,
   410 U.S. 284 (1973)....................................................................................... passim

*Clark v. O'Leary*,
   852 F.2d 999 (7th Cir. 1988). ...................................................................104, 105, 120, 123

*Cone v. Bell*,
   556 U.S. 449 (2009)....................................................................................57, 101, 129, 142

*Crane v. Kentucky*,
   476 U.S. 683 (1986)........................................................................................97, 99

*D'Ambrosio v. Bagley*,
   527 F.3d 489 (6th Cir. 2008) ...................................................................80, 95, 103, 105

*Darden v. Wainwright*,
   477 U.S. 168 (1986).......................................................................................129

*Davis v. Alaska*,
    415 U.S. 308 (1974)..................................................................... passim

*Dawson v. Delaware*,
    503 U.S. 159 (1992)......................................................................140

*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986)..........................................................117, 118, 121

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974)..............................................................128, 135

*Ellison v. Walls*,
    2008 U.S. Dist. LEXIS 48728 (N.D. Ill. June 13, 2008) ........................58

*Farmer v. Ratelle*,
    1997 LEXIS 33623 (9th Cir. Nov. 21, 1997) ..............................96, 111

*Fowler v. Sacramento Cnty. Sheriff's Dep't*,
    421 F.3d 1027 (9th Cir. 2005) ...............................117, 120, 121, 125

*Francis v. Franklin*,
    471 U.S. 307 (1985)......................................................................77

*Greene v. Fisher*,
    132 S. Ct. 38 (2011)....................................................................139

*Harris v. Thompson*,
    698 F.3d 609 (7th Cir 2012) ...................................................... passim

*Holmes v. South Carolina*,
    547 U.S. 319 (2006)................................................................. passim

*House v. Bell*,
    547 U.S. 518 (2006)..........................................................100, 105, 109

*Hurtado v. Tucker*,
    245 F.3d 7 (1st Cir. 2001).................................................................79

*In re Winship*,
    397 U.S. 358 (1970)..........................................................58, 76, 79, 96

*Jackson v. Virginia*,
    443 U.S. 307 (1979)................................................................. passim

*Kentucky v. Olden*,
    488 U.S. 227 (1988)..........................................................105, 106, 113, 120

*Maurer v. Minn. Dep't of Corr.*,
    32 F.3d 1286 (8th Cir. 1994) ...................................................................129, 132

*McLemore v. Bell*,
    503 F. App'x. 398 (6th Cir. 2012) ...................................................................77

*Moffet v. Kolb*,
    930 F.2d 1156 (7th Cir. 1991) .......................................................................128

*Napue v. Illinois*,
    360 U.S. 264 (1959)..........................................................................................117

*O'Laughlin v. O'Brien*,
    568 F.3d 287 (1st Cir. 2009).................................................................... passim

*Old Chief v. United States*,
    519 U.S. 172 (1997)...............................................................................104, 108

*Ortiz v. Yates*,
    704 F.3d 1026 (9th Cir. 2012) ...............................................................123, 124

*Parle v. Runnels*,
    505 F.3d 922 (9th Cir. 2007) .................................................................138, 139

*Payne v. Tennessee*,
    501 U.S. 808 (1991).........................................................................................129

*People v. Bueno*,
    358 Ill. App. 3d 143 (2d Dist. 2005)..............................................................136

*People v. Coleman*,
    187 Ill. App. 3d 541 (4th Dist. 1989).............................................................136

*People v. Cruz*,
    162 Ill. 2d 314 (1994) .............................................................................135, 137

*People v. Flores*,
    128 Ill. 2d 66 (1989) .......................................................................................119

*People v. Morgason*,
    311 Ill. App. 3d 1005 (5th Dist. 2000)...........................................................136

*People v. Rivera*,
    962 N.E.2d 53 (Ill. App. Ct. 2011) ..................................................................94

*People v. Smith*,
    2013 IL App. Ct. (2d) 120508-U .............................................................. passim

*People v. Smith*,
No. 2-03-1076 (Ill. App. Ct. 2005) ("*Kenneth Smith I*") ...........................................6

*People v. Smith*,
No. 2-08-1106 (Ill. App. Ct. 2010) ("*Kenneth Smith II*") ...................................6, 139

*People v. Stephens*,
2013 IL App. Ct. (1st) 1210810-U.....................................................................131

*People v. Swope* (*In re Swope*),
213 Ill. 2d 210 (2004) ................................................................................131

*People v. Trotter*,
254 Ill. App. 3d 514 (1st Dist. 1993) ..............................................................125

*People v. Vinson*,
90 Ill. App. 3d 6 (3d Dist. 1980).....................................................................119

*Perry v. New Hampshire*,
132 S. Ct. 716 (2012)......................................................................................58

*Perry v. Rushen*,
713 F.2d 1447 (9th Cir. 1983) ..........................................................................96

*Porter v. McCollum*,
558 U.S. 30 (2009)..........................................................................................82

*Rakovich v. Wade*,
850 F.2d 1180 (7th Cir. 1988) ......................................................................80, 81

*Ray v. Clements*,
700 F.3d 993 (7th Cir. 2012) ...........................................................................84

*Ruhl v. Hardy*,
743 F.3d 1083 (7th Cir. 2014) ..........................................................................57

*Sandstrom v. Montana*,
442 U.S. 510 (1979).........................................................................................77

*Smith v. Sec'y of N.M. Dep't of Corr.*,
50 F.3d 801 (10th Cir. 1995) ..........................................................................103

*Taylor v. Kentucky*,
436 U.S. (1978)......................................................................................140, 144

*Thomas v. Chappell*,
678 F.3d 1086 (9th Cir. 2012) ...............................................................94, 95, 96

*Thomas v. Hubbard*,
    273 F.3d 1164 (9th Cir. 2001) ................................................................... passim

*Thompson v. Louisville*,
    362 U.S. 199 (1960) ........................................................................................58

*Ticey v. Peters*,
    8 F.3d 498 (7th Cir. 1993) ......................................................60, 61, 62, 65

*United States ex rel. Newman v. Rednour*,
    917 F. Supp. 2d 765 (N.D. Ill. 2012) ......................................................57

*United States v. Bahe*,
    40 F. Supp. 2d 1302 (D.N.M. 1998) ...................................................... passim

*United States v. Baker*,
    40 F.3d 154 (7th Cir. 1994) .......................................................................80

*United States v. Benabe*,
    436 F. App'x. 639 (7th Cir. 2011) ..........................................................141

*United States v. Blount*,
    953 F.2d 688 ..................................................................................................77

*United States v. Bohle*,
    445 F.2d 54 (7th Cir. 1971) .....................................................................117

*United States v. Burks*,
    547 F.2d 968 (6th Cir. 1977) ....................................................................81

*United States v. Green*,
    648 F.2d 587 (9th Cir. 1981) ..................................................................138

*United States v. Hunt*,
    278 F. App'x. 491 (6th Cir. 2008) ...........................................................77

*United States v. Lamon*,
    930 F.2d 1183 (7th Cir. 1991) ..................................................................58

*United States v. Long*,
    748 F.3d 322 (7th Cir. 2014) ....................................................................80

*United States v. Orrico*,
    599 F.2d 113 (6th Cir. 1979) ..............................................................62, 72

*United States v. Scheffer*,
    523 U.S. 303 (1998) .......................................................................................99

*United States v. Spellissy*,
   2006 WL 1980274 (M.D. Fla. July 12, 2006) ........................................................64

*United States v. Valenzuela-Bernal*,
   458 U.S. 858 (1982) ...........................................................................................98, 99

*United States v. Yakou*,
   428 F.3d 241 (D.C. Cir. 2005) ................................................................................77

*Washington v. Smith*,
   48 F. Supp. 2d 1149 (E.D. Wis. 1999) ......................................102, 109, 110, 115

*Watkins v. Miller*,
   92 F. Supp. 2d 824 (S.D. Ind. 2000) ............................................................. passim

*Wiggins v. Smith*,
   539 U.S. 510 (2003) ...........................................................................................81, 126

*Williams v. Taylor*,
   529 U.S. 362 (2000) .............................................................................................57, 60

## STATUTES

720 ILCS 5/32-2 .............................................................................................................67

725 ILCS 5/115-10.1 ............................................................................................. passim

28 U.S.C. § 2243 ...........................................................................................57, 101, 129

28 U.S.C. § 2254(d) .............................................................................................. passim

## OTHER AUTHORITIES

Keith A. Findley, *Judicial Gatekeeping of Suspect Evidence: Due Process and
   Evidentiary Rules in the Age of Innocence*, 47 Ga. L. Rev. 723, 751-52 (2013) ....................64

S. Comm. on the Judiciary, S. Rep. No. 93-1277, 93rd Cong., 2d Sess. (1974), *reprinted
   in* U.S. Code Cong. & Admin News (1974) .....................................................63, 64

Stanley Goldman, *Guilt by Intuition: The Insufficiency of Prior Inconsistent Statements to
   Convict*, 65 N.C. L. Rev. 1, 2 (1986) .............................................................63, 72

Wright & Gould, Federal Practice & Procedure: Evidence 2d § 6027 (2007) ...........................125

## I.    INTRODUCTION.

1.    This Petition presents the Court with an opportunity – and a duty – to right a grave injustice.  Petitioner Kenneth Smith is innocent of the charges against him; he is the "wrong guy."  And the process used to convict him inexplicably fell grievously short of the requirements under the United States Constitution.  That process was fundamentally defective because it permitted – and then affirmed – a conviction in the absence of *any* constitutionally reliable evidence.  It was also defective because it unjustifiably kept from the jury several crucial items of competent, reliable, and highly relevant evidence that directly supported the core of one of Petitioner's defenses – namely, that someone else committed the crime charged – and undoubtedly would have influenced the jury, which deliberated for more than 21 hours over the course of three days at Petitioner's Third Trial.  Petitioner recognizes that, as a practical matter, federal *habeas* relief from a State court conviction may be rare.  But Petitioner's conviction is that rare case that requires the Court to act.

2.    Petitioner's conviction arises out of an incident that occurred on March 6, 2001.  That day, two masked men attempted to rob the Burrito Express restaurant in McHenry, Illinois and one of them shot and killed its owner, Raul Briseno.  (*See, e.g.*, Ex. 22 at R. 6099-100, 6123-24, 6189.)  The State's theory is that Petitioner, carrying a .22-caliber handgun, and his purported accomplice Justin Houghtaling, went into the Burrito Express wearing ski masks with the intention of robbing it.  (Ex. 21 at R. 5756.)  The State contends that purported accomplice David Collett waited outside, and another purported accomplice, Jennifer McMullan, was the driver of the getaway car.  (*Id.*)  During the attempted robbery, Briseno pulled a knife and, along with his employee Eduardo Pardo, chased the two masked men, one of whom was wearing a green jacket, out of the restaurant.  (Ex. 21 at R. 5756-57.)  The State asserts Pardo caught Houghtaling after he slipped on a patch of ice and dragged him back toward the Burrito Express.  (Ex. 21 at

1

R. 5757.)  The State asserts Petitioner then started shooting, ultimately hitting Briseno, who died. The two masked men fled.  (*Id*.)

3.      Petitioner, however, presented extensive and compelling evidence that three completely different people – Russell "Rusty" Levand, his then girlfriend Susanne "Dallas" DeCicco, and her cousin Adam Hiland (collectively, the "DeCicco Group") – committed the crime.  Members of the DeCicco Group confessed repeatedly to their relatives, friends, and even on videotape to the police.  Their confessions included non-public details of the crime that were not known by Mr. Smith or any of his alleged accomplices.  (Ex. 169, Def. Ex. 51; Ex. 170, Def. Ex. 52; Ex. 25 at R. 6774-75, 6692-95, 6706, 6708-09, 6722-23, 6755, 6751-53, 6779-82, 6760-61, 6732-33, 6742-43; Ex. 24 at R. 6654-55.)  There was physical and circumstantial evidence implicating the DeCicco Group, including the only gun ever recovered – a gun that belonged to the DeCicco Group (known as the "Brummett gun"), which could not be excluded as the murder weapon.  (Ex. 25 at R. 6827-28; Ex. 156, Def. Ex. 39; Ex. 160, Def. Ex. 42; Ex. 164, Def. Ex. 45.)  There was testimony that Hiland had physical injuries consistent with the struggle he told friends and family he had with Briseno during the attempted robbery (Ex. 25 at R. 6718-19, 6752, 6758-59, 6776), and there was evidence that DeCicco's car was found destroyed under suspicious circumstances shortly after the crime, consistent with DeCicco's confession to police. (Ex. 25 at R. 6685-86; Ex. 151, Def. Ex. 34.)  The evidence presented by Petitioner showed that Levand was the shooter, Hiland was the accomplice wearing the green jacket who struggled with Briseno, and DeCicco was the driver of the getaway car.

4.      Petitioner appeals from a murder conviction obtained after a third trial on these charges during which not a single person took the stand and offered sworn testimony that Petitioner was involved in any way.  At his Third Trial:

2

- There was no incriminating statement by Petitioner.

- There was no physical evidence connecting Petitioner to the crime: no gun, no fingerprints, no DNA, no blood.

- There was no eyewitness testimony that Petitioner was involved, not even from the surviving eyewitness whose view was good enough to produce reliable sketches of the perpetrators.

- There was no live sworn testimony from any purported accomplice of Petitioner that he was involved in Briseno's death.

- Petitioner presented substantial evidence that the DeCicco Group (a group with which he had no connection) repeatedly confessed to the killing in statements that (i) included details intentionally kept from the public and not reflected in Houghtaling's statements, and (ii) were corroborated by each other and substantial physical evidence.

- The *only* evidence even putatively implicating Petitioner was the prior inconsistent statements of purported accomplice Justin Houghtaling, admitted as substantive evidence under 725 Ill. Comp. Stat. 5/115-10.1, but adamantly recanted again on the stand by Houghtaling despite the risk of additional perjury charges.[1]

Inexplicably, after deliberating for more than two and a half days, the jury convicted.

5. Numerous clear and highly prejudicial constitutional errors infected Petitioner's Third Trial and appeal, requiring *habeas* relief here. *First*, the evidence at trial failed to prove his guilt beyond a reasonable doubt. The Appellate Court erroneously held that once

---

[1] Following Petitioner's Second Trial, the State prosecuted and convicted Houghtaling of perjury based on his testimony at that trial.

3

Houghtaling's prior inconsistent statements satisfied the Illinois statutory requirements for *admission* of hearsay, the Court was prohibited from performing its own assessment of the reliability of those statements, even though that assessment is constitutionally required by *Jackson v. Virginia*, 443 U.S. 307 (1979). The Appellate Court also ran directly contrary to *Jackson* in holding that Petitioner's evidence against the DeCicco Group did not entitle him to acquittal unless it "overwhelmed" the State's case; instead, the only issue is whether the evidence created a reasonable doubt on the entire record. (*See* Part VI.)

6. *Second*, Petitioner was denied his constitutional right to present a complete defense under the Sixth and Fourteenth Amendments. The trial court improperly excluded reliable, competent, and relevant evidence tending to show that the DeCicco Group – and therefore not Petitioner – committed the crime charged: (1) the DeCicco Group knew that Briseno was selling drugs out of the Burrito Express, and therefore had a motive for targeting the restaurant on the night at issue after they ran out of drugs and were looking to obtain more; and (2) a member of the DeCicco Group, Adam Hiland, consulted with and confessed to a criminal defense attorney, who advised Hiland not to turn himself in. (Part VII.A.) The trial court also improperly excluded reliable, competent, and relevant evidence casting doubt on evidence the State offered. (Part VII.B.)

7. *Third*, the cumulative effect of these errors, and others, deprived Petitioner of a fair trial. (Part VIII.)

## II.    THE PARTIES.

8. Petitioner Kenneth Smith, now 38 years old, is confined in Stateville Correctional Center pursuant to a conviction of two counts of first degree murder and one count of attempted armed robbery. Petitioner has been incarcerated since he was 25 years old. Petitioner was sentenced to 67 years imprisonment for first degree murder and a concurrent 7 years

imprisonment for attempted armed robbery; Petitioner obtained his GED while working in the Department of Corrections.

9.      Respondent Tarry Williams is Warden of Stateville Correctional Center, the IDOC facility where Petitioner is presently incarcerated.

## III.    PROCEDURAL HISTORY.

10.      In May 2001, the police arrested Petitioner, Houghtaling, McMullan, and Collett in connection with the Burrito Express shooting after receiving a tip that McMullan might have information about the shooting.  (Ex. 2 at C. 23; Ex. 8 at R. 1006; Ex. 9 at R. 1414; Ex. 24 at R. 6576.)  Collett, who has always denied involvement, was arrested shortly after McMullan in McHenry County in May 2001 (Ex. 9 at R. 1414); Houghtaling was pulled off a bus in Omaha, Nebraska on May 12, 2001, interrogated by police while he was high on drugs, and eventually arrested.  (Ex. 21 at R. 5967-70, 5989-90.)  Houghtaling initially denied involvement in the Burrito Express shooting, but implicated himself and Petitioner after the police falsely told him that Petitioner, Collett, and McMullan had all given incriminatory statements to police.  (Ex. 21 at R. 5967-68, 5990-93; Ex. 23 at 6371-74.)  Petitioner was arrested later that day and has always maintained his innocence.  (*See, e.g.*, Ex. 12 at R. 2950.)

11.      On November 14, 2001, Houghtaling pled guilty and was sentenced to 20 years after agreeing to cooperate with the State.  (Ex. 21 at R. 5999-6000.)  Collett also pled guilty to avoid the possibility of a lengthy prison term and was sentenced to 5 years.  (Ex. 23 at R. 6447-48.)  McMullan was tried and convicted in April 2002 based on Houghtaling's testimony at her trial.

12.      Petitioner was indicted on May 31, 2001 (Ex. 3 at C. 31) and tried in June 2003 (the "First Trial").  Houghtaling refused to testify at the First Trial, but the trial court permitted the State to read Houghtaling's testimony from McMullan's trial into the record and Petitioner

was convicted. (Ex. 9 at R. 1378-80; Ex. 11 at R. 1751-1816.) The Appellate Court vacated the conviction and remanded for a new trial because the introduction of Houghtaling's prior testimony violated the Confrontation Clause. *People v. Kenneth Smith*, No. 2-03-1076, at 8-9 (Ill. App. Ct. 2005) (unpublished Rule 23 Order) ("*Kenneth Smith I*").

13.     In August 2008, the State tried Petitioner again (the "Second Trial"). Houghtaling testified on direct that he and Petitioner robbed the Burrito Express on the night at issue, that Houghtaling was the man in the green jacket, and that Petitioner was the man with the gun. (Ex. 13 at R. 3457-72.) On cross-examination, however, Houghtaling immediately and without prompting recanted all of his direct testimony, testifying that he was "forc[ed] . . . to lie . . . [b]ecause [the State] want[s] to convict Kenny Smith for a crime he didn't commit, none of us committed." (Ex. 13 at R. 3474-75.) On re-direct, the State impeached Houghtaling with his May 12, 2001 statement to police in Omaha. (Ex. 13 at R. 3496-520, 3524-45.)

14.     At the Second Trial, Petitioner called DeCicco and Hiland who denied their involvement in the Burrito Express shooting, but when Petitioner sought to introduce their prior confessions (Ex. 15 at R. 4363-4402; Ex. 16 at R. 4473-85), the trial court barred Hiland's confessions entirely and only permitted piecemeal portions of DeCicco's confessions. (Ex. 15 at R. 4365, 4370-83.) The Appellate Court again reversed, holding, among other things, that the trial court should have admitted the confessions to impeach Hiland. (Ex. 174, *People v. Smith*, No. 2-08-1106, at 60-64 (Ill. App. Ct. 2010) (Unpublished Rule 23 Order) ("*Kenneth Smith II*").

15.     The Appellate Court remanded for a third trial, which occurred in February 2012 and is the subject of this *habeas* petition.

## IV.     STATEMENT OF FACTS.

### A.     The Pre-Trial Proceedings.

#### 1.     The Trial Court Excludes Significant Evidence Tending To Show The DeCicco Group Had A Motive To Target The Burrito Express On The Night At Issue.

16.     Before trial, Petitioner sought to admit evidence showing that Briseno sold cocaine from his restaurants, including the Burrito Express, and that Levand (a member of the DeCicco Group) learned of Briseno's drug-dealing at the Burrito Express a week prior to the attempted robbery when he participated in a drug deal with Briseno.  Petitioner argued that this evidence went to the DeCicco Group's motive for targeting the Burrito Express on the night at issue, but the trial court excluded the evidence.  Petitioner thereafter made the following live proffers.

### a.     Patrick Anderson Proffer.

17.     Patrick Anderson would have testified that in 2001, he knew Briseno well (Ex. 19 at R. 5252-53) and purchased cocaine from Briseno through a man named "Serge," who worked in Briseno's restaurants.  (Ex. 19 at R. 5253-55.)  Anderson, who was also friends with Levand, sold the cocaine he purchased from Briseno to Levand.  (Ex. 19 at R. 5255.)  Approximately a week before the Burrito Express shooting, Levand accompanied Anderson to the Burrito Express to purchase drugs.  (Ex. 19 at R. 5255-56.)  Anderson and Levand arrived at the Burrito Express, but Serge told them to wait.  (Ex. 19 at R. 5253-54.)  While they were waiting in the parking lot, Anderson told Levand that Briseno kept high quality cocaine and sums of cash at the restaurant.  (Ex. 19 at R. 5256.)  A few minutes later, Briseno arrived at the restaurant, went inside to speak with Serge, and immediately thereafter, Serge came back out and sold the drugs to Anderson.  (Ex. 19 at R. 5254-55.)

18.     As set forth below in Part III.A.1, Anderson testified at trial that Levand confessed to him in the summer of 2011.  However, the trial court prohibited Anderson from testifying about why he did not tell anyone sooner about Levand's confession and his actions the week before the attempted robbery.  In his proffer, Anderson explained that he would have testified that he did not come forward with this information earlier because Levand did not confess to him until the summer of 2011, while they were both at the McHenry County jail. (Ex. 19 at R. 5256-58.)  Anderson had once been wrongly accused of a crime and he thought that if someone had information to help him, he would have wanted that person to come forward. (*Id.*)  Anderson first tried to provide the information to authorities, but when that proved fruitless, he sent a letter to Petitioner's counsel.  (Ex. 19 at R. 5258-59.)

19.     The trial court held that Anderson's testimony was hearsay and "highly suspect" because Anderson came forward by writing a letter to defense counsel "ten years after the fact," and "clearly does not establish a motive for the DeCicco Group to commit a robbery" because "[t]here is no close connection to the drugs and to this crime for which the defendant is on trial." (Ex. 17 at R. 5215-16.)

### b.      Officer Guillermo Quinones Proffer.

20.     Officer Quinones would have testified that in 2000, he was an undercover operative employed by the Metropolitan Enforcement Group in Lake County, Illinois.  (Ex. 18 at R. 5233-34.)  As part of an undercover drug investigation, Quinones made multiple visits to a restaurant owned by Briseno in August and September 2000, less than six months before the Burrito Express shooting.  (Ex. 18 at R. 5236-41.)  Quinones was tasked with meeting Briseno and purchasing drugs from him.  (Ex. 18 at R. 5239.)  On one occasion, Quinones spoke with Briseno about Briseno's cocaine business and Briseno offered to sell cocaine to Quinones. (Ex. 18 at R. 5239-40.)  Quinones then purchased drugs from Briseno and his associate, Sergio

Salinas. (Ex. 18 at R. 5240.) The trial court excluded Quinones's proffered testimony finding that it did not have a close enough connection with the crime. (*See* Ex. 17 at R. 5215-16.)

### c. Detective Richard Solarz Proffer.

21. Detective Solarz would have testified that he conducted a search of the Burrito Express on March 7, 2001 as a K-9 handler and used a narcotic-sniffing dog. (Ex. 18 at R. 5228-31.) During the search, the dog indicated the possible detection of narcotics inside the restaurant in a desk drawer and a cabinet. (Ex. 18 at R. 5230-32, 5234-36.) As with Quinones, the trial court excluded Solarz's proffered testimony finding that Briseno's drug dealing did not have a close enough connection with the crime. (*See* Ex. 17 at R. 5215-16.)

### 2. The Trial Court Refuses To Exclude The Testimony Of Petitioner's Alleged Accomplices, Who The State Called Solely To Introduce Their Recanted, Out-Of-Court Statements Implicating Petitioner.

22. Petitioner also sought to exclude testimony of his alleged accomplices, Houghtaling and Collett, because the State planned to call them solely to introduce their out-of-court statements implicating Petitioner. (Ex. 17 at R. 5199-5200, 5202-07.) The State knew both would deny their involvement, would not support the State's case, and would not implicate Petitioner. (Ex. 13 at R. 3474-75; Ex. 14 at R. 4120-21.) The trial court overruled Petitioner's objections. (Ex. 17 at R. 5207.) Petitioner renewed his objection before Houghtaling testified on the ground that his counsel spoke with Houghtaling, who confirmed he would deny involvement, but the court again overruled the objection. (Ex. 21 at R. 5862.)

### B. The Trial: The State's Theory Of The Case.

### 1. Two Masked Men Enter The Burrito Express On March 6, 2001 In An Apparent Attempted Robbery, Resulting In Briseno's Death.

23. Eduardo Pardo testified he was a cook at the Burrito Express on March 6, 2001. (Ex. 22 at R. 6097.) Around 7:15 P.M., Pardo and Briseno were alone in the back of the

restaurant when two masked men entered, walked right past the cash register, and barged through the kitchen door. (Ex. 22 at R. 6099-6100, 6143.) The taller masked man pointed a gun and spoke, but Pardo, who speaks very little English, did not understand him. (Ex. 22 at R. 6102-04.)

24.     Briseno brandished a knife and chased the two masked men out of the restaurant. (Ex. 22 at R. 6104-05.) Pardo followed, and the chase went into the parking lot and across the street. (Ex. 22 at R. 6106, 6151.) The two masked men ran directly across Third Street and out of sight behind the house on the corner of Third Street and Waukegan Avenue. (Ex. 22 at R. 6151.) Pardo observed Briseno stop to say something to a person in a passing car. (*Id.*) The shorter of the two masked men, described by Pardo as wearing a green jacket, slipped on a patch of ice and fell.[2] (Ex. 22 at R. 6111-12.) Pardo removed the mask of the man without the gun, grabbed him from behind, called to Briseno, and dragged him back toward the restaurant. (Ex. 22 at R. 6114-15, 6126-27.) Pardo got a good look at the man's face at that time and was able to see all of his facial features. (Ex. 22 at R. 6155-56.) Briseno rejoined Pardo, as the man with the gun removed his own mask and began to fire shots. (Ex. 22 at R. 6117-18, 6128.) Briseno directed Pardo to bring the man without the gun back to the restaurant and call the police. (Ex. 22 at R. 6118-19.)

25.     As the man with the gun continued to shoot, Briseno cried out and spit up blood. (Ex. 22 at R. 6121- 23.) Pardo released the man without the gun and ran into the restaurant to call the police, who arrived on the scene within minutes. (Ex. 22 at R. 6124, 6128-29.) From inside, Pardo observed Briseno holding the man without the gun, using him as a shield. (Ex. 22

---

[2] During his May 2001 interrogation, Houghtaling said nothing about falling when he was being chased. (Ex. 137, Def. Ex. 20, at 5.) It was not until the 2008 trial, after Pardo's testimony on the matter was known, that Houghtaling said he slipped on ice. (Ex. 21 at R. 5872.) On the other hand, Hiland initially told his sister Charlene McCauley that he slipped on some icy stairs at DeCicco's dad's house (*i.e.*, Ben DeCicco). (Ex. 25 at R. 6758-59.) Later, however, he confessed that he had been injured in the Burrito Express shooting. (Ex. 25 at R. 6761-62; Ex. 26 at R. 6983.)

at R. 6132.)  When Pardo came outside, Briseno lay on the ground, and the two men had fled. (Ex. 22 at R. 6149-50.)  Pardo never saw a third man.  (Ex. 22 at R. 6150-51.)

26.     That night, Pardo met with a police sketch artist and provided a description of the two men.  (Ex. 22 at R. 6135-37.)  The sketch artist, Nora Rubel, testified that she met with Pardo and a translator for over four hours as Pardo described the two men and suggested changes to her sketches.  (Ex. 22 at R. 6053-54.)  Both of the sketches showed clean-shaven, young males.  (Ex. 22 at R. 6161, 6163.)

27.     At trial, the State showed Pardo the green jacket the police recovered from Houghtaling's home the day he was arrested.  (Ex. 22 at R. 6076-77; Ex. 96, People's Ex. 66.) The State asked Pardo if the coat "look[ed] *like* the green jacket that you saw that night." (Ex. 22 at R. 6140 (emphasis added).)  Pardo replied that it did.  (*Id.*)  On cross-examination, Pardo did not recall telling the police on the night of the shooting that the green jacket worn by the man without the gun had black "just around the collar area," no pockets, and no "zipper going up the front of the jacket."  (Ex. 22 at R. 6152-54.)  Because these details were inconsistent with the coat recovered from Houghtaling, which did not have black around the collar, had visible pockets, and had a zipper, Petitioner called Officer Jeff Rhode, the officer who took Pardo's statement on the night at issue, to impeach Pardo.  (Ex. 24 at R. 6582-84.)  When counsel asked about Pardo's description of the jacket, the State objected.  (Ex. 24 at R. 6587-89.) The court sustained the objection, preventing Petitioner's counsel from completing the impeachment.  (*Id.*)

28.     To this day, Pardo has never identified Petitioner or any of his alleged accomplices as the men who attempted to rob the Burrito Express.  (*See, e.g.*, Ex. 22 at R. 6162.) Indeed, when Officer Michael Brichetto of the City of Crystal Lake met with Pardo on March 8,

2001 – just two days after the shooting – and showed Pardo photographs of Petitioner, Houghtaling, and Collett, Pardo was unable to identify them. (Ex. 24 at R. 6597-601.)

### 2. Police Arrive Within Minutes And Discover A "Bloody" Crime Scene.

29. Patrol Sergeant Kevin Cox arrived at the scene less than a minute after he received the call and prior to the arrival of the paramedics; he saw no one fleeing the scene. (Ex. 21 at R. 5797.) Cox observed Briseno, silent and unmoving, lying in "a large pool of blood" near the restaurant and observed blood "all over the scene." (Ex. 21 at R. 5797, 5809-12; *see also* Ex. 36, People's Ex. 6; Ex. 37, People's Ex. 7.) In fact, there was "so much blood" from Briseno's "open wounds" that Cox did not believe CPR was necessary. (Ex. 21 at R. 5798.) David Harwood, a firefighter and paramedic, arrived a few minutes later. (Ex. 21 at R. 5805-06.) Harwood moved Briseno into the ambulance, where he administered CPR. (Ex. 21 at R. 5809-10.) Harwood described the "copious amounts of blood" in Briseno's mouth, airway, and flowing out of the single gunshot wound near Briseno's left armpit. (Ex. 21 at R. 5811-13.)

### 3. Police Go Over The Crime Scene With "A Fine Tooth Comb," But Find No Evidence Linking Petitioner Or His Alleged Accomplices To The Crime Charged.

30. City of McHenry Police Lieutenant Gary Wigman – who had hundreds of hours of police training, including special training in crime scene investigations and firearms – arrived at the Burrito Express at 7:35 P.M. on March 6, 2001; the crime scene and a large area surrounding the Burrito Express already had been secured and numerous officers were present. (Ex. 22 at R. 6208-12.) The scene remained secured for two and a half days. (Ex. 22 at R. 6223.)

31. Wigman called in the McHenry County Major Crimes Task Force ("MIAT") and personally took charge of the crime scene, working alongside Trooper Patrick Phillips from MIAT. (Ex. 22 at R. 6217-19.) Officers went over the crime scene with "a fine tooth comb,"

using metal detectors to search for weapons or bullet casings and powerful magnets to dredge the nearby creek.  (Ex. 22 at R. 6219-20, 6277-78.)  A canine unit was present, and officers were "on their hands and knees" looking for any shred of evidence.  (Ex. 22 at R. 6220.)  Wigman and his team secured the interior of the Burrito Express and investigators searched for prints throughout the restaurant.  (Ex. 22 at R. 6243-45.)

32.     Wigman explained that there are two broad categories of handguns:  automatics and revolvers.  An automatic ejects bullet casings after firing, and a revolver does not.  (Ex. 23 at R. 6282-83.)  The police used metal detectors and magnets to search for the murder weapon, or at least learn more about it; they found no casings in the vicinity of the Burrito Express, indicating that a revolver was used.  (Ex. 23 at R. 6283-85.)  This was confirmed in March 2001 by firearms expert Joanne McIntyre, who examined the bullet recovered from Briseno's body and identified it as a .22 caliber revolver.  (Ex. 22 at R. 6177-78; Ex. 25 at R. 6793.)  The police never recovered any potential murder weapon linked in any way to Petitioner or any of his alleged accomplices.  (Ex. 23 at R. 6284.)  They did, however, recover a .22 caliber revolver (the "Brummett gun") from the home of DeCicco's mother, Vicki Brummett, who had called the police with information relating to the Burrito Express shooting in November 2001,[3] that matched the characteristics of the gun used in the Burrito Express shooting.  (Ex. 156, Def. Ex. 39; Ex. 159, Def. Ex. 42; Ex. 26 at R. 6894-99.)

33.     On cross-examination, Wigman admitted that none of the physical evidence gathered was connected in any way to Petitioner or any of his purported accomplices.  (Ex. 23 at R. 6299-300.)   Wigman reviewed the evidence retrieved during the initial investigation,

---

[3] As explained in Part IV.C., below, all of the members of the DeCicco Group were living at the nearby Brummett house on the night at issue.  Brummett called the police after DeCicco told her that the Brummett gun was the gun used in the Burrito Express shooting.  (Ex. 25 at R. 6723-24.)

including: latent fingerprints taken from the crime scene; various objects found in the parking lot, including the butcher knife, a pop can, and a cigarette butt; the entire kitchen door and the door from another nearby business; numerous swabs from pools of blood in the parking lot; two cars from the parking lot; a photo of a latent shoe impression from inside the restaurant; and a metal fragment removed from a brick wall at the scene. (Ex. 23 at R. 6285-88.) Everything was processed and examined for fingerprints and DNA and compared with standards obtained from Petitioner, Houghtaling, and Collett, but nothing connected any of them in any way to the crime. (Ex. 23 at R. 6288-96, 6299-300.)

34.     Mary Beth Thomas, a forensic scientist with the Illinois State Police specializing in latent fingerprint examination, lifted latent fingerprints from the Burrito Express door and a set of door knobs and compared them to standards provided by Petitioner, Houghtaling, Collett, and McMullan, but nothing matched. (Ex. 22 at R. 6078, 6086-87, 6090-92.)

35.     Patrick Powers (called by Petitioner), a forensic scientist with the Illinois State Police Crime Lab, received four footwear impressions taken from the crime scene, as well as shoes from Petitioner, Houghtaling and Collett. (Ex. 24 at R. 6519-22.) He performed a comparison, but nothing matched. (Ex. 24 at R. 6521-26.)

36.     James Bald (called by Petitioner), a forensic scientist with the Illinois State Police Crime Lab, testified about several items of evidence from the investigation, including a cigarette butt and various blood stains taken from the crime scene. (Ex. 24 at R. 6551-52.) Bald compared the DNA from the evidence to standards from Petitioner, Houghtaling, Collett, and McMullan, but nothing matched. (Ex. 24 at R. 6554-64.)

37.     Dr. Larry Blum performed Briseno's autopsy on March 7, 2001. (Ex. 22 at R. 6183.) Blum removed the bullet from Briseno's body (Ex. 22 at R. 6188-89), and observed a

laceration on Briseno's head caused by contact with a blunt object; Blum testified the injury was consistent with being pistol-whipped. (Ex. 22 at R. 6184-86, 6192-93.) Later, Officer Patrick Phillips and Officer Gary Wigman reviewed the evidence collected at the autopsy. (Ex. 21 at R. 5841-42; Ex. 22 at R. 6296-97.)

### 4. Police Elicit A "Confession," Implicating Petitioner, From Justin Houghtaling, Who Later Recants Entirely.

38. Over Petitioner's objection, the State called Houghtaling, who denied involvement in the Burrito Express shooting. The State asked Houghtaling what time he, Petitioner, Collett, and McMullan went to the Burrito Express on March 6, 2001; Houghtaling replied that they did not go to the Burrito Express on March 6, 2001. (Ex. 21 at R. 5867-69.)

39. Houghtaling testified that he had known Petitioner for only about three weeks on the night at issue, as Petitioner was dating McMullan, who lived across the street from Houghtaling. (Ex. 21 at R. 5864, 5866, 5976-77.) Around 6:30 P.M. on March 6, 2001, McMullan and Petitioner picked up Houghtaling from his house and McMullan drove the group to pick up Collett. The group then drove to Cally Brown's house just over the Wisconsin border so McMullan could borrow a laptop computer from Brown. (Ex. 21 at R. 5865-66, 5977.) The drive was approximately 45 minutes each way and they stayed at Brown's house for between 10 and 20 minutes. (Ex. 21 at R. 5977-79.) McMullan then drove the group back to McHenry, Illinois. They stopped at Cloud 9, a "head shop" (a shop selling smoking and drug use supplies) located down the street from the Burrito Express, and then went to Weisenberger's house, located just behind the Burrito Express. (Ex. 21 at R. 5866-68, 5980-82; Ex. 23 at R. 6412.) They stayed at Weisenberger's house all night; in the morning, McMullan and Houghtaling dropped Collett off before going home. (Ex. 21 at R. 5983-84.)

40.     In response to the State's questioning, Houghtaling admitted he pled guilty to first degree murder and was sentenced to 20 years in connection with the Burrito Express shooting. (Ex. 21 at R. 5867.)  Over Petitioner's objection, the State was permitted to substantively admit Houghtaling's prior inconsistent statements under 725 ILCS 5/115-10.1.  As described below, the State introduced evidence, including the entire audio recording of Houghtaling's statement to police during his May 12, 2001 interrogation, and Houghtaling's April 3, 2002 and August 8, 2008 testimony.

41.     **Houghtaling's May 12, 2001 Interrogation:**  McHenry Police Department Detective Sergeant William Brogan and Detective Jones, also from McHenry, pulled Houghtaling (who testified that he was high on hallucinogenic drugs at the time) off a bus in Omaha, Nebraska and interrogated him in the Omaha Police Department for approximately forty-five minutes.  (Ex. 21 at R. 5966-69, 5990-91.)  In the first fifteen minutes of the conversation, which officers failed to record, Houghtaling denied involvement in the Burrito Express shooting, but after the officers told him (falsely, it turned out) that his three friends – Petitioner, McMullan, and Collett – had been charged and were giving statements to police,[4] and that the police would help Houghtaling if he confessed, Houghtaling changed his story. (Ex. 21 at R. 5969, 5991-92.)  Brogan confirmed that Houghtaling initially denied any knowledge of the Burrito Express shooting and that Houghtaling changed his story after Brogan falsely told him that Petitioner, McMullan, and Collett had made statements to police.  (Ex. 23 at

---

[4] McHenry Police Department Detective John Jones testified that on May 12, 2001, he spoke with Petitioner and who he was with – two months earlier – on the night of March 6.  (Ex. 23 at R. 6337-38.) Petitioner said he was with Collett and McMullan.  (Ex. 23 at R. 6338.)  Asked whether he was also with Houghtaling, Petitioner stated he did not know Houghtaling.  (*Id.*)  However, Jeff Rhode testified that he interviewed Petitioner on March 7, 2001, the day after the shooting and when asked who he was with the night before, Petitioner said, "Jennifer, Justin, and Dave."  (Ex. 24 at R. 6590-91.)

16

R. 6371-74.) After Houghtaling changed his story, the officers turned on the tape and recorded the remainder of the interrogation. (Ex. 21 at R. 5992-95; Ex. 138, Def. Ex. 21.)

42.     Houghtaling told Brogan and Jones that he, Petitioner, McMullan, and Collett were at "this house behind the Burrito Express" and "Ken came up to me. It was like come with me, I want to go do something." (Ex. 137, Def. Ex. 20, at 1.) Jones, however, suggested that Houghtaling and Petitioner first discussed the robbery in McMullan's car on the way to McHenry, and Houghtaling agreed. (Ex. 137, Def. Ex. 20, at 10.) When Houghtaling was unsure about what happened when he and Petitioner allegedly entered the Burrito Express, Jones again helped him:

> Q.     OK, and who was in the restaurant when you guys went in?
>
> A.     Some dude behind the counter and a few other people, nah, I I [*sic*] can't remember.
>
> Q.     Can't remember how many people were in the restaurant? OK what happened then?
>
> A.     Ken walked up and went like I want money.
>
> Q.     OK, what happened after that?
>
> A.     Then, the owner or the dude guy on the counter grabbed a knife and I ran.

(Ex. 137, Def. Ex. 20, at 3.) Houghtaling was unsure about the size of the knife involved, describing it as not "little but it was not huge like a regular filet knife or something" but investigators knew at the time that the knife involved was a "large butcher knife." (Ex. 137, Def. Ex. 20, at 4; Ex. 21 at R. 5781.)

43.     Jones asked if anyone other than the "owner with the knife" chased them from the restaurant, and Houghtaling replied, "not that I know of." (Ex. 137, Def. Ex. 20, at 4.) Jones then suggested, "there was another guy holding [Houghtaling] and another guy with a knife," and

Houghtaling agreed, "That could be, I can't, it happened so long ago that I don't remember. I'm not a hundred per cent [sic] positive, but it could be." (Ex. 137, Def. Ex. 20, at 6.) Houghtaling, however, could not describe how he was grabbed. (Ex. 137, Def. Ex. 20, 5-6.) Houghtaling also agreed with Jones' suggestion that Houghtaling heard gunfire and saw "the man with the knife" fall, but could not say where he fell. (*Id.*) Instead, Houghtaling said that after he heard the gunfire, "the dude let go of me and I ran. I was scared." (Ex. 137, Def. Ex. 20, at 5) But this was contrary to Pardo's description of the events: "[Briseno] had the person that I was previously holding that I let go onto the ground. He was holding him in front of him kind of like a shield, and he was moving him around while the other person kept shooting." (Ex. 22 at R. 6132.)

44. During the Omaha interview, Houghtaling also said he ran back to Weisenberger's house, indicating that they "met backup at the house. Then we left." (Ex. 137, Def. Ex. 20, at 6.) Jones suggested that they instead got in McMullan's car and drove to a head shop called Cloud 9, and Houghtaling agreed: "Now that I think about it, yes." (Ex. 137, Def. Ex. 20, at 7.) Houghtaling told police that neither he nor Petitioner ever spoke to Collett and McMullan about what happened. (Ex. 137, Def. Ex. 20, at 14.) One of the only things that Houghtaling "got right" about the events at issue is that Collett was the only person to enter Cloud 9 (which he would of course know if he was with Collett even if they had no connection to the shooting). (Ex. 137, Def. Ex. 20, at 7.)

45. The police asked several questions about the gun used. Houghtaling did not know where the gun went after the shooting and was unsure about the characteristics of the gun. (Ex. 137, Def. Ex. 20, at 9.) At first, Houghtaling told police the gun "looked like a little .22." (Ex. 137, Def. Ex. 20, at 3.) Later, when the police asked whether the gun was a revolver or an

automatic, Houghtaling offered that it was a revolver, but could not explain the difference between the two, and could not say whether the gun had a wheel (like a revolver) or a clip (like an automatic). (*Id.* at 18-19.) Brogan made drawings of the two types of guns (Ex. 134, Def. Ex. 17) and asked Houghtaling to pick the gun used in the shooting. Houghtaling chose the drawing of the automatic. (Ex. 23 at R. 6393-94.)

46. At trial, Brogan admitted that much of Houghtaling's May 12 statement was first suggested through the use of leading questions asked by Detective Jones. (Ex. 23 at R. 6385-87.) He admitted that confessions are more reliable if the suspect supplies details on his own, and that the more the investigator uses leading questions to supply detail, the less reliable the confession is. (Ex. 23 at R. 6363-64.) Brogan conceded that all else equal, an investigator should "try to avoid the use of leading questions." (*Id.*)

47. According to Brogan, during an interrogation, police often attempt to elicit information to corroborate the confession, which can take two forms: (1) independent corroboration, which involves a subject supplying information unknown to the investigator, such as the location of a murder weapon, that can be verified; and (2) dependent corroboration, which involves a suspect demonstrating knowledge of facts about a crime that police have kept secret from the public. (Ex. 23 at R. 6360-62.) Brogan admitted that Houghtaling provided police with *no facts* to corroborate the confession with either independent or dependent corroboration. (Ex. 23 at R. 6397-98.) Indeed, both Brogan and Wigman testified that police intentionally kept secret the facts that (1) Briseno had a laceration on his head consistent with being pistol-whipped; and (2) Briseno stopped to speak to a passing car as he chased the two robbers. (Ex. 23 at R. 6369; Ex. 26 at R. 6891-92.)

48.     The overall evidence at trial showed that not a single element of Houghtaling's May 2001 statement demonstrated accurate, non-public knowledge about the Briseno shooting. Between the recording and transcript of the interrogation – which showed that Houghtaling knew very little, got many known facts wrong, and simply repeated what interrogators told him about others – and the testimony of the police officers – which showed that Houghtaling did not know *any* corroborating facts, including facts which the police had intentionally held back to test the veracity of statements – Petitioner showed at trial that Houghtaling's statement did not demonstrate that he was there.   Indeed, Petitioner pointed out in closing argument at trial that *every* element of Houghtaling's statement failed to show his knowledge of the shooting:   either Houghtaling did not know the element or affirmatively got it wrong; it was suggested to Houghtaling by police or the subject of public press coverage; or Houghtaling failed to say anything about it:[5]

---

[5] In closing argument at trial, Petitioner presented a chart nearly identical to the one reproduced here. (*See* Ex. 171, Def. Closing Slides, at 40.)  In this chart, Petitioner has added the column titled "Citation," which contains trial exhibit and record citations added for the Court's convenience.

| **MAY 2001 HOUGHTALING INTERROGATION IN OMAHA** | | | | | | |
|---|---|---|---|---|---|---|
| **Important Detail** | **Didn't Know** | **Suggested By Police** | **Wrong/ Conflicts Other Testimony** | **Missing** | **Publicly Known** | **Citation** |
| Jimmy's House First | | | X | | | Def. Ex. 20 at 1, 10; R. 5943-44 |
| Walked To Burrito Express From Jimmy's | | | X | | | Def. Ex. 20 at 2; R. 7034 |
| Ski Mask | X | X | | | X | Def. Ex. 20 at 2; R.6888-89 |
| Other People In Burrito Express | X | | X | | | Def. Ex. 20 at 3; R. 6389-90 |
| Employee At Counter | | | X | | | Def. Ex. 20 at 3; R. 6389-90, 6097-6101 |
| Briseno Grabbed Knife | | | | | X | R. 6889-90, 6368 |
| Briseno Ran After Chasing | | X | | | X | Def. Ex. 20 at 3-4; R. 6890 |
| Briseno Yelled At Passing Car | | | | X | | Def. Ex. 20; R. 6891-92 |
| Where Houghtaling Ran | X | X | | | | Def. Ex. 20 at 4 |
| Knife Not Huge | | | X | | | Def. Ex. 20 at 4; R. 6368, 6889-90 |
| How Houghtaling Was Grabbed | X | | | | | Def. Ex. 20 at 5 |
| Man Without Gun Slipped On Ice | | | | X | | Def. Ex. 20 |
| Man Without Gun Dragged Back To Burrito Express | | X | | | | Def. Ex. 20 at 5 |
| Man Without Gun Used As Shield | | | | X | | Def. Ex. 20 |
| Where Briseno Fell | X | X | | | X | Def. Ex. 20 at 8 |
| Briseno Hit On Head | | | | X | | Def. Ex. 20 |
| Went Back To Jimmy's House After Shooting | | | X | | | Def. Ex. 20 at 6-7; R. 6391-92 |
| Cloud 9 After | | X | | | | Def. Ex. 20 at 8 |
| Met Up With Jennifer's Car After | X | X | | | | Def. Ex. 20 at 7 |
| Number of Shots Fired | X | | X | | | Def. Ex. 20 at 17; R. 6416 |
| Clothes Houghtaling Wore | X | | | | | Def. Ex. 20 at 12 |
| Clothes Ken Smith Wore | X | X | | | | Def. Ex. 20 at 2 |

49.     **Houghtaling's April 3, 2002 Testimony at McMullan's Trial:**  Houghtaling testified against McMullan as part of his plea deal.  Contrary to his initial statement to police, at McMullan's trial, Houghtaling's testimony was generally consistent with the State's theory of the case – *i.e.*, on the day at issue, Houghtaling and Petitioner discussed the robbery at Houghtaling's house; later, when Houghtaling and Petitioner went into the Burrito Express, they found Briseno and Pardo in the kitchen, but no one else present; Briseno then raised a knife, so Houghtaling and Petitioner ran out of the restaurant, but Houghtaling slipped on ice in the

parking lot and Briseno and Pardo grabbed him; as Briseno and Pardo dragged Houghtaling back toward the restaurant, Petitioner began shooting; Briseno was shot and both Houghtaling and Petitioner fled.  (Ex. 21 at R. 5943-44, 5948-55.)

50.     Houghtaling's 2008 testimony differed from the State's theory in that Houghtaling stated in 2008 that both Pardo and Briseno grabbed him and dragged him back toward the store, while Pardo testified in 2012 that only he was holding Houghtaling at first, and Briseno only grabbed Houghtaling after Pardo ran inside to call 9-1-1.  (Ex. 21 at R. 5951; Ex. 22 at R. 6132.)  On cross-examination, Houghtaling explained that a few months after his testimony against McMullan, he wrote her a letter in which he apologized for lying in his testimony against her:  "I know I lied and I was bogus."  (Ex. 21 at R. 6001-02.)

51.     **Houghtaling's August 13, 2008 Testimony at Petitioner's Second Trial:** Although Houghtaling refused to testify at Petitioner's First Trial, at Petitioner's Second Trial, Houghtaling testified that he and Petitioner entered the Burrito Express, and then Briseno picked up a butcher knife and chased them out of the restaurant;  Houghtaling slipped on ice and Briseno and Pardo began "wrestling" with him (which is inconsistent with Pardo's testimony) (Ex. 22 at R. 6132); Houghtaling tried to escape, but Pardo "put a knife to [his] throat" (which is inconsistent with Houghtaling's prior statements and directly contrary to Pardo's testimony) (Ex. 22 at R. 6146); Petitioner started firing shots; Houghtaling "felt a jerk," and Briseno and Pardo both let go of him (also inconsistent with Houghtaling's interrogation statement and Pardo's testimony) (Ex. 22 at R. 6132); Houghtaling then ran to McMullan's car where McMullan and Collett were waiting; at that point Petitioner was "gone" and Houghtaling did not know where he went; McMullan drove back to Weisenberger's house where Houghtaling stayed

until the next morning (again, inconsistent with the Cloud 9 surveillance video showing Collett in the store after the time of the robbery). (Ex. 21 at R. 5870-77.)

52.     Houghtaling, however, immediately recanted all of his direct testimony at the Second Trial, stating that the State's attorney was forcing him to lie, "Because they [the State] want[s] to convict Kenny Smith for a crime he didn't commit, none of us committed." (Ex. 21 at R. 6005.)

53.     **Houghtaling's Cross-Examination at Petitioner's Third Trial:** Houghtaling testified that neither he nor Petitioner were involved in the attempted robbery of the Burrito Express, rather, he pled guilty in exchange for a sentence of 20 years, which was significantly less than the maximum of 60 years that the State told him he would get. (Ex. 21 at R. 5867, 5999-6000.)

54.     Petitioner sought to establish that Houghtaling learned the basic facts contained in his out-of-court statements through news accounts and word of mouth and that to the extent Houghtaling got certain facts "right," he was only able to do so with the facts about the crime that were publicly available. (Ex. 21 at R. 5973-76; Ex. 168, Def. Ex. 50.) The State objected on hearsay and foundation grounds and the court sustained the objection, insisting that Houghtaling provide details about each fact: "What newspaper and what person and when?" (*Id.*)

55.     The trial court also refused to allow Petitioner to make an offer of proof by questioning Houghtaling, but allowed Petitioner to explain that Houghtaling would have testified about the following items that he learned from the press or from people prior to his May 2001 statement:

>       That the police thought that the shooting was about 7:20 p.m.; that
>       the police thought that there were two young men involved. The

police thought that one man had a handgun; that the police thought that both went into the store; that the police thought that both were wearing black ski masks with eye holes; that the police thought that Mr. Briseno was in the Burrito Express with one employee; that the police thought that Mr. Briseno was using a butcher knife at the time; that the police thought masked men ordered Briseno to give them money.

. . .

That the police thought that Mr. Briseno and the employee chased two men out of the restaurant; that the police thought that Mr. Briseno caught one of the masked men outside the restaurant; that the police thought Mr. Briseno struggled with one of the masked men in the parking lot; that the police thought Mr. Briseno was shot by another masked man.  I would also ask Mr. Houghtaling whether he understood that the possibility that Mr. Briseno had been pistol whipped was in the public, and he would testify that he understood that was not in the public.

(Ex. 21 at R. 6039-40.)  Although Petitioner also introduced as evidence news articles that were published prior to Houghtaling's May 12, 2001 statement and that reflected the relevant facts (Ex. 168, Def. Ex. 50), the trial court sustained the State's objection to this testimony.  (Ex. 21 at R. 6041.)

56.    Petitioner also sought to elicit testimony from Houghtaling that he had been called to testify against Petitioner in 2003, at Petitioner's First Trial; that he refused to testify; and that the reason he refused to testify was that Petitioner was not involved in the Burrito Express shooting.  (Ex. 21 at R. 6003, 6041-42.)  The State objected on relevance grounds, and the trial court sustained the objection.  (Ex. 21 at R. 6003.)

57.    Following his testimony at Petitioner's Second Trial in 2008, Houghtaling was convicted of perjury and sentenced to five and a half years in prison (the State did not have to prove which testimony was false, just that the testimony was contradictory).  (Ex. 21 at R. 6028.)  Houghtaling acknowledged the potential for a similar result at the Third Trial, but said, "I'm tired of lying.  The truth has to come out sooner or later."  (Ex. 21 at R. 6028-29.)

24

5. **David Collett Takes A "Plea Of Convenience," Despite No Evidence Whatsoever Of His Involvement In The Burrito Express Shooting.**

58. In a pretrial hearing, Petitioner moved to bar Collett's testimony on the ground that the State had no basis to call him: it knew he would not support its case. (Ex. 17 at R. 5202-08.) The trial court denied Petitioner's motion. (Ex. 17 at R. 5207.) At trial, and over Petitioner's objection, the State called Collett and asked him who attempted to rob the Burrito Express on March 6, 2001. Collett responded: "I have no clue." (Ex. 23 at R. 6406.)

59. When asked what he did on March 6, 2001, Collett testified that he went with Petitioner, McMullan, and Houghtaling to Brown's house in Wisconsin. (Ex. 23 at R. 6411-12.) Collett and Houghtaling sat in the back seat on the drive back to McHenry and got in a fight because Collett wanted his green jacket (which Houghtaling had borrowed) back. (Ex. 23 at R. 6412-13.) McMullan pulled the car over; Collett got out and walked up the hill to Weisenberger's house, but when no one was home, Collett walked to Cloud 9. (Ex. 23 at R. 6413-15.) Cloud 9 surveillance video shows Collett entering the store at 7:38 P.M. and leaving at 7:44 P.M. (Ex. 23 at R. 6419-20; Ex. 111, People's Ex. 86.) Collett did not notice anything unusual when Petitioner, McMullan, and Houghtaling picked him up from Cloud 9; Collett never saw a gun, ski masks, blood, scratches, or any other evidence that Petitioner and Houghtaling were involved in a bloody crime. (Ex. 23 at R. 6437-43, 6445, 6450-51.) They went to Weisenberger's house and, as they drove by, Collett noticed lights from police cars at the Burrito Express. (Ex. 23 at R. 6439-41.) They all spent the night at Weisenberger's house; Collett did not see Petitioner or Houghtaling shower or change their clothes. (Ex. 23 at R. 6446.)

60. Collett testified that he took a "plea of convenience" to avoid a lengthy prison term because his lawyer advised him that, with the reduced charge offered, Collett might avoid

jail time.[6]  (Ex. 23 at R. 6447-48.)  Based on this, and over Petitioner's objection, the State was

permitted to introduce a statement Collett made at his September 2001 sentencing hearing.  The

State reminded Collett that Briseno's widow testified about the impact of Briseno's death and

asked Collett whether he responded as follows:

> I'd just like to say that I'm – no, no apology, nothing I can possibly
> say can help the victims with what they're dealing with, but I can
> offer my apologize – apology.  I really – if I would have known
> that any of this would have happened, I really would have tried to
> do something to stop it, but, honestly, I mean, I really didn't think
> anything like that would have happened – was going to happen.  If
> the judge, if your Honor, if you see fit to grant me probation, I will
> follow through with it completely and to the Court's satisfaction.  I
> would just like to apologize again to the victims for their loss.
> Thank you.

(Ex. 23 at R. 6408-09.)  Collett admitted making the statement.  The State asked Collett why he

apologized to the victim's family if he had nothing to do with the shooting, to which Collett

responded, "[b]ecause of the grief she was going through."  (Ex. 23 at R. 6409.)

61.     The State also asked Collett if "[a]nything unusual occur[ed] as [he was] leaving

Jimmy's house . . . Did you hear anything?"  Collett responded that he "believed [he] had

previously stated that [he] heard what sounded like a car backfiring."  (Ex. 23 at R. 6415-16.)

Based on this, the State was permitted to ask Collett, over Petitioner's objection, about a

statement he made to police during the investigation:  "Did you tell the police, May – Get this

right here – May 12, 2001, as you walked behind Burrito Express and up to the rear of Jimmy's

backyard, you heard shots?"  (Ex. 23 at R. 6416.)  Collett responded, "[p]ossibly," and "the

police took what I said out of context.  I said previously that it sounded like a car backfiring and

they said could it have been gunshots.  I said, I don't know, I've never heard gunshots."  (*Id.*)

---

[6] Indeed, nothing in the record indicates that Collett had any role in the Burrito Express shooting.  Pardo
testified that he never saw a third person acting as a lookout, none of Houghtaling's statements implicated
Collett, and Collett never admitted guilt or made an incriminating statement.  (Ex. 23 at R. 6406-07,
6447-48.)

The State then asked: "Were you asked how many shots you heard and did you answer you heard two shots?" (*Id.*) Collett responded, "Could have been two is what I said." (*Id.*)

62. Finally, the State asked Collett about statements he made to police on May 12, 2001, including inculpatory statements attributed to Petitioner:

> Q. Did you have any conversation with the defendant Kenny Smith after you heard these shots about what happened at the Burrito Express?
>
> A. Not that I recall.
>
> Q. On May 12th of 2001, did you tell Detective Sgt. Brogan that when you got in JD's car, Smith said that some kids just robbed the Burrito Express? Did you tell the police that?
>
> . . .
>
> A. I could possibly have, sir.

(Ex. 23 at R. 6417-18.)

> . . .
>
> Q. Did you have any conversation with the defendant at Jimmy Weisenberger house [*sic*] about what had occurred at the Burrito Express?
>
> A. No. The only -- the only time it was ever brought up was like what happened, what could have happened there, and we were watching the news and stuff to see what had happened, but we weren't seeing nothing.
>
> Q. On May 12th of 2001, did you tell Detective Sgt. Brogan that you asked Smith what happened at the Burrito Express and Smith stated 'just had some fun?'
>
> . . .
>
> A. Don't recall, but I probably said it if it's written down.

(Ex. 23 at R. 6421.)

C.     **The Trial:  Petitioner's Defense.**

63.     After the State rested (Ex. 23 at R. 6453), Petitioner moved for a directed verdict, arguing that the State failed to prove Petitioner guilty beyond a reasonable doubt.  Petitioner argued that no direct testimony or physical evidence implicated him or his alleged accomplices; rather the only evidence implicating Petitioner was Houghtaling's prior inconsistent statements, which were totally unreliable and uncorroborated.  (Ex. 23 at R. 6454-59.)  The trial court denied the motion.  (Ex. 23 at R. 6459-60.)  In his defense, Petitioner introduced additional evidence indicating that no evidence connected him or his alleged accomplices to the crime scene.

64.     Petitioner's defense, however, did not end there.  Petitioner put on a substantial case that included significant evidence demonstrating the DeCicco Group committed the crime charged.  Unlike the State's case against him, Petitioner presented damning physical, testimonial, and circumstantial evidence implicating the DeCicco Group, including confessions to police, friends, and family, the murder weapon, observations of the injuries sustained by Hiland during the chase, and the DeCicco Group's destruction of evidence.  None of this physical, testimonial, or circumstantial evidence implicated Petitioner – it all pointed directly to the DeCicco Group.  And there was no evidence whatsoever of a connection between the DeCicco Group and Petitioner or his alleged accomplices, nor did the State so contend.

1.     **Additional Evidence Indicates That Neither Petitioner Nor His Alleged Accomplices Were At The Crime Scene On The Night At Issue.**

65.     In addition to the testimony of Powers and Bald, described above, indicating there were no forensic matches from the crime scene to Petitioner or his alleged accomplices, Petitioner called Detective Solarz and Jimmy Weisenberger, both of whom testified that they observed Petitioner and/or Houghtaling within hours of the Burrito Express shooting and neither exhibited any evidence of the shooting or signs of struggle.  Petitioner, Houghtaling, Collett, and

28

McMullan arrived at Weisenberger's home on the evening of March 6, 2001 sometime after police arrived at the Burrito Express. (Ex. 24 at R. 6621-22.) Weisenberger did not see any blood or scratches on any of them, nor did he see any of them in possession of a gun or masks. (Ex. 24 at R. 6621-23.) Later that evening, Weisenberger rode with Collett, in McMullan's car, to buy beer (Ex. 24 at R. 6625-26); he did not see any blood, masks, bullets, or a gun in the car. (Ex. 24 at R. 6626-27.) On cross-examination, the State asked Weisenberger, over objection, whether he had used drugs in the past and whether Petitioner, Houghtaling, and Collett were smoking marijuana on March 6, 2001. (Ex. 24 at R. 6639-41.)

> Q. Okay. And you said that you did smoke dope, marijuana, at some point?
>
> A. Yeah.
>
> Q. What – when was it that you smoked marijuana?
>
> A. When I was a kid.
>
> Q. What do you mean by when you were a kid?
>
> A. Teenager.
>
> Q. When you were 18, 19?
>
> A. I said 17 is the last time I probably smoked.

(Ex. 24 at R. 6640.)

> . . .
>
> Q. Was anybody else ingesting drugs at your house?
>
> MS. HORTON: Objection, your Honor.
>
> THE COURT: Overruled.
>
> A. Yes, I believe they were smoking pot.
>
> Q. Okay. Who was on the porch?
>
> A. I believe Ken, Dave and Justin.

29

(Ex. 24 at R. 6640-41.)

66.     Solarz testified that he picked up Houghtaling on March 7, 2001 and brought him to the police station to be interviewed.  (Ex. 24 at R. 6511.)  Houghtaling was wearing the green jacket when Solarz arrived at his house the morning after the Burrito Express shooting; Houghtaling wore the green jacket to the police station; and Houghtaling allowed police to photograph him wearing the green jacket.  (Ex. 24 at R. 6509-14.)  Solarz did not see any blood stains on the jacket or scratches on Houghtaling.  (Ex. 24 at R. 6514-15.)

67.     Petitioner also introduced a "booking photo" of himself that was stipulated to have been taken on March 7, 2001, the day after the shooting.  That booking photo showed that Petitioner had facial hair that day – unlike the police sketches of either of the two suspects, which were clean shaven.  (Ex. 92, People's Ex. 62; Ex. 93, People's Ex. 63; Ex. 22 at R. 6161, 6163.)  Here is a side-by-side comparison of the booking photo and the police sketch of the alleged shooter, which is who Petitioner was accused of being (Ex. 171, Def. Closing Slides, at 19; Ex. 92, People's Ex. 62; Ex. 95, People's Ex. 65):



### 2. Significant Evidence Proves That The DeCicco Group Committed The Crime Charged.

68.     At trial, in addition to asserting that the State had failed to prove him guilty beyond a reasonable doubt, Petitioner introduced very substantial evidence that it was the DeCicco Group which was responsible for the shooting.   Specifically, Petitioner offered evidence that Susanne "Dallas" DeCicco was the driver (Ex. 169, Def. Ex. 51 at 7; Ex. 170, Def. Ex. 52, at 3-4); that her cousin, Adam Hiland, was the male wearing the green jacket who was held by Briseno (Ex. 170, Def. Ex. 52, at 46-47); and her then-boyfriend, Russell "Rusty" Levand, was the shooter (Ex. 25 at R. 6761; Ex. 169, Def. Ex. 51, at 8; Ex. 170, Def. Ex. 52, at 12-13).   (*See also* Ex. 25 at R. 6774-75, 6779-83, 6733-35, 6742, 6722-25.)   In reviewing this testimony, the following demonstrative that shows the relationships between the various witnesses may be helpful to the Court (*see* Ex. 171, Def. Closing Slides, at 49):



69.     It may also be helpful to have an understanding of the relative locations of the

places involved in the testimony.  Here is a demonstrative map used at trial, showing the agreed

locations of the Burrito Express, Jimmy Weisenberger's house (where Petitioner, Houghtaling,

Collette and McMullan were on the night of March 6), the DeCicco house (where DeCicco,

Levand and Hiland started the evening), and Cloud 9, the "head shop" Collette visited just

minutes after the shooting (*see* Ex. 139, Def. Ex. 22; Ex. 171, Def. Closing Slides, at 44):



**a.** **Dallas DeCicco Confessed Repeatedly To Friends, Family, And Even Police.**

70. **DeCicco confessed to police, twice:** DeCicco twice confessed on videotape to police. (Ex. 142, Def. Ex. 25; Ex. 150, Def. Ex. 33; Ex. 169, Def. Ex. 51; Ex. 170, Def. Ex. 52.) Her confessions contain graphic details of the crime that were unknown to Houghtaling and, in some instances, were intentionally withheld from the public by police. (*Id.*) Doug Vandermaiden, a patrol sergeant with the Quincy, Illinois Police Department, participated in an interview of DeCicco on November 19, 2005. (Ex. 23 at R. 6461-62, 6465; Ex. 169, Def. Ex. 51.) Sergeant Virgil Schroeder of the Illinois State Police participated in an interview of DeCicco on January 26, 2006. (Ex. 24 at R. 6663-65; Ex. 170, Def. Ex. 52, at 21-22.) Before both interviews, police read DeCicco her *Miranda* rights. (Ex. 24 at R. 6665-67; Ex. 23 at

33

R. 6465-66; Ex. 140, Def. Ex. 23; Ex. 149, Def. Ex. 32.)   The jury saw both videos at trial.

(Ex. 24 at R. 6494, 6675.)   Together, DeCicco's confessions total nearly 110 pages.  (Ex. 169,

Def. Ex. 51; Ex. 170, Def. Ex. 52.)

71.     DeCicco's description of the events on the night at issue is generally consistent in

both statements and is generally consistent with the State's theory – with the obvious exception

that DeCicco said the crime was committed by Levand, Hiland, and DeCicco, not Petitioner,

Houghtaling, and McMullan.[7]  As shown on the videos and in the transcripts of the interviews,

DeCicco told police that on the day of the shooting, she visited the hospital where her sister,

Elizabeth Schwartz, had recently had a baby.  (Ex. 142, Def. Ex. 25; Ex. 150, Def. Ex. 33;

Ex. 169, Def. Ex. 51, at 5; Ex. 170, Def. Ex. 52, at 3.)  DeCicco's then-boyfriend, Levand, and

her cousin, Hiland, came to the hospital with her.  (*Id.*)  The DeCicco Group left the hospital

when it was getting dark and went to the home of DeCicco's natural father, Ben DeCicco.

(Ex. 169, Def. Ex. 51, at 6.)

72.     Levand and Hiland had talked about stealing purses or robbing someone multiple

times in the past.  (Ex. 169, Def. Ex. 51, at 7; Ex. 170, Def. Ex. 52, at 26.)  DeCicco explained

that earlier that day, Levand and Hiland had stolen the revolver that belonged to DeCicco's step-

father, David Brummett (the "Brummett gun").  (Ex. 169, Def. Ex. 51, at 6-7; Ex. 170, Def. Ex.

52, at 3-4.)  DeCicco knew that Levand and Hiland had stolen the gun, because when she looked

in her trunk after they got back from the robbery, she saw the gun wrapped in a blue towel.  (*Id.*)

Levand and Hiland left Ben DeCicco's house at one point, and when they did not return within

20 minutes, DeCicco went to look for them in her car.  (*Id.*)  DeCicco did not have to go far, as

she saw Levand and Hiland standing near the Burrito Express, just around the corner from her

---

[7] The State's "theory" that Collett was involved as a lookout is not supported by any of the evidence, including Pardo's testimony and even Houghtaling's out-of-court statements.

father's house.  (*Id.*)  DeCicco stopped to see what they were doing, at which point she saw Levand and Hiland run into the Burrito Express with masks on their faces.  (Ex. 170, Def. Ex. 52, at 4-5.)  Levand, the taller of the two, had the gun.  (Ex. 170, Def. Ex. 52, at 12.)  Shortly thereafter, she saw Levand and Hiland run out of the Burrito Express being chased by two Hispanic men.  (Ex. 169, Def. Ex. 51, at 7.)

73.     As DeCicco drove by the street in front of the Burrito Express parking lot (near Don's Cleaners) (Ex. 22 at R. 6057, 6070), one of the Hispanic men yelled something into her car.  (Ex. 169, Def. Ex. 51, at 7.)  As Wigman testified, Pardo observed Briseno yell something into a passing car, but the investigators intentionally held back this information from the public to help corroborate any confessions they received.  (Ex. 26 at R. 6891-92.)  Unlike DeCicco, Houghtaling had no knowledge of this detail.  (Ex. 23 at R. 6395-96.)

74.     DeCicco heard gun shots as she drove away.  (Ex. 169, Def. Ex. 51, at 7; Ex. 170, Def. Ex. 52, at 4.)  A few minutes later, DeCicco met Levand and Hiland back at her father's house near the Burrito Express.  (Ex. 169, Def. Ex. 51, at 7; Ex. 170, Def. Ex. 52, at 4.)  Hiland, who was wearing a dark green jacket, got blood on the backseat of DeCicco's car because he was covered in blood and had a cut on his hand.  (Ex. 169, Def. Ex. 51, at 7-8, 21; Ex. 170, Def. Ex. 52, at 4.)  With DeCicco driving, all three of them went to Levand's grandmother's house, where they threw away their gloves and other clothing, and then to the Brummett residence, where they hid the other bloody items in a culvert in front of the house; they later burned the evidence. (Ex. 169, Def. Ex. 51, at 8; Ex. 170, Def. Ex. 52, at 14-15, 20, 43, 48, 67-68.)

75.     When the DeCicco Group arrived at the Brummett residence, Levand and Hiland told DeCicco that one of the Hispanic men caught Hiland and dragged him back through the parking lot towards the Burrito Express.  (Ex. 169, Def. Ex. 51, at 8; Ex. 170, Def. Ex. 52, at 13.)

Hiland called out for help and Levand fired shots. (Ex. 169, Def. Ex. 51, at 8; Ex. 170, Def. Ex. 52, at 13.) When Briseno was hit, he spat blood on Hiland. (Ex. 169, Def. Ex. 51, at 8, 21; Ex. 170, Def. Ex. 52, at 13, 47.) (This is a detail about which Houghtaling had no knowledge. (*See* Ex. 137, Def. Ex. 20.)) Consistent with Pardo's testimony, DeCicco told police that Briseno caught Hiland and was dragging him backwards; Levand then ran up and struck Briseno on the head with the gun so that Hiland could get away. (Ex. 169, Def. Ex. 51, at 8, 10, 21; Ex. 170, Def. Ex. 52, at 12-13, 40.) As Brogan testified, the pistol-whip was another detail intentionally withheld from the public by police (Ex. 23 at R. 6369), and was unknown by Houghtaling – in fact, when police asked Houghtaling in May 2001 about the pistol-whip, Houghtaling said that he could not remember whether Briseno had been hit (Ex. 23 at R. 6388). DeCicco explained that before the DeCicco Group returned the Brummett gun to its storage place in David Brummett's bedroom, Levand pulled Briseno's hair out of the gun. (Ex. 169, Def. Ex. 51, at 10.) Some time later, Levand and Hiland stole DeCicco's car and had it burned in a field in Wisconsin because they were unable to get all of the blood out of the backseat. (Ex. 169, Def. Ex. 51, at 18-21; Ex. 170, Def. Ex. 52, at 38-39.)

76.     Subsequently, in their January 2006 interview of DeCicco, after DeCicco confessed, the interviewing officers spent over an hour telling DeCicco they did not believe her story and offering to give her an "out" if she recanted, but DeCicco persisted:

> Q.     You need to understand that it's fine. It's not too late to go and say look, this didn't happen.
>
> A.     No, it happened and I'm willing to step forward.
>
> Q.     And that's fine. I just want to give you that out if that's it.

(Ex. 170, Def. Ex. 52, at 33.) DeCicco offered to take a polygraph test and told the officers that Hiland had visited a lawyer after Vicki Brummett provided the murder weapon (*i.e.*, the

Brummett gun) to police. (Ex. 169, Def. Ex. 51, at 9; Ex. 170, Def. Ex. 52, at 52-53, 72.) Despite DeCicco's confessions, the police did nothing; in their minds, they already had their culprits. (*See, e.g.*, Ex. 170, Def. Ex. 52, at 56.)

77. **DeCicco started confessing to her family and friends within weeks of the Burrito Express shooting:** Just a few weeks after the Burrito Express shooting, DeCicco confessed to her sister, Elizabeth Schwartz. (Ex. 25 at R. 6774-75.) Schwartz testified that she and DeCicco were at the Brummett house when DeCicco, without prompting, told Schwartz that she and Hiland had been involved in the Burrito Express shooting. (Ex. 25 at R. 6775.)

78. Approximately six months later, in October 2001, DeCicco confessed to Britney Tyda, a childhood friend. (Ex. 25 at R. 6692-95.) Tyda, DeCicco, and Levand were hanging out at Tyda's apartment when DeCicco and Levand got into an argument. (Ex. 25 at R. 6697.) Tyda overheard DeCicco tell Levand that "if he went to the police about her writing bad checks, she would go to the police about him shooting someone." (Ex. 25 at R. 6696-97.) After Levand left, Tyda was comforting DeCicco, who was crying and upset. (Ex. 25 at R. 6694-95.) DeCicco explained to Tyda that she had witnessed Levand and Hiland attempt to rob the Burrito Express, and that Levand shot Briseno. (Ex. 25 at R. 6695.)

79. DeCicco also confessed to her half-sister, Carly Rexford, around Christmas 2005; DeCicco's mother was also present during the conversation. (Ex. 25 at R. 6706, 6708-09.) DeCicco told Rexford that Hiland and Levand stole the Brummett gun from David Brummett and used it when they attempted to rob the Burrito Express on the night at issue. (Ex. 25 at R. 6709.) There was an altercation and Levand shot Briseno. (Ex. 25 at R. 6710.) The State argued during closing that DeCicco should not be believed because she could not remember the date the Burrito Express shooting occurred. (Ex. 27 at R. 7113.) Consistent with DeCicco's

confession to police, however, Rexford testified that she and DeCicco visited Schwartz in the hospital on March 6, 2001 – the same day as the Burrito Express shooting. (Ex. 25 at R. 6706.) DeCicco left before Rexford, and told Rexford that she was leaving the hospital because Levand and Hiland were waiting for DeCicco in her car. (Ex. 25 at R. 6707-08.)

80.     DeCicco even confessed to her mother, who promptly turned the Brummett gun over to police because it was the gun used in the crime: DeCicco confessed to her mother, Vicki Brummett, in late 2001. (Ex. 25 at R. 6722-23.) DeCicco told Brummett that, on the night of March 6, 2001, DeCicco went to pick up Levand and Hiland and found them standing outside the Burrito Express. (Ex. 25 at R. 6724.) DeCicco observed Levand and Hiland enter the restaurant and then come running out. (Ex. 25 at R. 6724.) DeCicco told Brummett that one of the men from the restaurant ran in front of DeCicco's car and yelled at her to call the police. (Ex. 25 at R. 6724.) Again, this fact was specifically withheld from the public by police. Brummett also testified that she observed Hiland in the days before and after the Burrito Express shooting because Hiland lived with the Brummetts at the time. (Ex. 25 at R. 6718-19.) After March 6, 2001, Brummett noticed scratches on Hiland's hands and knees that were not present prior to March 6, 2001. (Ex. 25 at R. 6719.)

81.     Consistent with DeCicco's statement regarding the date of the Burrito Express shooting, Brummett testified that she visited Schwartz, her daughter, at the hospital on March 6, 2001. (Ex. 25 at R. 6717.) She remembered it was the same day as the Burrito Express shooting because on her way home from the hospital Brummett noticed "a bunch of police cars" in the area. (Ex. 25 at R. 6718, 6728.)

82.     Although Brummett did not recall the exact date DeCicco confessed to her, Brummett estimated it was around the time that she turned over her husband's gun (which was

normally kept in their bedroom closet) to police.  (Ex. 25 at R. 6719-20, 6723; Ex. 26 at R. 6898-99.)  DeCicco told Brummett that Levand used the Brummett gun in the crime and that Levand hit Briseno in the head with the gun.  (Ex. 25 at R. 6725.)  As a result of her conversation with DeCicco, Brummett called Wigman on November 19, 2001 and Wigman visited the Brummett home a few days later.  (Ex. 26 at R. 6894-96.)  Wigman retrieved the .22 caliber revolver belonging to David Brummett and subsequently provided the gun to the Illinois State Police Crime Lab for testing.  (Ex. 26 at R. 6898-99, 6904, 6909.)

83.    Earlier that year, in March 2001, the State's firearms expert, Joanne McIntyre, examined the bullet recovered from Briseno's body, which she identified as a .22 caliber long rifle bullet.  (Ex. 25 at R. 6793-94, 6801-02.)  Although some characteristics of the bullet could not be determined because of damage to it, McIntyre counted six lands and grooves and used a stereo microscope and ruler to precisely measure the width of the land and groove impressions to the hundredth of an inch.  (Ex. 25 at R. 6802-03, 6805-08.)

84.    McIntyre received the Brummett gun in December 2001 and fired ten test shots.  (Ex. 25 at R. 6816-17.)  Using a comparison microscope, she examined the test-fired bullets alongside the bullet recovered from Briseno's body, lining up the land and groove impressions.  (Ex. 25 at R. 6818-19.)  McIntyre concluded that the bullets from the Brummett gun shared the following characteristics with the bullet recovered from Briseno:   (1) they were .22 caliber; (2) they had six land and groove impressions; (3) the width of the land impressions was consistent; and (4) the width of the groove impressions was consistent.  (Ex. 25 at R. 6815-26.)  Thus, *McIntyre concluded the Brummett gun could have been the gun that fired the bullet recovered from Briseno.*  (Ex. 25 at R. 6827-28.)  Similarly, Dr. Larry Blum, the forensic pathologist who performed Briseno's autopsy, testified that the size, shape, and type of wound

39

on Briseno's head was consistent with being struck by a gun and that *the Brummett gun could have caused the injury on Briseno's head.* (Ex. 25 at R. 6850-52.) No other gun potentially connected to the killing was ever recovered.

85. All told, Petitioner put on evidence that DeCicco confessed at least six times over the course of approximately five years (Ex. 25 at R. 6692-97, 6706-09, 6722-24, 6774-75; Ex. 169, Def. Ex. 51; Ex. 170, Def. Ex. 52; *see* Ex. 171, Def. Closing Slides, at 51):

| Person | Relationship | When |
|---|---|---|
| Beth Schwartz | Sister | March 2001 |
| Vicki Brummett | Mother | Summer-Fall 2001 |
| Brittany Tyda | Friend | October 2001 |
| Quincy PD | | November 2005 |
| Carly Rexford | Friend | December 2005 |
| Illinois State Police | | January 2006 |

**b.      Hiland Confessed To Friends, Family, And Even An Attorney, Beginning Just Days After The Burrito Express Shooting.**

86. **Hiland confessed to his friend, cousin, and sister:** Charlene Nicole McCauley (who previously went by the name Nicki Hiland) is Hiland's sister by birth. (Ex. 25 at R. 6755.) In March 2001, McCauley lived with Hiland, DeCicco, Levand, and Schwartz at the Brummett house. (Ex. 25 at R. 6755-56.) Although the Brummetts kept their bedroom door locked, McCauley observed DeCicco, Levand, and Hiland pick the lock on the door and enter the Brummett bedroom. (Ex. 25 at R. 6757-58.) On the day after the Burrito Express shooting, McCauley observed Hiland with cuts, bandages, and gauze all over his forearms. (Ex. 25 at R. 6758-59.) When she asked what happened, he initially told her that he slid down icy stairs at

40

the house of DeCicco's dad (*i.e.*, Ben DeCicco). (Ex. 25 at R. 6758-59.) Later, however, he confessed that he had been involved in the Burrito Express shooting. (Ex. 25 at R. 6761-62; Ex. 26 at R. 6983.)

87. Gina Kollross, McCauley's adoptive sister, was dating Hiland's brother, Andrew, in March 2001. (Ex. 25 at R. 6748-49.) A few days after the Burrito Express shooting, Kollross observed bandages on Hiland's hand and asked him what happened. (Ex. 25 at R. 6752.) Initially, he said he slipped on some icy stairs (Ex. 25 at R. 6752), but a week or so later, Hiland confessed, admitting that he did not really fall on ice; rather, he and Levand "were just going to rob the Burrito Express and then the owner or the person that was there chased after him and had gone after him with a knife and was going after his arm and his hand, and then Rusty had shot him so Adam could be free." (Ex. 25 at R. 6751-53.)

88. Two or three months after the Burrito Express shooting, Hiland confessed to his cousin, Elizabeth Schwartz. (Ex. 25 at R. 6779-82.) They were both still living at the Brummett house and one night, Schwartz and Hiland drove to a restaurant to eat dinner. (Ex. 25 at R. 6776, 6780-81.) The restaurant shared a parking lot with the storefront where the Burrito Express used to be located. (Ex. 25 at R. 6780-81.) When they parked, Hiland refused to get out of the car and appeared visibly uncomfortable. (Ex. 25 at R. 6780-81.) Schwartz then looked at Hiland, and said, "she wasn't lying." (Ex. 25 at R. 6781.) When Hiland asked what she was talking about, she told him that her "sister [DeCicco] had told [her] that he was involved in the Burrito Express killing." (Ex. 25 at R. 6781.) Hiland reacted in anger: "She [Dallas] is a fat fucking bitch and she can't keep her mouth shut. She needs to keep her mouth shut." (Ex. 25 at R. 6780-81.)

89.     As they drove away, Hiland told Schwartz that he, Levand, and DeCicco had been smoking crack that night and when they ran out of drugs, Levand and Hiland decided to rob the Burrito Express. (Ex. 25 at R. 6782.) Two men chased Levand and Hiland out of the store and one of the men grabbed Hiland. (Ex. 25 at R. 6782.) During the struggle, Hiland grabbed the knife and cut his hand. (Ex. 25 at R. 6782.) Levand shot at the man with the knife and then ran up and hit him in the head with the gun. (Ex. 25 at R. 6782.) Schwartz also observed Hiland with cuts and scrapes on his hand and arm the week following the Burrito Express shooting. (Ex. 25 at R. 6776.)

90.     Just before Christmas 2001, McCauley, who was no longer living at the Brummett house, received a call from Hiland and she agreed to pick him up. (Ex. 25 at R. 6760-61.) When she met with him, Hiland appeared depressed and ashamed as he described his involvement in the Burrito Express shooting to her:

> Adam told me that he, Dallas and Rusty were actually the ones who committed the crime there [at the Burrito Express] and he said that they were at Dallas's dad's house smoking crack in their garage, Dallas's dad's garage, and they ran out of drugs and they wanted to get more money. They decided to go rob this place for money and they said that Dallas – or, I'm sorry, Rusty and Adam went inside and a man started to chase them, so they ran out, and somehow one of the men got a hold of Adam, you know, grabbed him, and he was fighting with Adam and then Rusty shot him and they left.

(Ex. 25 at R. 6761-62.)

91.     **Hiland confessed to Danny Trumble and a defense attorney, but the trial court excluded evidence of Hiland's confession to the attorney:** Daniel Trumble is Hiland's friend and former roommate. (Ex. 25 at R. 6732.) Hiland had lived with Trumble in 2001 or 2002, and confessed to Trumble on a number of occasions during the summer of 2002. (Ex. 25 at R. 6732-33, 6742-43.) One evening, Trumble and Hiland were drinking when Hiland told

Trumble that he, Levand, and DeCicco were responsible for the Burrito Express shooting. (Ex. 25 at R. 6733-35.)  Hiland was crying and shaking when he explained to Trumble that they intended to rob the restaurant, but one of the men in the Burrito Express pulled a knife, so Levand shot him.  (Ex. 25 at R. 6733-35.)

92.    After Hiland confessed, Trumble suggested that Hiland speak to a defense attorney, which Hiland agreed to do; Trumble then accompanied Hiland to see the attorney and was present when Hiland repeated his confession to attorney Ed Edens.  (Ex. 25 at R. 6735-38.)  The trial court, however, sustained the State's objection to this testimony.  (Ex. 25 at R. 6738.)  The court permitted Trumble to testify that he heard Hiland confess again, but refused to allow Trumble to make any reference to the lawyer or to the other circumstances surrounding that meeting.  (Ex. 25 at R. 6739-40.)

93.    Petitioner made a proffer as to what Trumble would have said had he been permitted to testify:  Trumble would have testified that he suggested Hiland see an attorney and he took Hiland to meet with attorney Ed Edens, who had previously represented Trumble in an unrelated matter.  (Ex. 25 at R. 6740-41.)  The three of them met at a restaurant in Lake Zurich and Hiland confessed again with both Edens and Trumble present, telling the same story "word for word."  (Ex. 25 at R. 6740-42.)  Edens advised Hiland not to come forward because police had already arrested other individuals for the Burrito Express shooting.  (Ex. 25 at R. 6740-41.)  On the way home, they discussed the advice from the attorney and Hiland told Trumble that because others had been arrested, he was not going to turn himself in.  (Ex. 25 at R. 6742-43.)  The jury never heard Trumble's testimony about Hiland's confession to the attorney because the State objected to it and the trial court sustained the objection.  (Ex. 25 at R. 6736-6740.)  Despite this, in closing, the State sought to undermine Trumble's reliability:  "Again, a convicted

43

forgerer [sic] comes in here and says, Yeah, you know what Adam Hiland did it. He told me. Really? This is the guy who writes bad checks. Right. This is the guy that you're going to believe? Okay." (Ex. 27 at R. 7117.)

94. All told, Petitioner presented evidence that Hiland confessed to four different people – and attempted to present evidence of a fifth, lawyer Edens – over more than a year (Ex. 25 at R. 6761-62, 6751-53, 6779-82, 6733-42; *see* Ex. 171, Def. Closing Slides, at 55[8]):

## Adam Hiland Confessions

| Person | Relationship | When | Elements |
|---|---|---|---|
| Gina Kollross | Nicki's sister after adoption | Mar. 2001 | • 2 conversations<br>• Saw bandages on hand<br>• Attempted robbery<br>• Chased by knife-holder<br>• Levand shot Briseno |
| Beth Schwartz | Hiland's cousin | May or June 2001 | • Smoking crack<br>• Attempted robbery<br>• Chased out of BE<br>• Hiland caught/cut hand on knife<br>• Levand hit Briseno with gun |
| Charlene "Nicki" McCauley | Hiland's sister | Dec. 2001 | • Saw bandages on hand Mar. 7<br>• Smoking crack/needed money<br>• Chased out of Burrito Express<br>• Hiland caught<br>• Levand shot Briseno<br>• Somber/depressed |
| Daniel Trumble | Hiland's friend/roommate | Summer 2002 | • 3 conversations<br>• Hiland crying/shaking<br>• Attempted robbery<br>• Briseno pulled out a knife<br>• Levand fired shots |
| Ed Edens | Attorney who previously represented Trumble | Summer 2002 | • Conversation to obtain legal advice<br>• Trumble present for conversation<br>• Hiland repeated account word for word<br>• Hiland emphasized Levand was shooter<br>• Edens advised Hiland not to come forward |

> **c.** **Levand Also Confessed, And Explained Why He Was "Forced" To Hit Briseno Over The Head With The Gun And How The DeCicco Group Destroyed The Evidence.**

95. Petitioner called Patrick Anderson, who testified that he had been good friends with Levand since attending school together. (Ex. 24 at R. 6652-53.) In the summer of 2011,

---

[8] The slide "Adam Hiland Confessions" was presented at trial as seen below with the exception of the material regarding Ed Edens. (*See* Ex. 171, Def. Closing Slides, at 55.) That information was omitted at trial due to the court's exclusion of the evidence regarding Hiland's confession to Edens.

Anderson and Levand were both incarcerated in the McHenry County jail.  (Ex. 24 at R. 6653.) Levand and Anderson were talking one day and Levand confessed to Anderson that he committed the Burrito Express shooting:  Levand explained that he and Hiland went to the Burrito Express to rob it, but when Briseno chased them out and grabbed Hiland, Levand shot Briseno and hit him over the head with the gun in order to free Hiland.  (Ex. 24 at R. 6654-55.) Levand and Hiland, who was covered with blood, met DeCicco at her car and DeCicco drove them away.  (Ex. 24 at R. 6656.)  They burned the masks and the clothes they were wearing and they attempted to clean DeCicco's car, but they were afraid evidence might be discovered in the car, so Levand stole DeCicco's car a few months later and burned it somewhere in Wisconsin. (Ex. 24 at R. 6656.)

96.     As noted in Part IV.A.1.a above, Petitioner was not permitted to inquire about Anderson's motivation for coming forward – ten years after the crime – with the details of Levand's confession even though the State was permitted to repeatedly suggest that Anderson was not a reliable witness because of his convictions:  "This guy here [Anderson] admits to knowing this guy right here from being incarcerated together.  Okay.  That doesn't cause some suspicion, some problems with this guy's statement?  He has more criminal convictions than I have hairs on the top of my head.  Okay.  And you're going to believe him?"  (Ex. 27 at R. 7114.)  As set forth above in Anderson's proffer, Anderson would have explained that he did not learn of Levand's confession until the summer of 2011, and when he initially told police, they ignored him.  (Ex. 19 at R. 5256-58.)

97.     As Anderson testified (Ex. 24 at R. 6656) and DeCicco explained in her confession (Ex. 169, Def. Ex. 51, at 19; Ex. 170, Def. Ex. 52, at 38-39), Levand was afraid that evidence linking the DeCicco Group to the crime might be discovered in DeCicco's car, so

Levand stole the car and burned it in a field in Wisconsin. By stipulation, Petitioner presented the testimony of Officer Daniel Wielgat of the Gurnee Police Department (Ex. 25 at R. 6685): On June 27, 2001, responding to a call, Wielgat met DeCicco at a Comfort Inn in Gurnee and DeCicco reported to him that her car was stolen from the hotel parking lot. (Ex. 25 at R. 6685.) Levand was also present at the Comfort Inn. (Ex. 25 at R. 6685-86.) Later, Wielgat spoke with Detective Baisley from the Racine County, Wisconsin Sheriff's Department, who informed Wielgat that DeCicco's car was found on June 27, 2001, in Racine, Wisconsin, in a soybean field 60 feet from the roadway, completely destroyed by fire. (Ex. 25 at R. 6686; Ex. 151, Def. Ex. 34.) The investigation revealed that an accelerant burned the vehicle. (Ex. 25 at R. 6686.) In contrast, McMullan's car was impounded just after her arrest, and a thorough processing by police revealed no evidence of the shooting. (Ex. 24 at R. 6578-79.)

> **d.** **Petitioner Introduced Evidence Of Hiland And Levand's Resemblance To The Police Sketches Of The Offenders.**

98. Petitioner also introduced by stipulation evidence of the general appearance of Hiland and Levand: their Illinois Secretary of State photographs from 2001. (Ex. 155, Def. Ex. 38; Ex. 25 at R. 6716, 6756-57.) Their appearance was generally similar to those of the offenders depicted in the sketches (although, because there was no evidence that the photos were taken immediately proximate to the shooting, the presence of facial hair had no relevance) (Ex. 94, People's Ex. 64; Ex. 95, People's Ex. 65; Ex. 171, Def. Closing Slides, at 91-92):



**D.     The Trial:  The State Attempts To Rebut The Evidence Of The DeCicco Group's Guilt.**

99.     The State called DeCicco, who admitted she had convictions for retail theft and

obstruction of justice, and possession of prescription medication, and asked her about her

confessions to police; DeCicco testified that she lied when she confessed to the Quincy police in November 2005 because she thought police would let her go home that day if she confessed to a murder after being arrested for shoplifting. (Ex. 26 at R. 6956-58.) As to her subsequent confession to the Illinois State Police, DeCicco testified that "It just somehow made sense to me that if I just lied a little longer, I'd be able to get out and deal with it later." (Ex. 26 at R. 6958.) DeCicco tried to explain away some of her other confessions, testifying that she joked with her sister about having murdered Briseno and she confessed to her mother to extract money to buy drugs. (Ex. 26 at R. 6961.) DeCicco did not explain her other confessions to family members.

100. And although DeCicco could not explain where she learned all of the unreleased details of the crime, the State suggested that DeCicco learned those details through news and police reports. (Ex. 26 at R. 6961-63.) DeCicco agreed that she followed the Burrito Express shooting in the news, but denied seeing police reports. (Ex. 26 at R. 6962.) Over Petitioner's objection, the State impeached DeCicco with a statement she made in a previous proceeding on August 19, 2008 in which she said she saw police reports. (Ex. 26 at R. 6962-63.) (In contrast, when Petitioner attempted to introduce similar evidence about how Houghtaling learned details about the crime through news reports and word-of-mouth, the trial court refused to allow the testimony unless Houghtaling could state "What newspaper and what person and when." (Ex. 21 at R. 5973-76.) With DeCicco, however, the court did not require the State to establish any of this information. (Ex. 26 at R. 6963.)) And as explained below in Part VI.B.2.a, in affirming Petitioner's conviction, the Appellate Court relied, in part, on the possibility that the jury might have disregarded DeCicco's confessions because she learned the non-public facts from the hypothetical news and police reports. *People v. Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 170 (attached as Ex. 1).

101.    But in any event, these hypothetical news and police reports do not explain how Hiland and Levand knew the same unreleased details, including in confessions made just days after the crime.  At trial, the State called Hiland, who was in custody at the time for fleeing and eluding police in another matter, but did not ask Hiland about his involvement in the Burrito Express shooting or even about his knowledge of the unreleased facts.  (Ex. 26 at R. 6985-86.)  The State only asked Hiland whether he had ever been cut with a knife on his hand or arms.  (Ex. 26 at R. 6985.)  Hiland showed the jury a scar on his hand, denied ever being cut by a knife, and testified that the scar on his hand came from a recent incident where he was injured running from police.  (Ex. 26 at R. 6985, 6988.)

102.    The State also called Levand, who testified that he was in jail for possession and burglary.  (Ex. 26 at R. 6939-40.)  He also denied involvement in the Burrito Express shooting and denied confessing to Patrick Anderson.  (Ex. 26 at R. 6940.)

103.    In the end, Petitioner pointed out that the DeCicco Group's guilt solved a number of stubborn doubts and inconsistencies inherent in the State's case against Petitioner (in addition to the complete lack of any reliable evidence to support that case).  In particular:



(Ex. 171, Def. Closing Slides, at 74.)

**E.  The Verdict And Sentence.**

104.  On February 29, 2012, after twenty-one hours of deliberation over three days, the jury returned a guilty verdict.  (Ex. 29 at R. 7147, 7154-55.)  On April 26, 2012, the trial court sentenced Petitioner to a term of 67 years for first degree murder and a concurrent sentence of 7 years for attempted armed robbery.  (Ex. 7 at C. 4140.)

**F.  The Direct Appeal.**

105.  Petitioner timely filed an appeal, raising a number of issues, including that the evidence was insufficient to support his conviction under *Jackson*, 443 U.S. 307; that he was denied the right to present a complete defense; and that numerous prejudicial errors combined to render the trial fundamentally unfair in violation of his federal due process rights.  (*See* Ex. 172, Def. App. Brief; Ex. 173, Def. App. Reply Brief.)  Without granting the requested oral argument,

50

the Appellate Court affirmed in an unpublished "Rule 23" Order (attached hereto as Ex. 1). *Smith*, 2013 IL App. Ct. (2d) 120508-U.

106.    The Appellate Court rejected Petitioner's sufficiency of the evidence argument. The Court held that because the requirements of 725 ILCS 5/115-10.1 were satisfied, Houghtaling's out-of-court statements were properly admitted and the jury could afford "any weight" it deemed proper to the statements. *Id.* at ¶ 163. Without considering the evidence as a whole, the Court concluded that Houghtaling's out-of-court statements "were the strongest evidence against" Petitioner and were more than sufficient to convict. *Id.* at ¶ 156. In so holding, the Appellate Court concluded that it was not even permitted to *consider* whether Houghtaling's out-of-court statements were reliable:

> Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was 'substantially corroborated' or 'clear and convincing,' but it may *not* engage in any such analysis.

*Id*. at ¶ 163.

107.    The Appellate Court asserted that Houghtaling's statements were "corroborated" because Houghtaling had a green jacket and told police that Petitioner carried a "little .22" (which was never recovered). *Id.* at ¶ 157. However, the Court denigrated the value of the green jacket when it came to Petitioner's arguments, finding harmless error in the trial court's exclusion of testimony to impeach Pardo's in-court identification of Houghtaling's green jacket, which did not match the green jacket Pardo described on the night of the shooting. *Id.* at ¶ 229. Similarly, the Appellate Court rejected the corroborative value of the murder weapon in the context of the evidence against the DeCicco Group, finding the .22-caliber revolver that was *actually* recovered from DeCicco's home and *matched* the characteristics of the murder weapon "irrelevant" because "a .22-caliber gun is a very common type of gun." *Id.* at ¶ 170.

51

108.    And although the Appellate Court refused to examine the reliability of Houghtaling's out-of-court statements when determining the sufficiency of the evidence, the Court engaged in a detailed critique of the extensive evidence of the DeCicco Group's confessions.  After reviewing evidence implicating the DeCicco Group and acknowledging that "DeCicco knew two facts [about the crime] that were not made public," the Appellate Court nonetheless found DeCicco's confessions inconsistent and unreliable.  *Id.* at ¶¶ 166-72.  The Court speculated – contrary to the testimony of police witnesses – that DeCicco had non-public information because she "read new reports" or the information was not really kept secret.  *Id.* at ¶ 170.  The Court further speculated that the jury discounted the testimony of the witnesses who heard the DeCicco Group's extensive confessions because some had "convictions involving deceit" and some of the confessions occurred long after the shooting.[9]  *Id.* at ¶ 171.  The Court found that the jury must have accepted DeCicco's explanation for her confessions – *i.e.*, that she lied to get money for drugs and to get the police to release her after she was arrested for shoplifting – or simply "found the State's version persuasive."  *Id.* at ¶ 172.  Ultimately, the Court concluded that the conviction could be affirmed because evidence of the DeCicco Group's guilt did not "overwhelm" the State's case against Petitioner.  *Id.* at ¶ 166.

109.    In addition to rejecting Petitioner's argument on the insufficiency of the evidence, the Appellate Court affirmed the trial court's exclusion of key defense evidence.  While the Court noted that Petitioner raised a constitutional argument regarding the evidence exclusion, its opinion did not address or decide the constitutional question.  *See id.* at ¶¶ 174, 189.  Instead, the Court reviewed the exclusion of evidence under the deferential state-law concept of abuse of

---

[9] The same, however, was true of the testimony presented against Petitioner.  Houghtaling and Collett both had convictions, including Houghtaling's for perjury.  *Id.* at ¶ 60, 75.  All of Houghtaling's statements came months or years after the shooting.  *Id.* at ¶¶ 41-42, 50, 53.  DeCicco and Hiland, however, began confessing within weeks of the shooting.  *Id.* at ¶¶ 116, 127.

discretion, and concluded that the trial court did not abuse that discretion by excluding the proffered testimony of Anderson, Quinones, and Solarz: "it was not unreasonable to exclude the evidence on the bases that it was not entirely consistent with the admitted evidence . . . and that it would have confused the jury as to the proper focus of the trial." *Id.* at ¶ 189. Because the testimony Petitioner introduced explained that the DeCicco Group wanted to commit a robbery to obtain cash to purchase drugs, the Court asserted that Anderson's testimony that Levand knew Briseno kept drugs at the Burrito Express did not have a logical connection. *Id.* at ¶¶ 189-90. The Appellate Court ignored the testimony of Schwartz and McCauley indicating that the DeCicco Group was abusing drugs at Ben DeCicco's house – kitty-corner from the Burrito Express – and when they ran out, they decided to rob the Burrito Express. (Ex. 25 at R. 6761-62, 6782.) The Appellate Court also concluded that excluding Quinones's and Solarz's testimony "would not have been unreasonable [because] it would have confused the jury by directing its attention to Briseno's drug-dealing, and was not relevant to the DeCicco Group's alleged plan to rob someone or some establishment to obtain money to purchase drugs." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 190.

110. The Appellate Court also failed to make any findings regarding Petitioner's constitutional challenge to the exclusion of Trumble's testimony about the confession by Hiland to lawyer Ed Edens. The Court held that the trial court did not abuse its discretion by excluding Trumble's testimony on the ground that "the evidence at issue, that Hiland confessed to an attorney in a public place and in the presence of a third person, did not make it more likely that Hiland would be prosecuted." *Id.* at ¶ 199. In so holding, the Appellate Court relied entirely on an Illinois case applying *Chambers*, and concluded that because the third-party in that case confessed to police, it was distinguishable. *Id.* In any event, the Court concluded that any error

was harmless because the testimony was cumulative, as several other witnesses testified that Hiland confessed to them and "the jury heard DeCicco's statement that Hiland told her that he spoke to an attorney because, after the Brummett gun was retrieved, he was worried that the group would go to jail." *Id.* at ¶ 200. Thus, the Court held, "the jury would no doubt have reasonably inferred from DeCicco's testimony that Hiland confessed to the attorney." *Id.*

111. The Appellate Court agreed with Petitioner that the trial court erred by preventing Petitioner's impeachment of Pardo's testimony regarding the green jacket. *Id.* at ¶ 227. However, the Court found this error harmless on the ground that the discrepancies were minor, Petitioner was not completely precluded from testing Pardo's description, and the jury saw a photo of Houghtaling wearing the jacket and therefore could see that it had a zipper and pockets. *Id.* at ¶ 229. Furthermore, the Court found that Pardo's prior inconsistent statement that he did not see pockets or a zipper on the green jacket was not important because Houghtaling's jacket had a flap that covered the zipper and, in any event, "defense counsel argued during closing argument that Houghtaling's jacket had a zipper and pockets, but that Pardo did not recall saying anything about that, so, he had not identified that jacket as being the jacket on the man at the scene beyond a reasonable doubt; thus, the issue of Pardo's lack of memory was put before the jurors." *Id.*

112. The Appellate Court also held that the trial court did not err when it limited Petitioner's cross-examination into (1) how Houghtaling learned certain facts about the shooting and (2) why he refused to testify at Petitioner's 2003 trial. *Id.* at ¶¶ 239-40. With respect to how Houghtaling learned certain facts, the Appellate Court found that Petitioner was able to establish that Houghtaling knew details about the crime from newspapers and other people; Petitioner was *only* prevented from asking questions that identified what specific details Houghtaling learned.

54

*Id.* at ¶¶ 236-37. Excluding these details, according to the Court, was proper because Petitioner could not lay a foundation for the specific sources from which Houghtaling learned the information. *Id.* at ¶ 239.

113. As for Houghtaling's refusal to testify at Petitioner's 2003 trial, the Appellate Court concluded that this was not a prior consistent statement with Houghtaling's recantation because "it does not, as defendant suggests, corroborate his testimony at the third trial (that defendant did not commit the crime)." *Id.* at ¶ 243. The Court found that Houghtaling's refusal to testify at the First Trial "does not necessarily reflect that, had he testified there, he would have exculpated defendant; he could have implicated him." *Id.* at ¶ 243. The Appellate Court ignored Petitioner's offer of proof, which showed that Houghtaling would testify that in 2003 he invoked his Fifth Amendment right not to testify because he did not want to falsely accuse Petitioner. (Ex. 21 at R. 6002-03, 6041-42.)

114. The Appellate Court also stated that the trial court did not abuse its discretion by limiting Petitioner's cross-examination of Detective Wigman because the testimony would have been cumulative to Detective Brogan's testimony. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 246. Brogan testified about independent and dependent corroboration in general, and specifically about the evidence in this case that police did not disclose to the public. *Id.* Wigman, however, was in charge of the crime scene and would have testified additionally about whether the specific facts that Houghtaling provided police in his confessions had corroboration. (Ex. 23 at R. 6268-69, 6271-72; Ex. 26 at R. 6886-87; Ex. 22 at R. 6204-05.)

115. As to the improper admission of the panoply of prejudicial evidence against Petitioner, the Appellate Court held that "any error was harmless and did not contribute to conviction." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 250-51. In so holding, the Court

explained that the drug evidence introduced through Weisenberger did not contribute to Petitioner's conviction because: (1) Weisenberger's testimony about his cocaine and pill use over the years was not harmful because Weisenberger had already testified to having a buzz from consuming beers on the night at issue, and (2) Weisenberger's testimony that Petitioner smoked pot on the night of the burglary was cumulative because the jury had already heard Houghtaling's statement – that "we went outside, smoked a joint, and Kenny came up to me" – which the Court concluded definitively established that Petitioner had smoked marijuana. *Id.* at ¶¶ 250-51.

116. The Appellate Court held that the admission of the gruesome autopsy photos did not constitute error even though the cause of death was not disputed because the issue was decided on Petitioner's second appeal. *Id.* at ¶ 253. And the Appellate Court held that Detective Brogan's improper testimony about McMullan's purported out-of-court statement was not error. *Id.* at ¶¶ 255-56. Specifically, Brogan offered that "Miss McMullan, for one, told us that she had seen [Petitioner] with a revolver," and the trial court refused to strike the testimony despite the fact that McMullan was not called to testify and there was no evidence offered about the circumstances of the statement. *Id.* at ¶¶ 254-55. The Appellate Court concluded that the trial court did not err by declining to strike this evidence because the statement came in through a response to defense counsel's question. *Id.* at ¶¶ 255-56.

117. Petitioner timely sought leave to appeal from the Illinois Supreme Court, but his petition was denied on September 25, 2013. (Ex. 175.) Petitioner's Petition For Certiorari to the United States Supreme Court was denied on March 24, 2014. (Ex. 176.)

## ARGUMENT

## V.     LEGAL STANDARD.

118.     Petitioner's *habeas* petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, two different standards of review apply, depending on whether the state court actually adjudicated a properly raised federal claim.

119.     ***First***, AEDPA allows a federal court to grant *habeas* relief if the state court's actual adjudication of a federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" – *i.e.*, is "substantially different from the relevant precedent of th[e] [Supreme] Court."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  A state court decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts."  *Id.* at 413.

120.     ***Second***, when a state court fails to consider a properly raised federal constitutional issue, federal *habeas* review of that issue is not subject to the deferential standard that applies under AEDPA; rather, "the claim is reviewed *de novo*" under the pre-AEDPA standard of 28 U.S.C. § 2243.  *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Ruhl v. Hardy*, 743 F.3d 1083, 1090-91 (7th Cir. 2014).  In reviewing such a claim *de novo*, the federal court considers all of the evidence available to the state court at the point at which the issue was raised, *United States ex rel. Newman v. Rednour*, 917 F. Supp. 2d 765, 771 (N.D. Ill. 2012), and adjudicates the

question of law without engaging in additional scrutiny. *Ellison v. Walls*, 2008 U.S. Dist. LEXIS 48728, at \*17 (N.D. Ill. June 13, 2008).

**VI.    THE COURT SHOULD GRANT *HABEAS* RELIEF BECAUSE PETITIONER'S CONVICTION IS CONTRARY TO, AND IS AN UNREASONABLE APPLICATION OF, SUPREME COURT AUTHORITY ESTABLISHING THAT DUE PROCESS REQUIRES THE STATE TO PROVE GUILT BEYOND A REASONABLE DOUBT.**

121.    The United States Constitution requires guilt be proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 309. Proving guilt beyond a reasonable doubt is a heavy burden on the state, *In re Winship*, 397 U.S. 358, 362 (1970) (quoting *Brinegar v. United States*, 338 U.S. 160, 174 (1949)), that protects against convictions based on "dubious" evidence, *Perry v. New Hampshire*, 132 S. Ct. 716, 729 (2012). To ensure this heavy burden is met and to "prevent convictions where a reliable evidentiary basis is totally lacking," a reviewing court must consider whether all of the evidence presented is sufficient to support the conviction beyond a reasonable doubt. *California v. Green*, 399 U.S. 149, 164 n.15 (1970) (citing *Thompson v. Louisville*, 362 U.S. 199 (1960)); *United States v. Lamon*, 930 F.2d 1183, 1191 n.17 (7th Cir. 1991). If the reviewing court determines no rational jury could have found the elements of the crime beyond a reasonable doubt, it must reverse the conviction. *Jackson*, 443 U.S. at 318.

122.    Here, Petitioner's conviction should be reversed because it was supported only by Houghtaling's uncorroborated, out-of-court statements, and there was extensive evidence that someone other than Petitioner committed the crime charged. Petitioner satisfies AEDPA and *habeas* relief is warranted because the Appellate Court's decision upholding his conviction is both contrary to, and an unreasonable application of, clearly established federal law, as articulated in *Jackson* and other Supreme Court cases.

123.    As we show below in Part VI.A, the Appellate Court applied the wrong legal standards when determining the sufficiency of the evidence. ***First***, the Appellate Court

58

improperly held that once Houghtaling's prior inconsistent statements were admitted as substantive evidence, they were automatically sufficient to prove Petitioner's guilt and there was no need to determine whether the jury could rationally accept those prior inconsistent statements as proof beyond a reasonable doubt. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 163. **Second**, the Appellate Court inexplicably required Petitioner to prove that the evidence implicating the DeCicco Group "*overwhelmed* the State's case." *Id.* at ¶ 166 (emphasis added). Petitioner is entitled to *habeas* relief because both of these standards are directly contrary to the standard articulated by the United States Supreme Court in *Jackson*.

124. As we demonstrate below in Part VI.B, even if the Appellate Court's decision was not contrary to clearly established federal law (it was), the Appellate Court applied the *Jackson* standard in an objectively unreasonable manner in light of the facts of this case. Instead of considering all of the evidence together to determine whether "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," *Jackson*, 443 U.S. at 318, the Appellate Court considered the evidence presented by the State against Petitioner *separately* from the evidence Petitioner presented implicating the DeCicco Group. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 156-65 (discussing the State's evidence); *id.* at ¶¶ 166-71 (discussing Petitioner's evidence). The Court opined that the State's case on its own was not "so unreasonable, improbable, or unsatisfactory" as to raise a reasonable doubt. *Id.* at ¶ 172. Separately, the Court rejected without basis the evidence Petitioner presented demonstrating the DeCicco Group's guilt, but the Court did not consider whether this ample evidence of the DeCicco Group's guilt had any effect whatsoever on the strength of the State's evidence. *Id.* at ¶ 172. This grave failure alone entitles Petitioner to *habeas* relief, as the Court's process reflected an objectively unreasonable application of *Jackson* and its progeny.

59

**A.** **The Appellate Court's Decision Upholding Petitioner's Conviction Was Contrary To The Supreme Court's Clearly Established Precedent In *Jackson v. Virginia*, Which Requires The Reviewing Court To Determine That The State Proved Guilt Beyond A Reasonable Doubt.**

125. Although the Appellate Court mechanically recited the "beyond a reasonable doubt" standard, *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 154, it applied a rule that was "diametrically different" from the rule articulated by the Supreme Court in *Jackson*. *See Williams*, 529 U.S. at 405. ***First***, the Appellate Court held that because Houghtaling's prior inconsistent statements were properly *admitted* as substantive evidence under the state law hearsay rule, 725 ILCS 5/115-10.1, they necessarily constituted *sufficient* evidence to support Petitioner's conviction and the court was not permitted to ensure the evidence was reliable: "Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was 'substantially corroborated' or 'clear and convincing,' but it may *not* engage in any such analysis." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 163. ***Second***, the Appellate Court held that Petitioner failed to present compelling evidence of the DeCicco Group's guilt "that overwhelmed the State's case against him" and therefore the evidence against Petitioner was sufficient to sustain his conviction. *Id.* at ¶¶ 166, 172.

**1.** **The Appellate Court's Conclusion That Houghtaling's Prior Inconsistent Statements Were Sufficient To Support Petitioner's Conviction Is Contrary To *Jackson v. Virginia*.**

**a.** ***Jackson v. Virginia* Requires A Guilty Verdict Be Supported By Reliable Evidence.**

126. A reviewing court's duty to ensure the conviction is supported by substantial evidence is not diminished where the evidence consists of a co-defendant's prior inconsistent statements. *Green*, 399 U.S. at 170 & n.19; *Ticey v. Peters*, 8 F.3d 498, 500 (7th Cir. 1993). Just because evidence is admissible, does not mean that it is automatically sufficient to support a

guilty verdict. Where, like here, a defendant's conviction rests solely on the out-of-court, prior inconsistent statements of a co-defendant, the reviewing court still must conclude that the jury had a reliable basis to credit the prior inconsistent statements over the live testimony, *and* that those out-of-court statements were sufficient in light of *all* of the evidence presented to prove guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 318; *Ticey*, 8 F.3d at 502. The inquiry must focus "on the *quantity and the qualit*y of the evidence." *Ticey*, 8 F.3d at 500 (emphasis added).

127. In *Ticey*, the defendant was convicted of raping his 15 year-old sister who lived with the defendant and their mother. *Id.* at 499. Hours after the sister was attacked in her bedroom, she spoke with a police detective and identified the defendant as her attacker, telling the detective that she saw his face, recognized his voice, his odor, and his body height and weight. *Id.* Three days later, the sister initially repeated her identification of the defendant to an assistant state's attorney but, following a confrontation with her mother, the sister retracted her identification. *Id.* At trial, after the sister testified that she "could not be sure who her attacker was," the state was permitted to introduce her prior inconsistent statements as substantive evidence. *Id.* at 500. The defendant was convicted based solely on the out-of-court prior inconsistent statements and an Illinois appellate court affirmed the conviction. *Id.*

128. On *habeas* review, the Seventh Circuit looked to several factors to determine whether the jury could reasonably accept the sister's out-of-court statements over her in-court testimony. *Id.* at 501-03. The Seventh Circuit concluded that the out-of-court statements were "not corroborated by physical evidence," but they were nevertheless sufficient. *Id.* First, the Court looked at the circumstances under which the initial statement was made and concluded the circumstances supported their reliability – *i.e.*, the sister spoke to the detective within hours of

the attack, "minimiz[ing] the opportunity for fabrication," and the detective observed the sister's emotional state at the time of the identification. *Id.* Second, the Court considered the details implicating the defendant that were contained in the initial statement and that she made a consistent identification shortly thereafter and concluded that these details lent credibility to the out-of-court statements. *Id.* In contrast, the sister's trial testimony was a "weak and incomplete explanation" of why she allegedly made the prior statements. *Id.* Third, the Court determined that the sister had no motive to lie at the time she gave her initial statement, but there was evidence that she was under pressure to protect her brother and only changed her story at trial following pressure from her mother and the defendant. *Id.* Based on all of these factors, the Seventh Circuit concluded that the jury had a reasonable basis to believe the out-of-court statements over the in-court testimony and could have reasonably concluded that the State proved guilt beyond a reasonable doubt. *Id.* at 503-04.

129.    Other federal courts that have considered this issue have also concluded that, in order for prior inconsistent statements to be sufficient evidence of guilt such that the prior inconsistent statements can support a conviction on their own, there must be some evidence of corroboration or evidence that the original statements are sufficiently reliable. Only in "the most unusual case" will "a prior inconsistent statement alone [ ] suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence alone." *United States v. Orrico*, 599 F.2d 113, 118 (6th Cir. 1979); *see United States v. Bahe*, 40 F. Supp. 2d 1302, 1303, 1311 (D.N.M. 1998) (overturning conviction based solely on uncorroborated prior inconsistent statements where the witness had motive to lie). This is simply not that "most unusual case," particularly given the extensive evidence of someone else's guilt.

130.     When a conviction is based solely on prior inconsistent statements, it faces the inherent problem that the trier of fact's decision to credit an out-of-court statement over in-court testimony is often based on a guess or intuition, not credible facts.  *Bahe*, 40 F. Supp. 2d at 1310. "[T]he witness' prior inconsistent statement gains credibility by being repeated in court by a more credible spokes-person [*i.e,* the prosecutor] . . . [and] the jury may draw negative inferences from the recanting witnesses' demeanor, failing to recognize that his or her demeanor may have been just as poor when the statements were first made." *Id.* (quoting Stanley Goldman, *Guilt by Intuition:  The Insufficiency of Prior Inconsistent Statements to Convict*, 65 N.C. L. Rev. 1, 2 (1986)).   The danger associated with prior inconsistent statements offered as substantive evidence is significantly compounded when it is the only evidence the state offers against the accused, and therefore becomes the sole basis for a conviction.  *Id.*

131.     Congress recognized this danger when it was considering the use of prior inconsistent statements as substantive evidence under the Federal Rules.  The Senate Judiciary Committee addressed the "concern that a person could be convicted solely upon evidence admissible under this Rule [801(d)(1)]," by noting the distinction between "sufficiency of evidence to send a case to the jury" and mere "admissibility" of prior inconsistent statements.  S. Comm. on the Judiciary, S. Rep. No. 93-1277, 93rd Cong., 2d Sess. (1974), *reprinted in* U.S. Code Cong. & Admin News, at 7051, 7063 n.21 (1974).

132.     This distinction is the precise issue the Appellate Court disregarded here.  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 163.  Congress recognized the protections afforded by *Jackson* and proceeded under the assumption that the reviewing courts would serve as a check on the evidence:  That an out-of-court statement is admissible as substantive evidence under state law hearsay rules does not render it constitutionally sufficient to support a finding of guilt;

"[f]actual circumstances could well arise where, if this were the sole evidence, dismissal would be appropriate." S. Rep. No. 93-1277 (1974), *reprinted in* U.S. Code Cong. & Admin News, at 7051, 7063 n.21 (1974). The Appellate Court should have conducted the *Jackson* analysis here.

133. The inherent danger that a conviction will be based on unreliable evidence is increased significantly where, like here, the out-of-court statement is inculpatory and made by an alleged accomplice with a motive to lie. *See United States v. Spellissy*, 2006 U.S. Dist. LEXIS 47077, at *8-9 (M.D. Fla. July 11, 2006) (holding that a witness's guilty plea implicating the defendant, which was later recanted, could not support the defendant's conviction). Many common issues lead to false confessions, including the use of interrogation techniques such as making a suspect believe that a conviction is inevitable, threatening the suspect with horrible consequences absent a confession, leading the suspect, providing information otherwise unknown to the suspect, or offering the suspect sympathetic rationales to make a confession seem more palatable. Keith A. Findley, *Judicial Gatekeeping of Suspect Evidence: Due Process and Evidentiary Rules in the Age of Innocence*, 47 Ga. L. Rev. 723, 751-52 (2013).

134. Even when jurors are educated about the common factors leading to false confessions, they tend to yield to the popular misconception that false confessions do not actually occur. *Id.* at 751-53. Nevertheless, false confessions occur – and occur with some frequency. *Id.* at 725-26. Thus, when a conviction is based solely on prior inconsistent statements admitted as substantive evidence, particularly where that out-of-court statement is the potentially false confession of a co-defendant, it is even more important that the reviewing court properly consider whether *all* the evidence presented proved the defendant's guilt beyond a reasonable doubt. *Bahe*, 40 F. Supp. 2d at 1310; *see also Jackson*, 443 U.S. at 315 (discussing the requirement that a fact-finder reach a subjective state of "near certitude of the guilt of the

64

accused"). The Illinois Appellate Court simply failed to do that here, contrary to the plain requirements of *Jackson* and similar cases.

**b.     Houghtaling's Prior Inconsistent, Out-Of-Court Statements Were Unreliable.**

135.     The Seventh Circuit's analysis in *Ticey* requires the conclusion that Houghtaling's out-of-court statements were unreliable:   (1) the circumstances of Houghtaling's statements, made months and years after the shooting, allowed ample opportunity for Houghtaling to fabricate an incriminating statement; (2) Houghtaling was an alleged accomplice who, after being lied to by police, received a plea deal in exchange for his testimony, and thus his statements were made under circumstances that created a strong incentive – even pressure – to lie; and (3) there was no reliable evidence corroborating Houghtaling's out-of-court statements. *See Ticey*, 8 F.3d at 502-03.   In addition to the *Ticey* factors, another factor provides even stronger evidence of unreliability; (4) the statements were factually incorrect and fraught with inconsistencies.

136.     ***First***, the circumstances and timing of Houghtaling's out-of-court statements suggest that they were not trustworthy.   For example, Houghtaling confessed to police on May 12, 2001, over *2 months* after the Burrito Express shooting.   During that time, Houghtaling had ample opportunity to learn facts and details about the crime from outside sources.   (Ex. 21 at R. 5972-73.)   If, like here, "a significant amount of time passes between a crime and a statement, a greater opportunity exists for a witness to fabricate a story and an identification." *Ticey*, 8 F.3d at 503.   Unlike the witness in *Ticey*, where the victim spoke to a detective just hours after the incident, at the time of his initial statement, Houghtaling was a primary suspect who was pulled off a bus three states away and two months after the crime and interrogated by police without first speaking to an attorney.   (Ex. 21 at R. 5966-67.)   In the two months between the shooting

65

and Houghtaling's apprehension, Houghtaling heard about the crime in the press, saw news reports about the case, spoke to other people about the shooting, read newspaper clippings about the crime, and learned that people he knew had been questioned about the crime. (Ex. 21 at R. 5972-75.) Houghtaling's statements at McMullan's trial in 2002 and in Petitioner's 2008 trial were even further removed from the crime, and occurred after Houghtaling had reviewed police reports, forensic reports, ballistic reports, witness statements – basically everything in the State's file – and met with the State's Attorneys to prepare for his testimony. (Ex. 21 at R. 5971-72, 6006-10.) This factor supports the conclusion that Houghtaling's out-of-court statements were not reliable.

137. The reliability of his statements are further undermined by Houghtaling's affect in making them. We respectfully urge the Court to listen to Houghtaling's recorded statement in May 2001, which started the entire unfortunate and unfounded chain of prosecution, and is appended as Exhibit 137. Houghtaling testified at Petitioner's Third Trial that he was under the influence of drugs at the time he made the statement. (Ex. 21 at R. 5989-90.) The interrogating officers testified they did nothing to determine whether he was intoxicated at the time. (Ex. 21 at R. 5991; Ex. 23 at R. 6405.) We may not know for sure whether Houghtaling was intoxicated, but aside from the various things he did not know or got plain wrong, his affect during the interrogation – uncommonly long delays before answering simple questions, and a highly uncertain tone – undermine the reliability of his statement. (*See* Ex. 23 at R. 6384, 6387-89.)

138. *Second*, unlike the victim in *Ticey*, Houghtaling had a clear motive to lie at the time he made the out-of-court statements: Houghtaling was also accused of the crime and wanted to be treated more favorably by the police and prosecutors. Houghtaling initially denied any culpability in the Burrito Express shooting, but after the police directly lied to him by falsely

66

telling him that Petitioner, Collett, and McMullan had all given incriminatory statements to police, Houghtaling changed his story and told police what they wanted to hear. (Ex. 21 at R. 5990-93; Ex. 23 at R. 6371-74.) The police encouraged Houghtaling to save himself from a 60-year sentence and promised to help Houghtaling if he confessed. (Ex. 21 at R. 5991-92, 5999-6000; Ex. 23 at R. 6372.) With the prospect of a long prison sentence hanging over him, Houghtaling confessed and later pled guilty and was sentenced to 20 years – instead of the maximum 60 – in exchange for a promise to testify against the other defendants. (Ex. 21 at R. 5999-6000.)

139. As Houghtaling was called to testify against his alleged accomplice, at Petitioner's First Trial, he began to have doubts about testifying falsely and refused to testify. (Ex. 11 at R. 1508-09; Ex. 21 at R. 6041-42.) At Petitioner's Second Trial, Houghtaling testified on direct that Petitioner participated in the Burrito Express shooting, but moments later on cross-examination, Houghtaling completely recanted, explaining that the State threatened to revoke his plea deal if he refused to testify this time. (Ex. 13 at R. 3457-75; Ex. 21 at R. 5961.) In fact, Houghtaling was convicted of perjury after he recanted his testimony at Petitioner's Second Trial (Ex. 21 at R. 6028) (though the State did not have to prove whether Houghtaling's testimony on direct or cross-examination was false, just that it was contradictory, 720 ILCS 5/32-2).

140. At Petitioner's Third Trial, Houghtaling testified that neither he nor Petitioner were involved in the Burrito Express shooting. (Ex. 21 at R. 5864-69.) The State then introduced all of Houghtaling's prior inconsistent statements as substantive evidence. (Ex. 21 at R. 5868-5957.) Unlike the victim in *Ticey*, there is no evidence that Houghtaling felt loyal to Petitioner, feared any sort of retaliation (they had both long been incarcerated by that time), or had any reason to deny that Petitioner was involved other than Houghtaling was "tired of lying."

67

(Ex. 21 at R. 6028-29.) This factor supports the conclusion that Houghtaling's out-of-court statements were not reliable.

141. **_Third_**, Houghtaling's out-of-court statements were not corroborated by the rest of the evidence. There was absolutely no physical evidence implicating Petitioner or Houghtaling, despite an extensive crime scene search, investigation, and thorough testing of the forensic evidence. (Ex. 22 at R. 6219-20, 6243-45; Ex. 23 at R. 6288-96; Ex. 21 at R. 5841-42.) The police cordoned off several blocks surrounding the Burrito Express and went over the scene with "a fine tooth comb," using metal detectors at the scene and magnets to dredge the nearby creek. (Ex. 22 at R. 6210-12, 6219-20; Ex. 23 at R. 6277-78.) Everything was processed, examined, and compared with standards obtained from Petitioner, Houghtaling, and Collett. (Ex. 23 at R. 6288-96, 6299-300.) The crime scene was bloody (Ex. 21 at R. 5780-81, 5812-13, 6130; Ex. 36, People's Ex. 6; Ex. 37, People's Ex. 7) and there was a bloody struggle with the victim (Ex. 22 at R. 6132), but neither Petitioner nor Houghtaling had blood on their clothes that night or the next day (Ex. 23 at R. 6443; Ex. 24 at R. 6514-15, 6621-23); the alleged getaway car had no blood (Ex. 23 at R. 6445; Ex. 24 at R. 6626-27, 6579-80); and there was no sign of injuries on Petitioner or Houghtaling (Ex. 23 at R. 6307-08, 6440, 6443; Ex. 24 at R. 6514-15, 6622).

142. There was also no eyewitness testimony corroborating Houghtaling's out-of-court statements or otherwise connecting Petitioner or his alleged accomplices to the crime. The sole eyewitness, Pardo, was shown photos of Petitioner and Houghtaling less than 48 hours after the shooting but was unable to identify either of them and has _never_ identified either as the men involved. (Ex. 24 at R. 6599-601; Ex. 22 at R. 6162, 6170; Ex. 147, Def. Ex. 30.) A police sketch artist created sketches of the robbers on the night of the shooting based on Pardo's description; the sketch of the man with the gun showed a clean-shaven face, but Petitioner's

booking photo from the next day showed he had facial hair.  (Ex. 22 at R. 6163, 6252-53; Ex. 23 at R. 6303-04; Ex. 92, People's Ex. 62; Ex. 93, People's Ex. 63.)  Likewise, none of the evidence concerning Petitioner's alleged accomplices connected Petitioner to the crime in any way.  Although the State theorized that Collett was a lookout and McMullan was the getaway driver (Ex. 21 at R. 5768; Ex. 27 at R. 7016, 7041), the State presented no evidence supporting this theory.  McMullan did not testify at all.  Pardo testified that he only saw two men involved in the robbery, and none of Houghtaling's out-of-court statements contained any incriminating facts about either McMullan or Collett as an alleged accomplice.  When Collett denied involvement (Ex. 23 at R. 6406-07), the trial court permitted the State to introduce evidence that Collett pled guilty to participating in the Burrito Express shooting, and that Collett apologized to Briseno's family "for their loss" at his sentencing hearing.  (Ex. 23 at R. 6406-09.)  Collett explained that he took "a plea of convenience," as recommended by his attorney, in order to avoid spending significant time in prison.  (Ex. 23 at R. 6406-07.)  This factor also supports the conclusion that Houghtaling's out-of-court statements were not reliable.

143.  ***Fourth***, Houghtaling's out-of-court statements were filled with factual errors, glaring inconsistencies, and a general lack of details of the crime.  During his May 2001 "confession" after being pulled off the bus and lied to, for example, Houghtaling got several key facts plain wrong:

- Houghtaling told police there were "a few other people" in the Burrito Express when he allegedly entered.  (Ex. 137, Def. Ex. 20, at 3.)  But investigators knew at the time that there were *no* customers in the Burrito Express when the robbers entered and the only other people present were Pardo and Briseno, who were in the kitchen and could not be seen from the front of the restaurant when the robbers entered.  (Ex. 23 at R. 6389-90; Ex. 22 at R. 6142-43.)

- Houghtaling told police that one person chased him from the Burrito Express.  (Ex. 137, Def. Ex. 20, at 4.)  But investigators knew at the time that both Pardo and Briseno chased the robbers from the store.  (Ex. 23 at R. 6390-91.)

69

- Houghtaling told police that after the shooting, "We met back up at the house. Then we left . . . I know we took David home." (Ex. 137, Def. Ex. 20, at 6-7.) But the investigators knew that David Collett went to Cloud 9 during the period right after the shooting. (Ex. 23 at R. 6391-92.)

- When shown by police a drawing of both a revolver and an automatic pistol, Houghtaling identified the automatic pistol as the weapon used in the crime. (Ex. 23 at R. 6394.) But as investigators knew at the time (because no shell casings were found at the scene), Briseno was shot with a revolver. (Ex. 23 at R. 6381.)

144. Houghtaling's out-of-court statements were also inconsistent with each other and with the other evidence presented at trial. For example, at the Second Trial, Houghtaling testified that he slipped and fell on ice while being chased by Briseno, and that after he fell, Briseno and Pardo jumped on him and then Pardo put a knife to his throat. (Ex. 13 at R. 3463-64.) In contrast, in his May 2001 statement, Houghtaling said that only one man grabbed him, and he said nothing about a knife to his throat. (Ex. 137, Def. Ex. 20, at 5-6; Ex. 21 at R. 5905-06.) Pardo also contradicted Houghtaling, testifying that he never had a knife during the struggle ("Q. Did you ever have a knife in your hand? A. Who me? No.") and that only he jumped on Houghtaling during the struggle. (Ex. 22 at R. 6144-46.)

145. During his interrogation in 2001, Houghtaling told police that he ran back to "the house" after Briseno let go of him, and when officers asked if he went back to a car, Houghtaling responded "not that I can remember." (Ex. 137, Def. Ex. 20, at 6.) It was not until officers pressed him, specifically asking whether he got into McMullan's car right away, that Houghtaling responded: "now that I think about it, yes." (Ex. 137, Def. Ex. 20, at 7.) At the Second Trial, Houghtaling testified to the police's version of events, stating that he ran back to McMullan's car when Briseno let go of him. (Ex. 13 at R. 3464-65.)

146. Additionally, Houghtaling told police during his 2001 interrogation that Petitioner suggested the robbery *at Weisenberger's house*, but after prodding, Houghtaling agreed with

70

police that the plan was discussed *in the car* on the way back from Wisconsin. (Ex. 137, Def. Ex. 20, at 1, 10.) In his 2002 testimony, Houghtaling changed his story yet again, testifying that he and Petitioner began planning the crime hours earlier *at Houghtaling's home*. (Ex. 21 at R. 5943-44.)

147.    The few facts Houghtaling got right in his May 2001 statement were fed to him by the police through leading questions, including the alleged use of ski masks, a handgun, and whether Houghtaling was grabbed and fell down. Detective Brogan, who is a criminal justice instructor, testified that leading questions are a disfavored technique because they result in false confessions. (Ex. 23 at R. 6363-64.) Nonetheless, during the interrogation, Detective Jones suggested key concepts and words before Houghtaling ever used them. (Ex. 23 at R. 6386-87.)

148.    Indeed, *nothing* in Houghtaling's statements supports the "reliability" of those statements in the sense that they show he had independent knowledge about the shooting of Briseno on the night of March 6, 2001. As summarized at trial, and above at Part IV.B.4, every element of Houghtaling's story was either wrong, fed to him by police, or publicly known, and there was absolutely no evidence that he knew anything about the few things that *could* have shown that he was actually there – the non-public facts held back by police for the *very purpose* of providing corroboration to a suspect's statements.

>                      c.    **Had The Appellate Court Conducted A Proper *Jackson* Analysis, It Would Have Concluded That Houghtaling's Out-Of-Court Statements Were Insufficient To Prove Guilt Beyond A Reasonable Doubt, Particularly When Considered With Evidence Of The DeCicco Group's Guilt.**

149.    Houghtaling's uncorroborated and unreliable out-of-court statements were insufficient on their own to support Petitioner's conviction and, especially in light of the evidence of the DeCicco Group's guilt, no rational trier of fact could have found that the State

proved Petitioner's guilt beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318. Had the Appellate Court conducted a *Jackson* analysis, it would have reached this conclusion.

150. In *Bahe*, 40 F. Supp. 2d at 1305-10, where essentially the only evidence against the defendant was a prior inconsistent statement that the victim recanted at trial, the district court noted that it had reviewed over 100 cases and failed to find a single one in which a conviction was sustained on so little evidence. The district court noted that "[i]n cases in which an inconsistent out-of-court statement was admitted as substantive evidence . . . and no other evidence was presented, state and federal courts have nearly uniformly concluded that there was insufficient evidence to support the conviction." *Id.* at 1307. The court looked to *Jackson* in finding that "the most basic component of due process in our system of criminal justice – the requirement that the government must prove its case beyond a reasonable doubt" – required the conviction to be overturned. *Id.* at 1310, 1313. "*Jackson v. Virginia* . . . looms like a cloud over the idea that, somehow, a conviction based solely on a out-of-court inconsistent statement, satisfies due process." *Id.* at 1310. Similarly, in *Orrico*, 599 F.2d at 117-19, the Sixth Circuit reversed a conviction where "the central element of the crime with which the defendant was charged was established entirely through the use of out-of-court statements."

151. Much like in *Bahe* and *Orrico*, here the jury, without any physical or circumstantial evidence connecting Petitioner to the crime, was essentially forced to *speculate* about which of Houghtaling's statements were true: his in-court testimony or his out-of-court statements implicating Petitioner. *Bahe*, 40 F. Supp. 2d at 1310. "When a trier of fact decides to believe a witness' prior out-of-court assertions rather than that same witness' present in-court contradiction of those earlier remarks, that decision often is based solely on guess or intuition, not credible facts." *Id.* (citing Stanley Goldman, *Guilt by Intuition: The Insufficiency of Prior*

72

*Inconsistent Statements to Convict*, 65 N.C.L. Rev. 1, 2 (1986)).  The Appellate Court committed constitutionally impermissible error in upholding the jury's speculation, as evidenced by the great lengths it had to go to in attempting to justify their conclusion.

152.    The Court held that Houghtaling's prior inconsistent statements were not unreliable because they "were consistent with each other and corroborative of Pardo's testimony," *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 160, ignoring (1) the many inconsistencies identified above in Part IV.B.4; (2) the reality that Houghtaling was forced to "corroborate" his own story in order to receive and retain his plea deal; and (3) the fact that Houghtaling's statements did not "corroborate" Pardo's testimony because the statements were crafted by the police pursuant to the version of events they had already received from Pardo (Ex. 22 at R. 6135; Ex. 23 at R. 6385-86).  And the Appellate Court's conclusion that the statements were consistent is at odds with its acknowledgement of inconsistencies just three paragraphs later.  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 163.  But instead of reviewing or evaluating these inconsistencies, the Appellate Court stated, "We cannot conclude that any inconsistencies cast doubt on the jury's verdict," thus *blatantly ignoring* its duty to determine whether a reasonable trier of fact could have found that Petitioner was guilty beyond a reasonable doubt.  *Id.*

153.    The Appellate Court attempted to find other supporting evidence where there was none and made much of the fact – apparently because the interrogation was conducted before any plea deal – that the jury heard the 2001 interrogation during which Houghtaling "confessed." *Id.* at ¶¶ 156-57.  But the Court ignored the fact that during the interrogation, the detectives were already telling Houghtaling that he would "help himself" by confessing, and that "it might go better for him if he cooperated and gave a statement."  (Ex. 23 at R. 6372.)  And the Court did not even comment on, let alone address, the many other factors that cut *against* the reliability of

Houghtaling's 2001 statements, such as: (1) that Houghtaling was a teenager at the time (Ex. 23 at R. 6372); (2) that the officers had already questioned Houghtaling for some time prior to starting the tape recorder (Ex. 23 at R. 6370); (3) that the officers admitted lying to Houghtaling about his alleged co-conspirators' having made statements (Ex. 23 at R. 6372-74, 6385); (4) the extent to which detectives fed Houghtaling the key events of the crime (Ex. 23 at R. 6385-86); and (5) Houghtaling's affect and demeanor in making the statements (*see* Ex. 23 at R. 6384-85; Ex. 138, Def. Ex. 21).

154.    Next, the Appellate Court reasoned that the jury might have been convinced by the fact that Houghtaling stated during his interrogation that the defendant carried a "little .22," *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 157, but ignored the fact that Houghtaling obviously did not know what that was – he erroneously pointed to the drawing of an automatic instead of a revolver when asked what the gun looked like. (Ex. 23 at R. 6393-94.)

155.    As to Collett, the Appellate Court speculated, with no evidence in the record, that the jury might have credited an *inference* drawn from Collett's expression of sympathy – not a statement implicating himself or Petitioner – over Collett's direct testimony that neither he nor Petitioner was involved in the crime. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 159.

156.    And the Appellate Court attempted to explain away the lack of identification evidence by noting that the jury was "aware that it was dark out during the shooting and that defendant's face was visible only when he was about 25 to 30 feet away from Pardo." *Id.* at ¶ 162. Evidence showed there were lights on in parts of the Burrito Express parking lot, however. (Ex. 21 at R. 5853-54.) Pardo testified that he got a good enough look at the perpetrators to accurately describe their faces to a sketch artist on the night at issue, and the sketches "closely resemble" the two robbers. (Ex. 22 at R. 6164, 6166-67.) Nora Rubel, the

sketch artist, testified that she spent multiple hours with Pardo on the night of March 6, 2001, as Pardo suggested changes to the sketches until the sketches accurately reflected what the perpetrators looked like. (Ex. 22 at R. 6053-54.) Pardo also told defense attorneys during a meeting in November 2007 that he got a "good look" at the shooter's face and "would be able to recognize the shooter today." (Ex. 24 at R. 6616-17.) Moreover, the Appellate Court took the inconsistent positions that because it was dark in the parking lot, Pardo might have been wrong about the perpetrator's facial hair – and yet, the jury would have been reasonable in crediting Pardo's testimony that Houghtaling's green jacket "looked like" the one the perpetrator wore. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 160, 162.

157. Furthermore, because the Appellate Court was in the unique circumstance of having to justify the verdict based on Houghtaling's wholly unreliable statements and in light of multiple confessions by the DeCicco Group, it had to take incongruous positions about the same kind of evidence. While it made little of the possibility that Houghtaling learned about the crime through news reports and word of mouth, the Appellate Court *postulated that DeCicco knew key, non-public facts because she read "new" news reports*, none of which were in the record, or because the details were not kept as secret as the police believed – again, without any basis in the record. *Id.* at ¶ 170. Quite unlike the way it glossed over the fatal inconsistencies in Houghtaling's testimony, the Appellate Court dwelled on the inconsistencies it *perceived* in DeCicco's confessions. *Id.* at ¶¶ 166-67. Although the Appellate Court quickly dismissed the fact that Houghtaling received a plea deal and had a motive to lie, *id.* at ¶ 163, it accepted DeCicco's bewildering explanation that she confessed to the *murder* in order to incur leniency on a *shoplifting* charge. *Id.* at ¶ 168. In explaining away other witnesses' testimony about the DeCicco Group's myriad confessions, the Court noted that many of the witnesses had

convictions involving deceit, apparently forgetting that Houghtaling too was *convicted of perjury based on the very testimony at issue* and had changed his story about what allegedly happened the night of the crime. *Id.* at ¶ 171. And the Appellate Court failed even to address certain evidence demonstrating the DeCicco Group's guilt – evidence the State did not even bother to challenge – including DeCicco's car being "stolen" and burned in a field in Wisconsin and Hiland's independent and unrebutted confessions. It is not enough, particularly in the context here, to simply find, as the Appellate Court did, that, "It was the jury's function to assess the witnesses' credibility." *Id.*

158. In sum, the Appellate Court's holding was contrary to clearly established federal law because the Appellate Court failed to evaluate the jury's verdict under *Jackson*, instead abdicating its duty to assess the *constitutional* reliability of the only evidence against Petitioner – Houghtaling's prior inconsistent statements – on the ground that they satisfied a state law hearsay rule. *Jackson* compels a different result.

> **2.** **Independently, The Appellate Court's Conclusion That Evidence Of The DeCicco Group's Guilt Did Not Require Reversal Because It Did Not "Overwhelm" The Evidence Of Petitioner's Guilt Improperly Shifted The State's Burden To The Defense And Is Therefore Contrary To *Jackson v. Virginia*.**

159. The burden of persuasion always rests squarely on the state. *In re Winship*, 397 U.S. at 363-64. Where, like here, a defendant presents credible evidence of a third-party's guilt, the state bears the burden of providing some plausible explanation for the evidence. *See Watkins v. Miller*, 92 F. Supp. 2d 824, 836-38 (S.D. Ind. 2000) (finding that, in light of newly obtained DNA evidence showing an unknown male's involvement in the crime, the State had to offer a theory that was not "far-fetched" and that aligned with the other evidence presented in order to argue that *two men*, including the defendant, committed the crime). Here, the Appellate Court improperly shifted this burden to Petitioner by requiring that he prove "the evidence against the

76

DeCicco group was far stronger than that against [Petitioner]." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 166.

160. "Improper burden-shifting is a violation of due process." *United States v. Hunt*, 278 F. App'x. 491, 497 (6th Cir. 2008). In *Francis v. Franklin*, 471 U.S. 307 (1985), the United States Supreme Court held on *habeas* review that it was reversible error to shift the state's burden of persuasion to the defendant through a jury instruction that might have led jurors to believe they could *infer* intent to commit the crime. *Accord Sandstrom v. Montana*, 442 U.S. 510 (1979). But burden-shifting can occur in contexts other than jury instructions. In *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005), the district court at first upheld an indictment on the ground that the defendant did not show that he was no longer a legal, permanent resident of the United States at the time of the crime, but later reversed course upon realizing that it had "improperly shifted the burden to [the defendant] to demonstrate that he was no longer a 'U.S. person.'" The appellate court affirmed the dismissal of the indictment. *Id.* at 254. *See also McLemore v. Bell*, 503 F. App'x. 398, 408 (6th Cir. 2012) (discussing whether the prosecutor's line of questioning improperly shifted the burden of proof); *United States v. Blount*, 1992 LEXIS 986, at *1-2 (D.C. Cir. Jan. 1992) (discussing whether the court improperly shifted the burden of proof to the defendant through certain statements in its holding).

161. In this case, improper burden-shifting occurred when the Appellate Court grounded its sufficiency of the evidence analysis in its rejection of "the defendant's argument that he presented compelling evidence of [the DeCicco Group's] culpability that overwhelmed the State's case against him." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 166. By focusing on whether the DeCicco Group evidence *overwhelmed* the State's case and whether "the evidence against the DeCicco Group was far stronger than against the defendant," instead of whether the

State's evidence was sufficient, the Appellate Court shifted the burden to Petitioner to prove the DeCicco Group's guilt. This improper burden-shifting was tantamount to requiring Petitioner to prove his own innocence, a clear constitutional violation. The Court also foisted upon Petitioner the task of showing that the State's evidence was "so unreasonable, improbable, or unsatisfactory" as to warrant a reversal. *Id.* at ¶ 172. But Petitioner had to show none of those things; all he had to do was raise reasonable doubt. *Jackson*, 443 U.S. at 309. He undoubtedly did.

> **B.      Alternatively, In Light Of The Extensive Evidence Of The DeCicco Group's Guilt, The Appellate Court's Decision Upholding Petitioner's Conviction Was An Unreasonable Application Of *Jackson v. Virginia*.**

162.      Even if the Appellate Court's decision upholding Petitioner's conviction is not contrary to clearly established federal law (it is), the Appellate Court unreasonably applied *Jackson* to the facts of this case. 28 U.S.C. § 2254(d)(1). Instead of considering evidence of the DeCicco Group's guilt as part of the overall evidence presented to determine whether the State proved Petitioner's guilt beyond a reasonable doubt, as required by *Jackson*, 443 U.S. at 318-19, the Appellate Court considered the evidence separately. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 156-65, 166-71. Had the Appellate Court properly considered all of the evidence in this case, it would have concluded that no rational jury could have found Petitioner guilty beyond a reasonable doubt. *See Bahe*, 40 F. Supp. 2d at 1313.

> **1.      *Jackson v. Virginia* Requires A Reviewing Court To Consider The Sufficiency Of The Evidence In Light Of All Of The Evidence Presented.**

163.      As explained above, *Jackson* requires the reviewing court to consider whether *all* of the evidence presented is sufficient to support the defendant's conviction beyond a reasonable doubt: "The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Federal courts interpreting *Jackson* have held that "[t]he failure of a state court to give appropriate weight to *all* of the evidence may mean its conclusion is objectively unreasonable." *O'Laughlin v. O'Brien*, 568 F.3d 287, 305 (1st Cir. 2009) (emphasis added) (citing *Hurtado v. Tucker*, 245 F.3d 7, 18 (1st Cir. 2001)). The Appellate Court's conclusion that the "evidence presented against [Petitioner] and his group" was such that a rational trier of fact could have found Petitioner guilty "beyond a reasonable doubt" totally ignored the extensive evidence of the DeCicco Group's guilt. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 156. Indeed, the Appellate Court concluded that Houghtaling's out-of-court statements were sufficient to convict *before* even discussing the evidence of the DeCicco Group's guilt. *Id.* at ¶¶ 156-65.

164. "[A] properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt . . . [W]hen such a conviction occurs in a state trial, it cannot constitutionally stand." *Jackson*, 443 U.S. at 316-17. A reviewing court is not permitted simply to accept the jury's assessment or speculate as to why the jury reached its verdict. *Id.* Nor should a reviewing court simply "give credence to 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *O'Laughlin*, 568 F.3d at 301. But that is precisely what the Appellate Court did here: "the jury was presented with two versions of the events and, given its verdict, it found the State's version persuasive." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 172. The Supreme Court has rejected the notion that the trier of fact in a criminal case should simply "perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition." *In re Winship*, 397 U.S. at 367-68.

165.    Although the reviewing court need not substitute its own opinion for the jury's, it still must consider *all* of the evidence taken together and make a determination based on that consideration that a rational trier of fact could have accepted the evidence presented as proof of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19.  When weighing the sufficiency of the evidence, courts in the Seventh Circuit "take into account all [of] the evidence . . . and make a holistic assessment of whether the jury reached a reasonable verdict." *United States v. Long*, 748 F.3d 322, 326 (7th Cir. 2014).  In *Long*, the court reasoned that certain pieces of evidence, standing alone, would not support a finding of a conspiracy, but *all the evidence together* might. *Id*; *accord United States v. Baker*, 40 F.3d 154, 160 (7th Cir. 1994) (stating that the court reviews all sufficiency of the evidence claims by assessing the "evidence as a whole, including all reasonable inferences").  In *Rakovich v. Wade*, 850 F.2d 1180, 1197-98 (7th Cir. 1988), the Seventh Circuit emphasized the importance of considering all evidence together; in that case, the plaintiff offered evidence of one incident of animosity between himself and the defendant in support of his retaliation claim.  The court noted that while that incident might show animosity, it was insufficient to support the retaliation claim in light of evidence of "all these other legitimate circumstances" supporting the defendant's actions. *Id*.  The court explained that it considered *all of the evidence together* in order to "determine its true significance." *Id.*

166.    Similarly, in *Watkins*, 92 F. Supp. 2d at 838, the court granted the petitioner's *habeas* petition upon finding that "*[i]n light of all the evidence*, [the State's] theory is merely an improbable theoretical possibility that no reasonable juror would credit beyond a reasonable doubt" (emphasis added).  And in *D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008), the Sixth Circuit affirmed a grant of *habeas corpus* explaining that certain suppressed evidence "would have had the effect of *both weakening the prosecution's case and strengthening the*

*defense's position* that someone else committed the murder," and as such, there was "a reasonable probability that the outcome of [the petitioner's] trial would have been different." (emphasis added).

167.     The same logic should have been applied here.  *Even if* Houghtaling's statements incriminating Petitioner would have been enough to support a finding of guilt on their own (they were not) had Petitioner not put on a defense, they *were severely – fatally – undermined* by the wealth of evidence showing the DeCicco Group committed the crime.  The Appellate Court could not have appreciated their "true significance" (or lack thereof) without examining them in light of the evidence belying them.  *Rakovich*, 850 F.2d at 1197.  Considering the evidence against Petitioner in tandem with the DeCicco Group evidence would have rendered the State's evidence insufficient to support a conviction beyond a reasonable doubt.

> **2.      The Appellate Court Unreasonably Applied *Jackson* Because It Did Not Properly Determine Whether There Was Constitutional Reasonable Doubt In Light Of The Evidence Against The DeCicco Group.**

168.     As described above in detail in Part IV.C.2, Petitioner presented extensive evidence – direct and circumstantial, physical and testimonial – of the DeCicco Group's responsibility for shooting Briseno.  Although the State tried to "explain away" some of that evidence, it failed to contest a number of important facts.  *See United States v. Burks*, 547 F.2d 968 (6th Cir. 1977) (reversing the conviction where the state failed to rebut the defendant's evidence of insanity) *rev'd on other ground*s, 437 U.S. 1 (1978).  Not only did the Appellate Court unreasonably apply *Jackson* and other authority by ignoring the State's failure to rebut important facts implicating the DeCicco Group, it unreasonably applied *Jackson* by: (1) deferring to the State's assertions rather than appraising the validity of those assertions, *Wiggins v. Smith*, 539 U.S. 510, 526-28 (2003) (finding error in the appellate court's deference to

counsel's "strategic decisions" without assessing those decisions and the investigative efforts that preceded them); (2) failing to give appropriate consideration and weight to key facts, *see Porter v. McCollum*, 558 U.S. 30, 41-42 (2009) (finding error in the state court's discounting mitigation evidence); and (3) engaging in rank speculation about what might have occurred including, in some instances, by giving contradictory assessments of the exact same facts in order to come out in favor of the State, *O'Laughlin*, 568 F.3d at 307 (granting *habeas*, noting that "a 'reasonable' inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence").

> **a.    The Appellate Court Unreasonably Applied *Jackson* In Deferring To The State's Unfounded Speculation To Explain Away The Proof Of The DeCicco Group's Guilt.**

169.    As described in detail above in Part IV.C.2.a, DeCicco began confessing to her friends and family within weeks of the Burrito Express shooting and continued confessing for years following the shooting.   DeCicco confessed to police on videotape – twice – and her confessions to police contained explicit details of the crime, including facts intentionally held back by police for the express purpose of corroborating a confession.   (*See* Part IV.C.2.a ¶¶ 73-75 above.)   Indeed, DeCicco told police, Brummett, and Schwartz the same non-public details – that one of the men yelled something into her car and that Levand hit the man on the head with the gun – neither of which were known by Houghtaling.   (Ex. 169, Def. Ex. 51, at 7-8.)   Also unlike Houghtaling, DeCicco knew the gruesome detail that Briseno spit blood (Ex. 169, Def. Ex. 51, at 8, 21), which was consistent with Pardo's testimony that Briseno cried out and spit blood: "[Briseno] was kind of like aah, and he spit blood out of his mouth."   (Ex. 22 at R. 6123.)

170.    In an attempt to minimize the extensive evidence of DeCicco's confessions, the State called DeCicco in rebuttal.   (Ex. 26 at R. 6954-63.)   DeCicco testified that her confessions to Schwartz were "a joke between myself and my sister," and that she repeated this "joke" to her

mother, Brummett, because in her words, "my mother felt sorry for me and she had given me money on a few occasions" to purchase heroin.  (Ex. 26 at R. 6961.)  DeCicco testified that she thought Brummett would give her more money for heroin if she confessed to a murder.  (Ex. 26 at R. 6961, 6975.)  The State offered no explanation for DeCicco's confessions to Tyda and Rexford (although it made a feeble effort to demonstrate that Tyda's memory had faded over time).  (Ex. 25 at R. 6701-04.)

171.     As to her videotaped confessions to police, DeCicco testified that after she was arrested for shoplifting, she thought that if she lied to police about her involvement in the attempted robbery and murder, the police would release her:  "I was told that I would definitely be leaving that day if I basically said something different and I was ready to go home."  (Ex. 26 at R. 6958.)  DeCicco testified that she confessed to police on videotape a second time because "[i]t just somehow made sense to me that if I just lied a little longer, I'd be able to get out and deal with it later."  (Ex. 26 at R. 6958.)

172.     In its closing argument, the State argued that DeCicco is "a lying liar and she's a thief."  (Ex. 27 at R. 7113.)  The State did not offer *any* explanation as to how DeCicco possibly could have learned all of the non-public details about the shooting if she had not been present; although the State tried to impeach her with prior testimony that she had seen police reports, DeCicco denied having seen them.  (Ex. 26 at R. 6963.)

173.     The Appellate Court acknowledged that "DeCicco knew two facts [about the crime] that were not made public" – indeed the very facts held back by police for the purpose of corroborating any confessions they received (Ex. 26 at R. 6891-92) – but nonetheless found DeCicco's confessions inconsistent and unreliable.  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 166.  The Appellate Court speculated – with no evidence in the record to support its

speculation – that DeCicco had non-public information because she "read new reports of the crime" or the information was not really kept secret. *Id.* at ¶ 170. The court found that the jury must have accepted DeCicco's explanation for her confessions – *i.e.*, that she lied to get money for drugs and to get the police to release her after she was arrested for shoplifting – or simply "found the State's version persuasive." *Id.* at ¶ 172.

174.    The Appellate Court's speculation about how DeCicco might have learned this non-public information – indeed the very information the police withheld from the public in order to corroborate any confessions they received – was constitutionally impermissible. *See Watkins*, 92 F. Supp. 2d at 836-38; *O'Laughlin*, 568 F.3d at 301, 305 ("We are loath to stack inference upon inference in order to uphold the jury's verdict."). The Appellate Court's speculation was an obvious substitution of its own judgment.

175.    If Houghtaling, rather than DeCicco, had knowledge of these non-public facts and the Appellate Court had *vacated* Petitioner's conviction based on its speculation that Houghtaling learned this information – not by being present at the shooting but by reading "new reports of the crime" or because "this non-public information was not kept as secret from the public as the police desired" – the State undoubtedly would have sought (and likely obtained) a reversal.[10]  *See Ray v. Clements*, 700 F.3d 993, 1013 (7th Cir. 2012) (reversing dismissal of *habeas* petition because the district court based its finding on "nothing more than a string of speculative doubts").

---

[10] As explained in Part VII below, Petitioner sought to introduce evidence that Houghtaling learned public facts about the crime – not because he was there but by reading news reports. The trial court excluded this evidence and the Appellate Court affirmed the exclusion

    b. **The Appellate Court Unreasonably Applied *Jackson* In Failing To Require *Any* Evidentiary Explanation For Adam Hiland's Multiple Confessions.**

176. Hiland confessed to friends and family shortly after the Burrito Express shooting.

His confessions also included details of the crime that were unreleased to the public.

- Hiland confessed to his sister, Charlene McCauley, in December of 2001 while riding in a car. (Ex. 25 at R. 6761.) On that occasion Hiland told McCauley in a somber, depressed, and even ashamed manner that "he, Dallas, and Rusty were actually the ones who committed the crime," that they had been smoking crack and ran out that night, and that they decided to go rob the Burrito Express for money. (Ex. 25 at R. 6761-62.) McCauley also testified that she personally observed cuts and scrapes on Hiland's hands and arms the morning following the shooting. (Ex. 25 at R. 6758-59, 6761-62.)

- Hiland confessed to his cousin, Elizabeth Schwartz, within two or three months of the shooting. Schwartz testified that the two were in Schwartz's van "right in front of where the Burrito Express was." (Ex. 25 at R. 6777.) When Hiland refused to get out of the car and became noticeably agitated and fidgety, Schwartz, who had already heard DeCicco's confession, said to Hiland, "She wasn't lying, was she?" and recounted what DeCicco had said. (Ex. 25 at R. 6780-81.) Hiland responded, "She is a fat fucking bitch and she can't keep her mouth shut. She needs to keep her mouth shut." (Ex. 25 at R. 6781.) Hiland later related that Levand hit Briseno on the head with the gun. (Ex. 25 at R. 6782.) Schwartz also testified that she saw cuts and scrapes on Hiland the day after the shooting. (Ex. 25 at R. 6776.)

- Hiland confessed to Daniel Trumble, his friend and former roommate, multiple times in the summer of 2002.[11] (Ex. 25 at R. 6733-35.) On the first occasion the two were drinking together, and as Hiland related the events he was visibly shaken; he was crying and his hands were shaking. (Ex. 25 at R. 6734.) A few days later (when he had not been drinking), Hiland related the events again, "word for word" (although emphasizing that Levand was the shooter) and once again appeared upset. (Ex. 25 at R. 6742.) The third time that the two spoke about the shooting, Hiland told Trumble that because someone else had been arrested for the crime, he was not going to come forward about his involvement. (Ex. 25 at R. 6743.)

- Gina Kollross, who is McCauley's adoptive sister and who was dating Hiland's brother at the time, testified that Hiland confessed to her multiple times. (Ex. 25

---

[11] As discussed in more detail in Part VII, Petitioner sought to introduce evidence that following this confession, Trumble took Hiland to speak to an attorney about his involvement in the incident, and that Trumble was present for that meeting. (Ex. 25 at R. 6736-38.) The court excluded this evidence as irrelevant. (Ex. 25 at R. 6738.)

at R. 6750-51.) Kollross testified that she observed Hiland's arms bandaged a day or two after the shooting and asked Hiland about it. (Ex. 25 at R. 6752.) At first Hiland told her that he had slipped on some stairs, but later confessed that he was injured during the attempted robbery of the Burrito Express. (*Id.*)

- Vicki Brummett also testified that she saw cuts and scrapes on Hiland the day after the shooting. (Ex. 25 at R. 6718-19.)

177. In an attempt to discredit some, but not all, of Hiland's confessions, the State argued in closing that Trumble was untrustworthy because he had previously written bad checks. (Ex. 27 at R. 7117.) Additionally, on cross-examination of McCauley, the State intimated that Hiland had confessed to her as a ploy to get money. (Ex. 25 at R. 6763-64.) But the State's evidence did not address at all Hiland's confessions to Kollross and Schwartz; nor did the State question that Hiland told Schwartz that Levand hit Briseno in the head with the gun. Although the State called Hiland on rebuttal, it only did so to show an absence of scars on his arms. (Ex. 26 at R. 6985-86.) However, the demonstration revealed that Hiland does have a scar on his hand. (Ex. 26 at R. 6988.) Because the State offered no rebuttal of or plausible theory to explain Hiland's many confessions, this evidence of Hiland's guilt alone raises reasonable doubt as to Petitioner's guilt. *See Watkins*, 92 F. Supp. 2d at 838.

178. The Appellate Court unreasonably applied *Jackson* when it again speculated, but did not actually determine, whether the evidence of Hiland's confessions raised a reasonable doubt as to Petitioner's guilt. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 171. The Appellate Court surmised that the jury discounted the testimony of Schwartz and Trumble (to whom Hiland confessed) because they had "convictions involving deceit," and further discounted the testimony of Trumble because Hiland's confession to him occurred long after the shooting.[12] *Id.* at ¶ 171.

---

[12] The same is true of the testimony presented against Petitioner. Houghtaling and Collett both had convictions, including Houghtaling's for perjury (Ex. 21 at R. 6020), and all of Houghtaling's statements came months or years after the shooting. (Ex. 21 at R. 5989, 5999-6000, 6004.) DeCicco and Hiland,

As to Hiland's cuts and scrapes, the Appellate Court said that "Pardo's description of the shooting does not necessarily lead to the conclusion that the man in the green jacket sustained such injuries" and that "Hiland offered an alternative explanation for his injuries: he had slipped and fallen on icy stairs at Benjamin DeCicco's house." *Id*. at ¶ 171.

179.    Although Trumble did have a conviction for writing bad checks (Ex. 25 at R. 6731-32), and Schwartz was convicted of forgery (Ex. 25 at R. 6771-72), the Appellate Court did not comment on the State's failure to explain why it would have behooved either Trumble or Schwartz to testify falsely against their friend and cousin.  Nor did the court explain why it was so very damaging that *Hiland's* confessions to Schwartz and Trumble occurred a few months (Ex. 25 at R. 6780) and a year after the crime (Ex. 25 at R. 6744), respectively, when it was not significant that *Houghtaling* had more than seven years, as well as full access to the police reports and all of the State's discovery, to learn about the facts of the crime (Ex. 21 at R. 6008-09).  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 171.  And although it is theoretically possible that the struggle with Pardo did not result in injuries and that Hiland was injured by falling down icy stairs, the Appellate Court does not address whether it would have been reasonable to believe these improbable explanations in light of the confessions and all the other evidence against the DeCicco Group.  *Id*. at ¶ 171.

>    c.    **The Appellate Court Unreasonably Applied *Jackson* In Failing To Require Any Evidentiary Explanation For Levand's Detailed Confession.**

180.    Levand confessed to his friend, Patrick Anderson, in the summer of 2011 when the two men were serving time in the McHenry County jail.  (Ex. 24 at R. 6653-55.)  Levand told Anderson that he and Hiland went to the Burrito Express with the intent to rob it, but Briseno

---

however, began confessing within weeks of the shooting, and their confessions contained explicit details not contained in Houghtaling's confession.  (Ex. 25 at R. 6750-51, 6775.)

chased them out.  (Ex. 24 at R. 6654-55.)  Levand also told Anderson that he hit Briseno over the head with the gun in order to free Hiland, who was being held by Briseno at the time.  (Ex. 24 at R. 6655.)  Levand told Anderson that he and Hiland, who was covered in blood, met DeCicco at her car and drove away.  (Ex. 24 at R. 6655-56.)  They burned the masks and clothes and attempted to clean DeCicco's car, but they were afraid evidence might be discovered, so Levand stole DeCicco's car a few months later and burned it in a field in Wisconsin.  (Ex. 24 at R. 6656.)

181.    The State did not dispute the details of Levand's confession to Anderson, nor did the State present any evidence that Levand fabricated his confession to Anderson.  (Ex. 24 at R. 6658-61.)  Rather, the State – without presenting evidence of a motive for Anderson to lie – emphasized that Anderson was a convicted rapist and suggested, on that basis, that he was lying and the jury should not believe his testimony.  (Ex. 24 at R. 6659.)  And the Appellate Court simply speculated that the jury discounted Anderson's testimony because he had "convictions involving deceit."  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 171.  The Court's conclusion had no basis in reason because the "evidence" discounting Levand's confession was nothing more than "mere speculation dressed up in the guise of evidence."  *See O'Laughlin*, 568 F.3d at 307. The Appellate Court's acceptance of this speculation was an unreasonable application of *Jackson* that violated Petitioner's constitutional rights and requires reversal.

> **3.    Had The Appellate Court Considered The Evidence Of The DeCicco Group's Guilt Together With The State's Evidence Against Petitioner, It Would Have Concluded That There Were Serious Questions As To Petitioner's Guilt Giving Rise To Reasonable Doubt As A Matter Of Law.**

182.    The DeCicco Group's many confessions raise a reasonable doubt as to Petitioner's guilt.  Indeed, their confessions corroborate one another, contain the same non-public details of the crime – details not known by Houghtaling or any of Petitioner's alleged accomplices – and the many details fill the gaps in the State's case against Petitioner.

88

183.    **Non-Public Facts.**  As described above in Parts IV.C.2 and VI.B.2, the police held back a number of details about the crime in order to corroborate any confession they might receive.  (Ex. 23 at R. 6369-70, 6395; Ex. 26 at R. 6886.)  Specifically, police held back the facts that Briseno (1) spoke to someone in a car during the robbery while Pardo chased the man in the green jacket, and (2) was hit in the head, or "pistol whipped," with the gun.  (Ex. 26 at R. 6891-92.)  In addition, the detail that Briseno spat blood after he was shot was clearly not made public, as neither Houghtaling, nor any of Petitioner's alleged accomplices knew that fact.  According to Detective Brogan, holding back details is an important investigative technique because it allows police to "determine whether the suspect knew something that only someone who had been there could know."  (Ex. 23 at R. 6359-61.)  Houghtaling did not know *any* of these facts, but the DeCicco Group knew *all* of them.

184.    As early as the summer of 2001, DeCicco told her mother, Vicki Brummett, about the crime and included the detail that Levand had hit Briseno with the gun.  (Ex. 25 at R. 6723-25.)  DeCicco told police in 2005 that Briseno had yelled something into her car, that Briseno spat blood after he was shot, and that Levand hit him in the head with the gun.  (Ex. 169, Def. Ex. 51, at 8.)  In 2006, she again told police about Levand hitting Briseno with the gun and about Briseno spitting blood.  (Ex. 170, Def. Ex. 52, at 12-13.)  Additionally, Hiland told Elizabeth Schwartz about the incident within two or three months of the shooting, including the detail that Levand hit Briseno in the head.  (Ex. 25 at R. 6781-82.)  And Levand told Anderson that he was forced to hit Briseno in the head with the gun in order to free Hiland from Biseno's grasp. (Ex. 24 at R. 6655.)

185.    Consistent with DeCicco's confessions that one of the men shouted something into her car, Pardo testified that he observed Briseno stop to say something to a person in a

passing car during the chase. (Ex. 22 at R. 6151.) Consistent with Brummett's, Schwartz's, and Anderson's testimony that DeCicco and Hiland confessed and told them that Levand pistol-whipped Briseno, as well as the transcripts of DeCicco's police interviews where she said the same thing, the State's medical expert testified that Briseno had a wound consistent with being struck by a gun. (Ex. 22 at R. 6184-86, 6192-93.) Consistent with DeCicco's repeated confessions that included the detail that Briseno spit blood (Ex. 169, Def. Ex. 51, at 8; Ex. 170, Def. Ex. 52, at 12-13), Pardo testified that Briseno spat blood (Ex. 22 at R. 6147-48) and the paramedic who responded to the shooting testified that there were "copious amounts of blood" in Briseno's mouth (Ex. 21 at R. 5812).

186. The Appellate Court ignored Hiland's report of these non-public details and quickly dismissed DeCicco's similar reports on the postulation that these facts were not kept as secret as the police had hoped. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 170. There is no support whatsoever in the evidence for this absurd hypothesis. The Court unreasonably applied *Jackson* in dismissing these corroborating details and the effect they had on the strength of the State's case, especially in light of the fact that none of Petitioner's alleged co-conspirators – not Houghtaling, nor Collett, nor McMullan – were aware of those facts. *O'Laughlin*, 568 F.3d at 305-07.

187. **The Brummett Gun.** The only gun police ever recovered that had a potential connection to Briseno's death came from the home of DeCicco's step-father, David Brummett. (Ex. 23 at R. 6284; Ex. 26 at R. 6898.) The State's firearm expert confirmed that the gun matched the characteristics of the bullet recovered from Briseno's body and could have fired the bullet. (Ex. 25 at R. 6828.) The State's medical expert testified that the gun's shape was consistent with, and could have made, the laceration on Briseno's head. (Ex. 25 at R. 6849-52.)

DeCicco confessed to Rexford that the gun used in the robbery belonged to her step-father. (Ex. 25 at R. 6709, 6712.)  DeCicco repeatedly explained that she saw Hiland and Levand handling the gun wrapped in a blue towel in the trunk of her car.  (Ex. 169, Def. Ex. 51, at 6; Ex. 170, Def. Ex. 52, at 18.)  This confession was corroborated by McCauley, who testified that she observed Hiland and Levand break into the Brummetts' bedroom where the gun was kept. (Ex. 25 at R. 6757-58, 6719-20.)

188.    The Appellate Court dismissed the evidence of the Brummett gun, pointing out slight inconsistencies in DeCicco's account of when and where she saw the gun, *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 166, and noting that a .22 caliber revolver is a very common type of gun. *Id.* at ¶ 170.  The Court unreasonably applied *Jackson* when it failed to consider the Brummett gun evidence in light of the fact that neither Petitioner nor any of his alleged co-conspirators were connected with any gun, and that Houghtaling was unable to even identify the type of gun that was used.  (Ex. 23 at R. 6394.)  *O'Laughlin*, 568 F.3d at 305-07.

189.    **Hiland's Physical Injuries.**  A number of individuals, including Brummett, Kollross, Schwartz, and McCauley testified regarding the physical injuries they observed on Hiland following the Burrito Express shooting and that he admitted that he sustained the injuries during the attempted robbery.  (Ex. 25 at R. 6718-19, 6750-52, 6758-59, 6776.)  These witnesses described Hiland's injuries as cuts, scrapes, and bruises, and McCauley added that Hiland had lots of bandages and gauze.  (*Id.*)  This evidence is consistent with the struggle among Briseno, Pardo, and the man in the green jacket that was described by Pardo.  It is also consistent with the scar on Hiland's hand, which he showed to the jury.  (Ex. 26 at R. 6988.)

190.    The Appellate Court inexplicably dismissed this evidence as well, noting that Hiland's DNA was not found on the knife Briseno wielded and that Pardo's description of the

struggle did not necessarily lead to the conclusion that the perpetrator would have had any injuries. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 168, 171. Again, the Appellate Court unreasonably applied *Jackson* in failing to give this evidence its due weight; it did not evaluate the evidence in light of the fact that Houghtaling had no injuries following the shooting, or in light of the many other factors incriminating Hiland. (Ex. 23 at R. 6308.) *See O'Laughlin*, 568 F.3d at 305-07.

191. **Other Circumstantial Evidence.** The State's evidence did not explain why Petitioner and his alleged accomplices had no blood on their clothes despite a bloody struggle. (Ex. 23 at R. 6443; Ex. 24 at R. 6514-15, 6621-23.) Even though Petitioner and Houghtaling were questioned by police on March 7, 2001 – wearing the same clothes they wore the night before – no blood or signs of struggle were observed by police or found on their clothes. (Ex. 23 at R. 6307-08.) Although the DeCicco Group was not observed by police immediately following the shooting, DeCicco told police – and Anderson testified that Levand admitted – that the DeCicco Group burned their clothes following the attempted robbery because they were covered in blood. (Ex. 170, Def. Ex. 52, at 15, 16, 20, 48, 67.)

192. The State similarly had no explanation for the lack of blood or evidence in McMullan's car, which was thoroughly examined by police (Ex. 24 at R. 6578-79; Ex. 25 at R. 6687-89; Ex. 163, Def. Ex. 44), but the DeCicco Group's car was burned to destroy the evidence (Ex. 169, Def. Ex. 51, at 18-19, 21; Ex. 170, Def. Ex. 52, at 38-39, 48; Ex. 151, Def. Ex. 34.)

193. The Appellate Court made little of the fact that no blood was found on Houghtaling or Petitioner, or in McMullan's car, stating that "Defendant's characterization of the crime scene as bloody is not supported by the evidence." *Smith*, 2013 IL App. Ct. (2d) 120508-

U ¶ 165.   The Court reached this conclusion in spite of the paramedic's testimony regarding "copious amounts of blood" on the patient and in the parking lot (Ex. 21 at R. 5812-17), the autopsy examiner's description of "extensive blood" in the airways (which would cause Briseno to cough up blood) and his explanation that Briseno died of blood loss (Ex. 22 at R. 6186, 6189, 6191), crime scene photographs showing pools of blood on the ground (Ex. 36, People's Ex. 6; Ex. 37, People's Ex. 7), DeCicco's repeated descriptions of Hiland being covered in blood (Ex. 169, Def. Ex. 51, at 7; Ex. 170, Def. Ex. 52, at 4, 13), and DeCicco's consistent explanation that her car was stolen and burned because there was blood on the back seat (Ex. 169, Def. Ex. 51, at 18-19, 21; Ex. 170, Def. Ex. 52, at 38-39, 48).

194.   The Appellate Court did not even mention the lack of fingerprints tying Houghtaling or Petitioner to the crime despite the absence of gloves.  Had the Appellate Court considered the lack of physical evidence against Petitioner alongside the extensive evidence against the DeCicco Group, it would have cast further doubt on the strength of the State's case. *O'Laughlin*, 568 F.3d at 304 (considering the lack of physical evidence as a factor when evaluating the sufficiency of circumstantial evidence).  Indeed, as demonstrated above and in Petitioner's closing chart (Part IV.D), the DeCicco confessions solved many of the stubborn and puzzling inconsistencies in the State's case against Petitioner.

*     *     *

195.   A reasonable jury cannot convict where the State fails to provide a plausible theory to explain away credible evidence exonerating the defendant.  *Watkins*, 92 F. Supp. 2d at 836-38.  In *Watkins*, the defendant was convicted in the rape and murder of an 11-year-old girl. *Id.* at 826.  The only direct evidence of the defendant's guilt was the testimony of a cellmate who claimed Watkins had confessed to him in jail.  *Id.* at 833-34.  On federal *habeas* review, the

defendant presented new evidence that semen taken from the victim was not his. *Id.* at 836. The State argued that the new evidence did not warrant *habeas* relief and suggested two men may have raped the victim. *Id.* The State's theory technically was consistent with the evidence, but the court held that "[i]n light of all the evidence, that theory is merely an improbable theoretical possibility that no reasonable juror would credit beyond a reasonable doubt." *Id.* at 838. *See also People v. Rivera*, 962 N.E.2d 53, 63 (Ill. App. Ct. 2011) (reversing conviction based on insufficient evidence where the State's theories attempting to explain away the evidence offered by the defendant implicating a third person "might not be physically impossible," but "a reasonable fact finder could not credit [the State's theories] beyond a reasonable doubt").

196. In *Thomas v. Chappell*, 678 F.3d 1086 (9th Cir. 2012), the court held that compelling evidence of a third-party's guilt necessarily created reasonable doubt. In that case, the following evidence was presented against the petitioner: (1) the petitioner owned a rifle that was capable of causing the murder victims' injuries; (2) the petitioner was with the victims on the day of their deaths; (3) the petitioner made arguably incriminating statements after the murders; and (4) other physical evidence such as the petitioner's corncob pipe being found near the bodies of the victims. *Id.* at 1102. On the other hand, the prosecution presented no murder weapon, no fingerprint evidence, no blood or bodily fluid evidence, and no witness to the crime. *Id.* at 1103. The defense presented testimony of a witness that strongly implicated another man; substantial evidence existed to corroborate that account. *Id.* Although there was testimony that the witness had fabricated the testimony, the court granted *habeas* relief, explaining that, "[A] conscientious jury, presented with the witnesses corroborating [the exculpatory] testimony, would find 'reasonable' the interpretation pointing to Petitioner's innocence. Once the

interpretation pointing to Petitioner's innocence was found, reasonable doubt would exist." *Id.* at 1106.

197.    In *Chappell*, the district court explained that on its own, the prosecution's case against the petitioner might have been sufficient to support his conviction. *Id.* at 1099. When viewed in light of the substantial evidence of the third-party's guilt, however, that evidence was no longer sufficient; reasonable jurors would likely harbor reasonable doubt. *Id.* at 1099-1100. Similarly demonstrating the importance of considering evidence of third-party guilt alongside the evidence against the defendant, in *D'Ambrosio*, 527 F.3d at 499, the Sixth Circuit affirmed *habeas* relief on a *Brady* claim, noting that the suppressed evidence of third-party guilt would have simultaneously weakened the prosecution's case and strengthened the defendant's case.

198.    Here, the Appellate Court noted Petitioner's arguments regarding the DeCicco Group evidence, but did not properly consider the evidence under the *Jackson* standard, instead concluding that the guilty verdict was proper because the jury must have "found the State's version [more] persuasive." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶172. *Jackson* requires more than that. 443 U.S. at 307. It was not the jury's job to weigh the Houghtaling evidence versus the DeCicco Group evidence to determine which group was guilty. *Id.* at 315. Rather, the jury should have considered whether the Houghtaling evidence was sufficient *in light of* the DeCicco Group evidence. *Id.*; *D'Ambrosio*, 527 F.3d at 499. Petitioner did not have to prove that the DeCicco Group was guilty, *Jackson*, 443 U.S. at 307, though he certainly presented enough evidence to do so. Indeed, if this were an appeal from Hiland's conviction, there is little doubt the State would be arguing the evidence presented was more than sufficient to prove his guilt beyond a reasonable doubt.

199.    The State, in contrast, did have to prove Petitioner's guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 315; *In re Winship*, 397 U.S. at 364.  Because the DeCicco Group's guilt necessarily points to Petitioner's innocence, credible evidence of the DeCicco Group's guilt raised a reasonable doubt as to Petitioner's guilt.  *See  Farmer v. Ratelle*, 1997 LEXIS 33623, at *6-7 (9th Cir. Nov. 21, 1997).   In *Farmer v. Ratelle*, the Ninth Circuit granted *habeas* relief based on ineffective assistance of counsel when the attorney failed to introduce evidence of third-party guilt, stating, "'third party confessions, if believed, would *necessarily* exonerate the defendant of the primary offense.'… Even if not completely accepted by the jury, evidence of a third-party confession casts a dark cloud of reasonable doubt over the guilt of the defendant." *Id.* (quoting *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir. 1983)); *Chappell*, 678 F.3d at 1106. But by considering the evidence separately, the Appellate Court did not consider whether the jury had a plausible basis to find Petitioner guilty beyond a reasonable doubt in light of the evidence of the DeCicco Group's guilt.  *See Chappell*, 678 F.3d at 1099-1100.   The Appellate Court's failure to consider the DeCicco Group evidence together with the Houghtaling evidence was therefore an unreasonable application of *Jackson*.  *See O'Laughlin*, 568 F.3d at 305 (stating, while applying *Jackson*, "The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable.").  *Habeas* relief is required here because the Appellate Court should have considered all of this evidence together; had it done so, it would have had no choice but to conclude the State failed to prove guilt beyond a reasonable doubt.  *Chappell*, 678 F.3d at 1106.

200.    Where the writ of *habeas corpus* issues based on a state's failure to prove guilt beyond a reasonable doubt, the proper remedy is for the court to order "unconditional release with prejudice to reprosecution."  *O'Laughlin*, 568 F.3d at 309.  The Double Jeopardy Clause

bars the State from a second bite at the apple. *Burks v. United State*s, 437 U.S. 1, 18 (1978). Because the State failed to present sufficient evidence of Petitioner's guilt, it is not entitled to another opportunity to try this case. Petitioner therefore requests that this Court issue the writ and direct that he be released from custody.

## VII. INDEPENDENTLY, THE COURT SHOULD GRANT *HABEAS* RELIEF BECAUSE THE ILLINOIS COURTS DEPRIVED PETITIONER OF HIS DUE PROCESS RIGHT TO PRESENT A COMPLETE DEFENSE UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

201. This Court should grant *habeas* relief for the additional reason that Petitioner was prevented from presenting a complete defense. *See Holmes v. South Carolina*, 547 U.S. 319, 327 (2006); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The Constitution guarantees a defendant the right to present a complete defense, which includes the right to introduce evidence that a third person committed the crime charged, *see*, *e.g., Holme*s, 547 U.S. at 327, and to challenge the State's evidence implicating the defendant, *see*, *e.g., Davis v. Alask*a, 415 U.S. 308, 315-16 (1974). Petitioner advanced two main arguments in his defense: (1) the DeCicco Group robbed the Burrito Express; and (2) the State's evidence implicating Petitioner was unreliable and unworthy of belief and therefore failed to establish guilt beyond a reasonable doubt. With respect to several key aspects of both defenses, the trial court excluded Petitioner's material evidence, and also prevented him from challenging the State's evidence and witnesses.

202. As we show in Part VII.A, below, the trial court unconstitutionally excluded evidence tending to show that the DeCicco Group – and therefore not Petitioner – committed the crime charged: (1) the DeCicco Group had a connection to, and motive for targeting, the Burrito Express; and (2) Hiland consulted with and confessed to an attorney for the purpose of getting legal advice, who advised Hiland not to turn himself in.

203.     As we show below in Part VII.B, the trial court excluded the following evidence calling into question the reliability of the State's witnesses:   (1) immediately following the shooting, Pardo described the green jacket in a way that was inconsistent with his in-court testimony and did not match the description of Houghtaling's green jacket; (2) Houghtaling learned details about the crime through news reports and word-of-mouth, not because he was present at the scene; and (3) police investigators did not use proper police interrogation techniques to obtain Houghtaling's May 2001 statement, rendering that evidence unreliable.

A.     **The Exclusion Of Evidence Tending To Show The DeCicco Group – Not Petitioner – Robbed The Burrito Express Deprived Petitioner Of His Constitutional Right To Present A Complete Defense, Contrary To The Interests Of Justice, And, Alternately, In Conflict With Supreme Court Authority.**

204.     The trial court violated Petitioner's constitutional right to present a complete defense when it excluded material and favorable evidence without rational justification. *Holmes*, 547 U.S. at 324-25; *see also Harris v. Thompson*, 698 F.3d 609, 626 (7th Cir 2012).   The Constitution gives criminal defendants the right to present a meaningful and complete defense. *Holmes*, 547 U.S. at 324.   Thus, "[t]he exclusion of defense evidence can have constitutional consequences beyond the rules of evidence." *Harris*, 698 F.3d at 639.   A defendant is entitled to *habeas* relief for the exclusion of evidence if:   (1) the excluded evidence was material and favorable; (2) the exclusion was arbitrary or disproportionate to its stated purposes; and (3) *if* the state court actually decided the constitutional question, the reviewing court's decision upholding the error was either contrary to, or an unreasonable application of, clearly established federal law. *See Harris*, 698 F.3d at 627 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)); 28 U.S.C. § 2254(d)(1).   If, however, the reviewing court did not actually decide the constitutional question, the constitutional question is reviewed *de novo*.

98

205.    Although courts may properly exclude evidence that fails to sufficiently connect another person to the crime, is speculative or remote, or does not tend to prove or disprove a material fact at issue, they *must* admit a defendant's "evidence tending to show the commission by another person of the crime charged . . . when it is inconsistent with, and raises a reasonable doubt of, his own guilt." *Holmes*, 547 U.S. at 327. In other words, courts must admit material and favorable evidence. *Harris*, 698 F.3d at 627. Evidence is material and favorable if there is a reasonable likelihood that it could have affected the trier of fact's judgment in the defendant's favor. *Id.* (citing *Valenzuela-Bernal*, 458 U.S. at 874). This standard is equivalent to materiality under the Supreme Court's *Brady v. Maryland* line of cases. *Id.*

206.    Moreover, a defendant's *material* evidence may not be excluded if the exclusion was based on an arbitrary or disproportionate application of a facially neutral rule (*e.g.*, hearsay or competency rules). *See Crane*, 476 U.S. at 689-90 (holding that while state courts may "exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability," the arbitrary or disproportionate application of those rules still violated the defendant's right to present a complete defense); *see also Chambers*, 410 U.S. at 295; *Holmes*, 547 U.S. at 326-27. In such a situation, the reviewing court must balance the evidence's importance to the defendant (*i.e.*, its materiality) with the State's legitimate interests in "promoting . . . 'fairness and reliability' in criminal trials," *Harris*, 698 F.3d at 634, and "the purposes [the rule is] designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308-09 (1998).

207.    Here, one of Petitioner's main defenses centered on showing that the DeCicco Group – and therefore not Petitioner – committed the crime charged. But the trial court prevented Petitioner from developing two key aspects of this defense by excluding: (1) testimony from Anderson and two police witnesses that would have established the DeCicco

Group's connection to, and motive for robbing, the Burrito Express (*see* below Part VII.A.1); and (2) testimony from Trumble that would have established the most salient detail of Hiland's confession – after Hiland confessed to Trumble, Trumble accompanied Hiland to an attorney for the purpose of seeking legal advice about his involvement in the murder and Hiland confessed to the attorney in Trumble's presence (*see* below Part VII.A.2).

> **1.** **Petitioner's Constitutional Rights Were Violated By The Illinois Courts' Exclusion Of The Proffered Testimony Of Anderson, Quinones, And Solarz, Which Would Have Established A Key Element Of Petitioner's Defense – The DeCicco Group's Connection To, And Motive To Rob, The Burrito Express.**

208.    Motive evidence has a potent effect on how juries decide guilt or innocence, especially when "the case is about who committed the crime." *House v. Bell*, 547 U.S. 518, 540-41 (2006). At the Third Trial, there was no evidence showing any prior connection between Petitioner and his alleged accomplices to the Burrito Express or the victim. Likewise, there was no evidence presented demonstrating that Petitioner and his alleged accomplices had any motive to rob the Burrito Express. In contrast, Petitioner proffered, but the jury never heard, evidence that would have established the DeCicco Group's connection to the Burrito Express, and importantly, their motive for robbing it. The proffered motive testimony of Anderson and Officers Quinones and Solarz was material and favorable, because it would have completed Petitioner's defense and would have further shown that it was more likely the DeCicco Group committed the crime charged – and therefore less likely that Petitioner was guilty. The Illinois courts' exclusion of this evidence violated Petitioner's basic due process rights and fundamental notions of fairness. The interests of justice therefore require a new trial.

a. **The Court Reviews *De Novo* The Exclusion Of The Testimony Showing A Connection Between The DeCicco Group And The Burrito Express, And A Motive For The Robbery, Because The Appellate Court Never Reached The Constitutional Issue.**

209. Petitioner argued on appeal that the trial court's exclusion of the motive evidence violated his right to present a complete defense under the United States Constitution. (Ex. 172, Def. App. Brief, at 35 (citing *Holmes*, 547 U.S. at 324, 327).) In affirming the exclusion of Anderson's testimony, the Appellate Court concluded that it "was not entirely consistent with the admitted evidence" and "would have confused the jury as to the proper focus of the trial." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 189. The Appellate Court also held that even if the trial court did err in excluding the testimony, the error was harmless, because Anderson's testimony was cumulative. *Id.* at ¶ 192. But in its analysis, the Appellate Court only discussed Illinois state evidence law. *Id.* at ¶¶ 178-92. "Where the state courts [do] not reach a federal constitutional issue, the claim is reviewed *de novo*.'" *Harris*, 698 F.3d at 623 (citing *Cone*, 556 U.S. at 472). This means that the Court must review the *habeas* claim under the pre-AEDPA standard, 28 U.S.C. § 2243, "under which [it] 'dispose[s] of the matter as law and justice require.'" *Id.*

b. **The Excluded Testimony Was Material And Favorable To Petitioner's Defense.**

210. The testimony of Anderson, Quinones, and Solarz would have explained why the DeCicco Group targeted the Burrito Express for their robbery – Briseno was a drug dealer who *they knew* had drugs and cash at the restaurant. The Burrito Express was located near the home of DeCicco's father, which is where the DeCicco Group was using drugs immediately before the robbery on the night at issue. (Ex. 25 at R. 6782.) The proffered motive testimony also would have explained when and how Levand learned that Briseno kept large quantities of cash and high quality cocaine at the restaurant – namely, just a week before the Burrito Express shooting. (Ex. 19 at R. 5256.) This would have provided the jury with additional information to help them

determine whose confession to believe – Houghtaling's or the DeCicco Group's. *C.f.*
*Washington v. Smith*, 48 F. Supp. 2d 1149, 1164-65 (E.D. Wis. 1999) (granting *habeas* relief
where excluded testimony was directly relevant to a central issue in the case and would have
bolstered the defendant's alibi). This evidence was critical to the jury's understanding of
Petitioner's defense and should have been admitted. *See id.*

211. Anderson would have testified that in 2001 he knew Briseno well (Ex. 19 at
R. 5252) and purchased cocaine from Briseno through a man named "Serge," who worked in one
of Briseno's restaurants. (Ex. 19 at R. 5255-56.) A week before the March 2001 shooting,
Levand went with Anderson to the Burrito Express for the purpose of buying drugs. (*Id.*) While
waiting in the parking lot for Briseno to arrive, Anderson and Levand discussed Briseno and
purchasing drugs: "[Levand] was questioning me . . . about . . . what we were doing there and
asking me . . . if that was my source of the cocaine I was getting. It was high quality cocaine.
And I explained to him that yeah, it was. And we talked about Raul in general and . . . and me
purchasing cocaine." (Ex. 19 at R. 5256.)

212. Quinones, an undercover police operative, and Solarz, a detective assigned to the
K-9 narcotics unit involved in the Burrito Express investigation, would have bolstered the
narrative about the DeCicco Group's motive. Quinones would have testified that as part of an
undercover investigation into several narcotics sellers, including Briseno (Ex. 18 at R. 5239), he
visited Dos Hermanos, a restaurant owned by Briseno which he used as a front to sell cocaine
(Ex. 18 at R. 5236-37). In fact, Quinones made multiple visits to one of Briseno's restaurants in
August 2000 – just six months prior to the Burrito Express shooting. (Ex. 18 at R. 5236-39.)
Quinones spoke to Briseno at the restaurant about Briseno's cocaine business and then purchased
drugs from Briseno and Serge. (Ex. 18 at R. 5239-42.) Quinones also suggested that he "had

just bought a big load of Coke and that [he] had real good prices, probably lower than whatever [Briseno] was getting and that if he was interested I'd be able to help him with cocaine." (Ex. 18 at R. 5241.) "[Briseno] seemed interested." (*Id.*) Additionally, Solarz would have testified that during the search of the Burrito Express on March 7, 2001, the day after the robbery and shooting, he was responsible for searching the Burrito Express for narcotics. (Ex. 18 at R. 5230.) Working with a K-9 narcotic-sniffing dog, the dog indicated the possible detection of narcotics inside a desk drawer and cabinet located in the Burrito Express's office. (Ex. 18 at R. 5228-32.)

213. The testimony of Anderson, Quinones, and Solarz was both material and favorable to Petitioner's defense. In the *Brady* context, courts have characterized third-party motive evidence as material, and required reversal for its suppression; the same materiality analysis applies to a defendant's right to present a complete defense. *Harris*, 698 F.3d at 627. In *D'Ambrosio v. Bagley*, the 6th Circuit reversed the defendant's conviction on *Brady* grounds, in part because the prosecution withheld "evidence that demonstrate[d] a motive on the part of another individual." 527 F.3d at 498. The motive testimony would have shown, among other things, that a third party "anonymously called the police and revealed non-public facts about the murder" and "fabricated a burglary to implicate the defendant in the murder." *Id.* at 498-99. The prosecution also suppressed evidence that would have weakened its own case. *Id.* The court held that because the suppressed evidence "would have had the effect of both weakening the prosecution's case and strengthening the defense's position that someone else committed the murder, there is a reasonable probability that the outcome of [defendant's] trial would have been different." *Id.* at 499; *see also Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 830 (10th Cir. 1995) (an excluded police report, "taken together with [third party's] already existing motive of

jealousy, which was established on cross-examination, would have undoubtedly inured to [defendant's] benefit.").

214.    Similarly, in *Clark v. O'Leary*, the Seventh Circuit granted the defendant's petition for *habeas* relief, because the state court excluded critical motive evidence.  852 F.2d 999, 1000 (7th Cir. 1988).  The defendant was convicted of murder and attempted murder based on eyewitness testimony that placed him at the scene of the crime.  *Id.* at 1000-01.  In his defense, the defendant sought to introduce – but the trial court excluded – evidence that the eyewitnesses who placed him at the scene had a motive to falsely implicate him because he belonged to a rival gang.  *Id.*  The Illinois appellate court affirmed the conviction.  *Id.* at 1000.  On federal *habeas* review, the Seventh Circuit held that the exclusion of this evidence violated the defendant's Sixth Amendment right to effective cross-examination, because the jury was entitled to evaluate all the evidence about the witnesses' motives.  *Id.* at 1006.  The Seventh Circuit found that the proffered evidence was not cumulative because although the defendant presented "more than enough evidence" suggesting the witnesses were lying, only the gang evidence established their motive for doing so.  *Id.* at 1006-07.

215.    Petitioner's case is similar to *Smith*, *D'Ambrosio*, and *Clark*:  the exclusion of the DeCicco Group's motive made Petitioner's defense seem incomplete when it was not, and this undoubtedly had a negative impact on the jury.  "Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach a verdict."  *Old Chief v. United States*, 519 U.S. 172, 187 (1997).  There exists "a need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be."  *Id.* at 188.  Indeed, when jurors' expectations

are not satisfied, they "may penalize the party who disappoints them." *Id.* The defendant's ability to tell a complete story is especially important in a case, like here, that centers around the identity of who committed the crime. "When identity is in question, motive is key," as juries give "great weight" to evidence suggesting a motive for someone else to commit the crime. *House*, 547 U.S. at 540. In sum, the exclusion of Anderson's testimony prevented Petitioner from establishing the DeCicco Group's motive and from completing his narrative about their guilt. Had the jury heard this motive testimony, it could have reasonably found it more likely that the DeCicco Group robbed the Burrito Express. *See D'Ambrosio*, 527 F.3d at 498-99.

### c. The Trial Court's Exclusion Of Anderson's Testimony Was Arbitrary And Disproportionate To Its Stated Purposes.

216. Although a trial court may exclude evidence that is irrelevant, collateral, or not logically connected to the case's central issues, *see Holmes*, 547 U.S. at 326-27, the trial court had no rational reason to exclude Petitioner's proffered motive evidence. For example, in *Kentucky v. Olden*, the defendant attempted to impeach a witness, but was prevented from doing so. 488 U.S. 227, 232 (1988). "[W]ithout acknowledging the significance" of the constitutional issue, the state court "held that petitioner's right to effective cross-examination was outweighed by the danger that revealing [the witness's] interracial relationship would prejudice the jury against her." According to the Supreme Court, this limitation was "beyond reason" and did not justify the exclusion of the exculpatory testimony. *Id.*

217. Here, the trial court's reason for excluding the motive testimony – it was not sufficiently connected to Briseno's death – is both "beyond reason" and belied by the record. (Ex. 17 at R. 5215.) Like the evidence in *Clark*, evidence of Briseno's drug dealing – and specifically, his dealing to members of the DeCicco Group in close proximity to the robbery – was directly relevant to the central issue in the case because it explained why the DeCicco Group

picked the Burrito Express on the night at issue and thus shed light on the identity of the robbers. Combined with the evidence the jury did hear – namely, that members of the DeCicco Group were drug users in need of drugs on the night at issue (Ex. 25 at R. 6753, 6761-62, 6765, 6782), the robbers walked right past the cash register and into the back of the store (Ex. 22 at R. 6143), and the DeCicco Group's version of events in their confessions matched facts much better than Houghtaling's version – the excluded evidence undoubtedly made the DeCicco Group's guilt more likely and the State's theory less credible.  *See Holmes*, 698 F.3d at 630-31.  The trial court rejected this as not connected to the admitted evidence (Ex. 17 at R. 5215) without even considering Petitioner's right to present a complete defense and with no rational justification. *See Olden*, 488 U.S. at 232.

> **d.**      **Alternatively, The Appellate Court's Decision To Uphold Petitioner's Conviction Despite The Improperly Excluded Motive Evidence Was An Unreasonable Application Of *Holmes v. South Carolina*.**

218.      As discussed above, in Part VII.A.1.a, the Court should consider the exclusion of Petitioner's proffered motive testimony *de novo*.  But even reviewed under the more deferential standard requiring federal courts to uphold state court decisions unless they are "contrary to," or involve an "unreasonable application" of, clearly established federal law, *habeas* relief is still warranted here.  *See* 28 U.S.C. § 2254(d)(1).  The Appellate Court's decision was an objectively unreasonable application of *Holmes*, which held that criminal defendants have the constitutional right to introduce evidence that a third person committed the crime, unless that evidence is "repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues."  547 U.S. at 326-27 (internal punctuation marks omitted).  Here, the Appellate Court unreasonably applied *Holmes* to the facts in Petitioner's case for four separate reasons.

219.   **First**, the Appellate Court concluded that the proffered motive testimony was not relevant, notwithstanding that its own statements and all the evidence in the record showed that not only was it highly relevant, but it was material.  (*See* Part VII.A.1.b.)  In particular, the Appellate Court held that "the possible presence of drugs, 'at times,' in the restaurant or on Briseno is not directly relevant because the admitted testimony reflected that the DeCicco Group allegedly decided to go out to commit a crime to obtain *cash* (so that they could purchase drugs)."  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 190 (emphasis added).  But the admitted evidence showed that the DeCicco group wanted cash to obtain drugs – which is perfectly consistent with the proffered testimony.  The Appellate Court's own statement makes clear that the DeCicco Group's ultimate goal was to obtain more drugs.  Thus, the Appellate Court's distinction between "drugs" and "money" is one without a difference, and does not fit within any justification for excluding evidence tending to establish a third party's guilt under *Holmes*.  *See Holmes*, 547 U.S. at 326-27.  The jury might have concluded that this difference did not matter, but Petitioner had a fundamental right to let the jury hear the evidence and decide.

220.   Moreover, the motive evidence was consistent with the record.  The Appellate Court overlooked Schwartz's testimony that Hiland told her that on the night at issue, the DeCicco Group "had been smoking crack and they had run out . . . basically they went to rob [the Burrito Express]" for the purpose of obtaining more drugs.  (Ex. 25 at R. 6782.)  In addition, McCauley explained that the DeCicco Group was smoking crack in Ben DeCicco's garage (Ex. 25 at R. 6761), which was located right behind the Burrito Express (Ex. 25 at R. 6774), though the Appellate Court did not acknowledge this fact.  Schwartz's and McCauley's testimony, if combined with the excluded testimony, would have created the "logical connection" from which the jury could have easily inferred that the DeCicco Group targeted the

Burrito Express for its *drugs and money*.  *See Holmes* 547 U.S. at 330 (third-party guilt evidence should only be excluded when it has a "weak logical connection" to the case's "central issues"). And, had this fact been admitted, the jury very well might have reached a different verdict.

221.  **Second**, the Appellate Court held that the proffered motive testimony was properly excluded because it "was not entirely consistent" with a statement by DeCicco "that she overheard Levand and Hiland discuss stealing purses or robbing someone to get money."  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 189.  Again, this is not a proper reason to exclude evidence under *Holmes*.  *Holmes*, 547 U.S. at 330.  To be admissible, the proffered evidence need only have a "logical connection" to the "central issues" in the case.  *Id.*  As discussed above, the proffered motive evidence undoubtedly had a logical connection to this case's central issue – who committed the crime.  Furthermore, contrary to the Appellate Court's conclusion, DeCicco's statement "that she overheard Levand and Hiland discuss stealing purses or robbing someone to get money" was totally consistent with the proffered evidence, as the DeCicco Group was contemplating stealing to obtain cash to buy drugs.  (Ex. 25 at R. 6761, 6782.)

222.  **Third**, the Appellate Court held that the evidence was properly excluded "on the basis that it would have confused the jury by directing its attention to Briseno's drug-dealing, and was not relevant to the DeCicco Group's alleged plan to rob someone or some establishment to obtain money to purchase drugs."  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 190.  But the crux of Petitioner's defense was the relative reliability of the DeCicco Group's confessions.  The jury was far more likely to be confused by the lack of any evidence suggesting why the DeCicco Group would choose to rob a burrito shop.  *See Old Chief*, 519 U.S. at 188 (explaining the importance of evidence in "all its particularity" and how jurors punish parties who do not satisfy their expectations).  Thus, without Anderson's testimony and the other motive evidence, the jury

had no reason to know why the DeCicco Group would target a burrito restaurant – as opposed to some other store – if it wanted large amounts of cash *and* drugs. *See House*, 547 U.S. at 552 (evidence pointing to third-party was "by no means conclusive" but considered in combination with other evidence, it "likely would [have] reinforce[d] other doubts as to [defendant's] guilt").

223.   **Fourth**, the Appellate Court inexplicably held that any error was harmless because the drug evidence would have been "cumulative." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 192.   The Appellate Court apparently confused "cumulative" evidence with "corroborating" evidence.   In *Washington*, the state excluded evidence about the defendant's whereabouts, which had not been established "beyond dispute at trial."   48 F. Supp. 2d at 1164. The excluded testimony would have "added significant weight and credibility to [the defendant's] alibi defense."   *Id.*   Despite this, the state court excluded the evidence as cumulative.   The district court granted *habeas* relief, holding that the state court's decision was objectively unreasonable under AEDPA, in part because the state court had confused cumulative evidence with corroborating evidence.   *Id.*   "Corroborating evidence adds strength . . . [c]umulative evidence is a very limited type of corroborating evidence . . . to say something is cumulative thus has the connotation of 'heaped on' evidence offered to prove something already established beyond reasonable dispute."   *Id.*

224.   Similarly, in the recent case of *Blackston v. Rapelje*, 769 F.3d 411, 426 (6th Cir. 2014), the Sixth Circuit granted the petitioner's *habeas* petition on the ground that the trial court had improperly excluded evidence that it postulated was cumulative.   There, the petitioner was accused and convicted of murder despite the absence of any physical evidence connecting him to the crime.   *Id.* at 426.   The State's entire case rested on the testimony of three witnesses, one of whom was a co-defendant who had a motive to shift blame, and the other two of whom were

intoxicated during their alleged conversations with the petitioner and gave conflicting accounts of what was said. *Id.* at 430-31. In reviewing the trial court's exclusion of certain impeaching evidence on the ground that it was cumulative, the Sixth Circuit noted that the proffered evidence included explanations, detail, and personal accounts of certain facts – none of which was supplied by other impeachment evidence. *Id.* at 426. The court thus held that the evidence was not cumulative: "Here, there was no physical evidence linking Blackston with the murder and, in such a situation, additional impeachment tending to tip the credibility balance cannot be brushed aside as cumulative." *Id.* And in determining that the error was not harmless, the Sixth Circuit emphasized the overall weakness of the State's case and the fact that "the verdict *depended* on which witness the jury found to be most credible." *Id.* at 432.

225. Here, the fact that "other witnesses [testified] that the DeCicco Group attempted to rob the Burrito Express," *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 192, does not render Anderson's proffered testimony cumulative. Anderson's proffered testimony served a very different purpose than the admitted confessions. As explained above, Anderson's testimony completed Petitioner's narrative by explaining *why* the DeCicco Group would target the Burrito Express as opposed to any other business. Moreover, this was a highly contested case in which two totally unrelated parties confessed to the crime. Any new evidence tending to show that one of the confessions was truthful or otherwise supported by the rest of the evidence would have been corroborative, rather than cumulative. *See Washington*, 48 F. Supp. 2d at 1164.

> **2. Petitioner's Constitutional Rights Were Violated By The Illinois Courts' Exclusion Of Trumble's Proffered Testimony That Hiland Confessed To A Lawyer To Get Legal Advice, Which Tended To Show That Hiland's Confessions Were True.**

226. A third-party confession is paradigmatic evidence that tends to raise a reasonable doubt of a defendant's guilt. "[T]hird party confessions, if believed, would *necessarily* exonerate

the defendant of the primary offense. . . . Even if not completely accepted by the jury, evidence of a third-party confession casts a dark cloud of reasonable doubt over the guilt of the defendant." *Farmer*, 1997 LEXIS 33623, at *7 (emphasis added).

227.    Hiland's long-time friend and roommate, Trumble, testified at trial that Hiland confessed three times to robbing the Burrito Express, resulting in Briseno's death. (Ex. 25 at R. 6732-33, 6742-43.) The trial court, however, excluded the most important details of Hiland's confessions to Trumble: Trumble and Hiland met with a criminal defense attorney about Hiland's involvement in the attempted robbery and murder;[13] during that meeting, Hiland confessed to the attorney in Trumble's presence and the attorney advised Hiland *not* to turn himself in to police because others (*i.e.*, Petitioner) had already been charged. (Ex. 25 at R. 6740-41.)

### a.    Trumble's Proffered Testimony That Hiland Confessed To An Attorney Was Material And Favorable Evidence.

228.    Third-party confessions are material evidence, especially where criminal defendants base their defense on the argument that the third party actually committed the crime. *See, e.g., Chambers*, 410 U.S. 284. In *Chambers*, a defendant accused of murder attempted to introduce testimony that a third party had confessed, on four separate occasions, to the murder for which the defendant was being tried. *Id.* at 289. The confessions were excluded and the defendant was convicted. *Id.* at 289-90. Finding the defendant had a constitutional right to introduce confessions that are sufficiently trustworthy, and ordering a new trial, the Supreme Court reversed the conviction. *Id.* at 302-03.

229.    Here, there is no question that Hiland's confession to Trumble and Edens satisfied the *Chambers* trustworthiness factors: the trial court expressly allowed Trumble to testify that

---

[13] As Trumble was present, there was no attorney-client privilege.

Hiland confessed *to him*. (Ex. 25 at R. 6737-38.) But the court forced Trumble to exclude every detail about that confession – *i.e.*, that he took Hiland to see an attorney for the purpose of seeking legal advice regarding Hiland's role in the murder, that Hiland confessed to the murder to the attorney with Trumble present, and that the attorney advised Hiland not to come forward. (Ex. 25 at R. 6740-41.)

230.    These details were material and favorable to Petitioner's defense. For one, the very same factors that make a confession trustworthy under *Chambers* also make it material. For example, under *Chambers*, courts must consider to whom the defendant makes the confession and whether the confession was against penal interest. *Chambers*, 410 U.S. at 299-300. These factors help courts determine whether a confession is "trustworthy;" here, these details also would have helped the jury assess the relative believability of Hiland's confession versus Houghtaling's – the core issue in Petitioner's case. What is more, the jury heard extensive details about Houghtaling's confessions and the circumstances under which they were made, which the State read into the record. (*See* Part IV.B.4.) Despite this, the trial court excluded crucial details about Hiland's confession to Trumble and Edens. The details were not hearsay, nor was there any other basis upon which to exclude the testimony. The trial court's error was further compounded by the State's suggestion during cross-examination of McCauley, that Hiland confessed to her in order to convince her to give him money for drugs. (Ex. 25 at R. 6762-64.) Hiland's confession to Edens, an attorney, would have rebutted this assertion because he could not have had any ulterior motive for confessing to Edens.

231.    Petitioner's defense boiled down to whether the jury believed Houghtaling's confession or the confessions of the DeCicco Group; any detail tending to show that any of the confessions were trustworthy could have raised a reasonable doubt of Petitioner's guilt. *See*

*Holmes*, 547 U.S. at 327; *Blackston*, 769 F.3d at 426. Had the jury heard that Hiland actually confessed for the purpose of seeking legal advice from a criminal defense attorney, there is a substantial likelihood that it would have given greater weight to Hiland's confession and that the result of the trial would have been different. *Id.*; *see also Harris*, 698 F.3d at 627.

232. Despite the importance of Trumble's testimony, the trial court excluded it without any rational justification. In fact, the only reason it gave was: "it is irrelevant." (Ex. 25 at R. 6738.) As discussed above, not only was Trumble's excluded testimony highly relevant, it was highly material and favorable. *See Olden*, 488 U.S. at 233 (finding trial court's exclusion of crucial testimony was "beyond reason" where it had no basis for its decision). The trial court and State both failed to provide any other reason why this portion of Trumble's testimony should have been excluded. The exclusion was entirely arbitrary. *Id.*; *see also Harris* 698 F.3d at 613.

> **b.** **The Appellate Court's Decision Upholding Petitioner's Conviction In Light Of The Trial Court's Exclusion Of This Critical Evidence Was An Objectively Unreasonable Application of *Holmes v. South Carolina* And *Chambers v. Mississippi.***

233. The Appellate Court's decision to uphold the exclusion of Trumble's testimony was an objectively unreasonable application of *Holmes* and *Chambers*. The Appellate Court's reasons why the testimony was properly excluded (or why its exclusion was harmless) do not square with the facts. To begin, the Appellate Court concluded that Trumble's testimony about the confession to the lawyer was properly excluded, because "[t]he fact that Hiland confessed in Trumble's presence was admitted at trial," and that Hiland also confessed "to an attorney does not necessarily imbue the confession with trustworthiness (and thus make it more probable that [Petitioner] did not commit the crime)." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 199. But to be admissible under *Holmes*, the details surrounding the confession need not "necessarily" imbue it with trustworthiness; they need only to have a logical connection to the case's central issue.

113

*Holmes*, 547 U.S. at 330-31. It is error for a trial court to exclude evidence because it believes the evidence is not credible, as "the question of witness credibility is the most fundamental issue that a jury resolves." *See Blackston*, 769 F.3d at 427-28. Here, it was for the jury to decide whether the circumstances of Trumble's confession made it more trustworthy (although we do not see how any other conclusion makes sense here). *Id.*

234. Further, the Appellate Court's own rationale recognizes the logical and important connection between the corroborating details in Hiland's confession and whether Petitioner was guilty of the crime charged – *i.e.*, if Hiland was telling the truth when he confessed, Houghtaling's confession was false and Petitioner was not guilty. To keep facts from the jury that would be probative of its determination on the various confessions – such as Hiland's confession to an attorney for the purpose of seeking legal advice regarding his involvement in the crime charged – prevented the jury from considering evidence that raised a reasonable doubt of Petitioner's guilt, and thus cannot be a reasonable application of *Holmes. See* 547 U.S. at 330-31. It should have been the jury, not the Appellate Court, that determined whether the excluded details "imbue[d] the confession with trustworthiness." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 199.

235. The Appellate Court alternatively concluded that the evidence about Hiland's confession to an attorney was cumulative, and thus its exclusion harmless, because the jury heard in DeCicco's videotaped confession "that Hiland told her that he spoke to an attorney because, after the Brummett gun was retrieved, he was worried that the group would go to jail. *The jury no doubt would have reasonably inferred from DeCicco's testimony that Hiland confessed to the attorney." Id.* at ¶ 200 (emphasis added). While a trial court may properly exclude cumulative evidence, *see Holmes*, 547 U.S. at 326-27, evidence is not cumulative where it supplies detail or

specificity that other evidence has not supplied, or where it tends to "tip the credibility balance" of a critical witness. *Blackston*, 769 F.3d at 426. Here, the details surrounding Hiland's confession to an attorney in Trumble's presence were anything but cumulative. There is no direct evidence in the record regarding Hiland's confession to an attorney. *See Washington*, 48 F. Supp. 2d at 1164. DeCicco's statement in a videotaped confession – a confession that she disavowed on the stand – simply is not the same as direct evidence from Trumble, who heard Hiland's confession to an attorney. Once again, the Appellate Court confused corroborating evidence with cumulative evidence. *See id.* The very reason Trumble's testimony would have been so probative (and not cumulative) is that *after* Hiland told DeCicco that he was worried because the gun used in the crime was recovered by police (as DeCicco stated in her confession (Ex. 170, Def. Ex. 52, at 52-53)), and that he wanted to seek the advice of an attorney, Hiland actually *did* consult an attorney and, in fact, confessed to the attorney in the process of seeking legal advice. (Ex. 25 at R. 6740-41.)

236. There is yet another reason why Trumble's testimony was not cumulative: The State argued vigorously that the jury should disregard DeCicco's statements. (Ex. 21 at R. 5759-60.) The State cannot have it both ways with DeCicco – arguing at trial that the jury should disregard the evidence because it is unreliable, but on appeal arguing that the excluded evidence would have been cumulative. The State's own inconsistency reveals that Trumble's testimony would have been, by definition, corroborative rather than cumulative. *Washington*, 48 F. Supp. 2d at 1164. Indeed, Petitioner sought to introduce Trumble's testimony because in addition to demonstrating Hiland's guilt, it would have *corroborated* portions of DeCicco's statements to police, making them more reliable. *See id.*

237.   And if the jury did, in fact, infer from DeCicco's statement that Hiland confessed to an attorney because "he was worried that the group would go to jail," there is simply no way it could have rationally concluded that the State proved *Petitioner's* guilt beyond a reasonable doubt.  (*See* above Part VI.)  For all of these reasons, the Appellate Court's characterization of Trumble's testimony as cumulative, and thus immaterial, was an objectively unreasonable application of *Holmes*.[14]

**B.   The Trial Court Violated Petitioner's Constitutional Right To Present A Complete Defense When It Prevented Him From Introducing Evidence That Would Have Undermined The State's Case, And The Appellate Court's Decision To Uphold The Conviction In Light Of These Errors Was An Unreasonable Application Of *Davis v. Alaska* And *Delaware v. Van Arsdall*.**

238.   A defendant's right to present a complete defense includes the right to "impeach" or "discredit" the state's witnesses, to reveal their biases, motives, and reliability.  *Davis*, 415 U.S. at 316.  "Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested."  *Id.*  Here, the trial court prevented Petitioner from presenting evidence that would show the testimony of the State's witnesses was not reliable on a number of significant points.  The trial court excluded:  (a) evidence offered by Petitioner to impeach Pardo's description of the green jacket worn by the robber without the gun (Part VII.B.1); (b) cross-examination of Houghtaling regarding how he learned details of the crime, asked for the purpose of testing the reliability of Houghtaling's confession (Part VII.B.2); and (c) cross-examination of Wigman about whether the police used proper interrogation techniques to get a reliable confession from Houghtaling (Part VII.B.3).

---

[14] The Appellate Court also chose to analyze the excluded testimony for trustworthiness under *Chambers*, even though this was never an issue on appeal.  The trial court actually allowed Trumble to testify about the confession; it prevented him from including key details about it.  But, even if it had been proper to analyze the confession for trustworthiness under *Chambers*, the Appellate Court's analysis would still have been objectively unreasonable because it improperly analyzed the "penal interest" factor and failed to even consider the other three *Chambers* factors – all of which weighed in favor of admitting Trumble's testimony.

239.    A defendant is entitled to *habeas* relief for an improper limitation on cross-examination if:  (1) the cross-examination would have helped the defendant impeach, discredit, or reveal the witnesses' knowledge or motivations, *Davis*, 415 U.S. at 316; (2) the error in excluding the cross-examination was not harmless, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); and (3) the reviewing court's decision upholding the error was either contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  Each of Petitioner's arguments satisfies these requirements.

240.    ***First***, the Supreme Court has explained that "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  Reliability becomes even more important when the witness is central to the state's case.  *See Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2001) (holding that a limitation on direct examination about how police officer conducted criminal investigation contributed to denial of defendant's due process right to present a complete defense); *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002), *cf. United States v. Bohle*, 445 F.2d 54, 74 (7th Cir. 1971).  Further, the defendant need not establish that the cross-examination would have definitively affected the jury's assessment: the court may not "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted the [defendant's] line of reasoning had counsel been permitted to fully present it." *Davis*, 415 U.S. at 317.  Instead, "it is sufficient that a jury 'might reasonably' have questioned the witness's reliability or credibility in light of the cross-examination." *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1036 (9th Cir. 2005) (citing *Van Arsdall*, 475 U.S. at 679).

241.    **_Second_**, a violation of the defendant's right to effectively cross-examine requires reversal unless the limitation was harmless beyond a reasonable doubt. _Van Arsdall_, 475 U.S. at 684.  To determine whether the limitation was harmless, the relevant factors include:  (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted, and, of course," (5) "the overall strength of the prosecution's case." _Id._

      **1.**     **Excluding Evidence That Would Have Impeached Pardo's Description Of The Green Jacket Violated Petitioner's Right To Present A Complete Defense Because It Prevented The Jury From Properly Appraising The Reliability Of Pardo's Testimony.**

242.    Eduardo Pardo was the only eyewitness to the crime.  Despite previously describing the physical characteristics of the robbers in detail, at trial, Pardo was generally unable to identify the robbers and has never identified Petitioner or Houghtaling.  (Ex. 22 at R. 6162.)  Pardo did, however, testify that the robber without the gun wore a green jacket.  (Ex. 22 at R. 6152.)  And when the State showed Pardo the jacket recovered from Houghtaling and asked whether that green jacket was the "jacket Justin Houghtaling was wearing on March 7th," Pardo answered, "Yes, sir."  (Ex. 22 at R. 6249-50.)  The State then emphasized this testimony in closing, stating "Eduardo Pardo identified the green jacket in court.  You recall Mr. Pardo's testimony when I showed him People's Exhibit 66 in court and had him look at it and I asked him if this looked like the jacket that the man was wearing.  And he said, yes."  (Ex. 27 at R. 7017.)  The State suggested this identification connected Houghtaling – and therefore Petitioner – to the crime charged.

243.    The green jacket recovered from Houghtaling and shown to Pardo in court had big pockets in the front, a front zipper, and no black around the collar.  (Ex. 46, People's Ex. 17;

Ex. 48, People's Ex. 19.)  Just hours after the attempted robbery, however, Pardo gave police a tape-recorded description of the green jacket worn by the robber without the gun that was inconsistent with his trial testimony – Pardo told police that the green jacket he observed worn by the robber without the gun had black around the collar, no pockets, and no front zipper. (Ex. 22 at R. 6152-54.)

244.    On cross-examination, Petitioner's counsel attempted to impeach Pardo's in-court "identification" of the green jacket by asking about his statements to police, but Pardo said he did not recall making the statements.  (*Id.*)  Petitioner tried to perfect the impeachment[15] by calling Officer Rhode, the police officer who took the statement from Pardo on the night of March 6, 2001.  (Ex. 24 at R. 6582-84.)  Rhode was prepared to testify about Pardo's statement, but the trial court sustained the State's objection.  (Ex. 24 at R. 6586-89, 6594-6595.)

245.    The Appellate Court did not dispute that the exclusion of Officer Rhode's testimony was in error but deemed the error harmless because:  (1) "any discrepancies in the description of the jacket were minor," and (2) the jury was "aware of the inconsistencies in Pardo's testimony" because defense counsel asked Pardo about his prior statement.  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 229.   Although the Appellate Court correctly identified the harmless error standard, the Court's conclusion that the error was harmless unreasonably applied *Davis* and *Van Arsdall* to the facts in this case.

246.    An error excluding impeachment evidence is not harmless (or in the Appellate Court's words "minor") where, like here, the excluded evidence goes directly to the reliability of the state's key eyewitness.  *See Davis*, 415 U.S. at 319-20 (holding limitation on cross-

---

[15] In Illinois, where a witness claims to lack recollection of a prior statement, the prior statement is admissible as impeachment.  *People v. Flores*, 128 Ill. 2d 66, 87 (1989).  Proper impeachment requires the examiner to lay the foundation by asking the witness about the statement, and, if denied, the examiner must introduce extrinsic evidence.  *People v. Vinson*, 90 Ill. App. 3d 6, 9 (3d Dist. 1980).

examination not harmless where witness was "a crucial identification witness" and cross-examination could have done serious damage to the state's case); *see also Olden*, 488 U.S. at 232-33 (limitation on cross-examination not harmless error where witness would have been "essential, indeed crucial to the prosecution's case"); *Fowler*, 421 F.3d at 1042 (especially in the absence of "any physical evidence," limitation on central witness's testimony not harmless); *Clark*, 852 F.2d at 1005 (limitation on cross-examination not harmless where state's evidence was not "overwhelming").

247.    Here, no discrepancy in Pardo's testimony was minor, as the reliability of Pardo's "identification" of the green jacket was critical to the State's case – indeed, there was no other physical evidence that even came close to linking Houghtaling or Petitioner to the crime.  The State urged the jury to infer that the green jacket worn by Houghtaling and identified in court by Pardo was *the green jacket worn by the robber without the gun* and therefore connected Petitioner to the crime.  (Ex. 22 at R. 6249-50; Ex. 27 at R. 7017.)  Officer Rhode's testimony would have undercut the reliability of Pardo's "identification" of the green jacket.  By excluding the impeachment testimony, the jury never heard that only hours after the shooting, Pardo's description of the green jacket was quite different than the jacket he "identified" in court. (Ex. 24 at R. 6594-96.)

248.    In addition, the Appellate Court's determination that "the issue of Pardo's lack of memory" was sufficiently put before the jurors when defense counsel argued during closing that "Houghtaling's jacket had a zipper and pockets, but that Pardo did not recall saying anything about that," does not make the error harmless.  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 299.  In fact, this entirely misses the point:  Pardo's lack of memory was not at issue.  At issue was the fact that Pardo had previously given police a totally inconsistent description of the green jacket –

*i.e.*, a description that did not match the jacket worn by Houghtaling, shown to the jury, and identified by Pardo in court as "looking like" the jacket worn by the robber without the gun on the night at issue. Without the impeachment, the jury only heard that Pardo did not recall giving a statement to police about the jacket. *See Fowler*, 421 F.3d at 1042 (in the absence of corroborating evidence, "proffered cross-examination took on added significance . . . jury was left without a possible explanation for why [witness's] account differed so").

249.    Nor did the Appellate Court consider, whatsoever, the "overall strength of the prosecution's case," another factor that made the error far from harmless. *Van Arsdall*, 475 U.S. at 684. In this closely contested case that came down to a battle of confessions, any evidence tending to show that the State's only identification witness got it wrong could not have been harmless beyond a reasonable doubt. *See Thomas*, 273 F.3d at 1178 ("where defendant's guilt hinges largely on the testimony of a prosecution's witness, the erroneous exclusion of evidence critical to assessing the credibility of that witness violates the Constitution") (internal quotation marks omitted); *Blackston*, 769 F.3d at 426. For the above reasons, the Appellate Court's conclusion that the exclusion of Pardo's testimony was harmless error was an unreasonable application of *Davis* and *Van Arsdall*.

**2.    The Trial Court's Limitation Of Houghtaling's Cross-Examination Unfairly Interfered With Petitioner's Right To Present A Complete Defense.**

250.    After the State introduced Houghtaling's May 12, 2001 confession as a prior inconsistent statement, Petitioner attempted to show that Houghtaling's recanted "confession" was not probative. The trial court, however, substantially restricted this line of questioning by prohibiting Petitioner from eliciting that: (1) Houghtaling's knowledge in May 2001 of the basic facts about the Burrito Express robbery came *exclusively* from news accounts or word of mouth (Ex. 21 at R. 5973-76); and (2) Houghtaling refused to testify at Petitioner's First Trial in 2003

121

because he did not want to *falsely* incriminate Petitioner (Ex. 21 at R. 6041-42). This testimony would have undercut the State's theory that Houghtaling had recently fabricated his assertion that he and Petitioner were innocent. The trial court's decisions to limit this cross-examination denied Petitioner's right to present a complete defense and the Appellate Court's decision affirming Petitioner's conviction in light of these errors was an unreasonable application of *Davis* and *Van Arsdall*.

> **a.** **Petitioner Sought To Elicit Testimony Demonstrating That Houghtaling's Statements Implicating Petitioner Were Not Reliable.**

251. Petitioner sought to elicit testimony that Houghtaling learned basic facts about the Burrito Express robbery – which he then told police in his May 2001 statement – from news accounts and word-of-mouth. (Ex. 21 at R. 5973-76.) This testimony was important to Petitioner's defense because it would have shown that: (1) the information contained in Houghtaling's statement was public knowledge and therefore anyone could have told police the same facts, (2) Houghtaling actually learned these facts from reading news accounts or by word of mouth, and (3) Houghtaling did not recently fabricate his recantation. Although Petitioner was able to establish – through the testimony of Wigman and Brogan and the introduction of contemporaneous news accounts – that *all of the facts Houghtaling got right in his confession could have come from publically available information*, Petitioner was prevented from establishing that Houghtaling *actually learned these facts from publically available information*. (Ex. 21 at R. 5973-76.)

252. Instead of allowing the testimony, the trial court required that Houghtaling be able to give specifics: "What newspaper and what person and when?" (Ex. 21 at R. 5976.) Because Houghtaling was unable to identify the precise public source of his knowledge about each fact, the trial court halted this line of questioning. (*Id.*)

253.    In addition, the State argued that Houghtaling had recently fabricated his testimony, telling the jury in opening argument that it expected Houghtaling would concoct a new version of events:  "I cannot predict to any one of you what Justin Houghtaling and David Collett are going to say when they get up on this witness stand, okay.  I suspect that they're going to alter their version of what happened on that night."  (Ex. 21 at R. 5758.)

254.    Petitioner sought to counter this by demonstrating that Houghtaling's testimony was not, in fact, a recent fabrication, as Houghtaling had repeatedly denied responsibility for the crime.  The trial court, however, prevented Houghtaling from testifying about his conduct at Petitioner's First Trial in 2003.  Houghtaling would have testified that in 2003, he refused to testify against Petitioner because "he believed that . . . neither he nor Mr. Smith was involved." (Ex. 21 at R. 6042.)

255.    As the Seventh Circuit has explained, "the widest latitude should be given the defense on cross-examination when trying to establish a witness' bias or motive." *Clark*, 852 F.2d at 1005-06.  For example, in *Ortiz v. Yates*, the defendant was on trial for spousal abuse when he sought to question his wife (the victim and the State's witness), about alleged threats the prosecutor made to her.  704 F.3d 1026, 1029 (9th Cir. 2012).  The prosecutor allegedly threatened the wife that she would suffer consequences if she refused to testify consistent with her original statement to police, which implicated the defendant.  *Id.* at 1030.  At trial, the defendant attempted to ask the wife about the prosecutor's threats, but was prevented from doing so.  *Id.* at 1032-33.  As a result, the defendant was unable to expose the witness's biases and motive – the core purpose of cross-examination.  *Id.* at 1034-35.  The Ninth Circuit held that the exclusion violated the defendant's constitutional right to cross-examination, which required that the defendant's *habeas* petition be granted.  *Id.* at 1040.  The testimony the defendant sought to

elicit was not harmless or cumulative, in part because his wife was the only witness who could link the defendant to the crime. *Id.* at 1036.

256.    Like the defendant in *Ortiz*, Petitioner had a right to cross-examine Houghtaling regarding his motivation for providing statements implicating Petitioner. *See id.* This testimony would not have been cumulative because there was no other evidence to demonstrate that Houghtaling actually learned specific facts about the robbery from newspapers and word of mouth. Nor was the testimony about Houghtaling's motive and credibility cumulative because the trial court prevented any questioning about Houghtaling's testimony at the 2003 trial. (Ex. 21 at R. 6006-07.) These topics were critical because Houghtaling's knowledge and credibility were among the central issues to be decided by the jury. *See Ortiz*, 704 F.3d at 1039 (the fact that the defendant "was permitted to cross-examine [his wife] on other matters does not alter our conclusion" that the limitation on certain crucial questions was prejudicial).

> **b.    In Upholding Petitioner's Conviction In The Face Of These Errors, The Appellate Court Unreasonably Applied *Davis v. Alaska* And *Delaware v. Van Arsdall*.**

257.    The Appellate Court held that the trial court did not err in limiting Petitioner's ability to cross-examine Houghtaling because:  (1) "defense counsel was unable to lay a foundation as to when or through what specific source Houghtaling claimed to have learned the details," *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 239, and (2) "Houghtaling's refusal to testify at the first trial does not necessarily reflect that, had he testified there, he would have exculpated defendant; he could have inculpated him." *Id.* at ¶ 243.  As a result, according to the Court, Houghtaling's 2003 testimony was not a prior consistent statement. *Id.*  These conclusions were an unreasonable application of *Davis* and *Van Arsdall*.

258.    ***First***, contrary to the Appellate Court's conclusion, defense counsel laid a sufficient foundation for the questions, as Houghtaling was asked to testify to his personal

knowledge.  (Ex. 21 at R. 5972.)  Counsel for Petitioner asked Houghtaling whether he learned certain details about the crime from press and word of mouth prior to May 2001.  (Ex. 21 at R. 5973-74.)  Houghtaling responded that he knew, from "newspaper clippings and talking to people" that the shooting took place at the Burrito Express around 7:20 PM.  (Ex. 21 at R. 5874-75.)  But the trial court would not let Houghtaling answer any additional questions about how he learned specific facts, unless he could remember the specific date, time, and location for each.  (Ex. 21 at R. 5976.)  Houghtaling could not remember, which is not surprising given that the trial occurred nearly 11 years after Houghtaling's May 2001 statement.  (Ex. 21 at R. 5976.)  The central point here was that Houghtaling learned the facts contained in his 2001 "confession," not from participating in the crime, but by hearing or reading about them in the public record.  (Ex. 21 at R. 5973-75.)  There is simply no requirement that more of a foundation be laid.

259.    Under Illinois law, a court may not prevent a witness from testifying that he perceived something simply because the court thinks the witness is mistaken or falsifying.  *People v. Trotter*, 254 Ill. App. 3d 514, 528 (1st Dist. 1993).  The court may reject the testimony "only when no reasonable trier of fact could believe" the witness perceived what he claims.  *Wright & Gold*, Federal Practice & Procedure:  Evidence 2d § 6027 at 278-79 (2007).  Here, there is no question Houghtaling was asked to testify about his personal knowledge.  As a result, the Appellate Court's decision to exclude the testimony on this basis was without justification, and thus was a violation of Petitioner's constitutional right to present a complete defense.  *See Fowler*, 421 F.3d at 1044.  Because Houghtaling's testimony about where he learned the facts of the case would have helped discredit his statement to police and his testimony at Petitioner's Second Trial – the only evidence implicating Petitioner – its exclusion was not harmless, and was an unreasonable application of *Davis* and *Van Arsdall*.

125

260. **Second**, the Appellate Court committed "a clear factual error," *Wiggins*, 539 U.S. at 528, when it concluded that "Houghtaling's refusal to testify at the First Trial does not necessarily reflect that, had he testified there, he would have exculpated defendant; he could have implicated him." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 243. In his offer of proof, Petitioner explained that the reason Houghtaling refused to testify at the 2003 trial was that "he believed that . . . neither he nor Mr. Smith was involved." (Ex. 21 at R. 6041-42.) Thus, there was no basis in the record for the Appellate Court to conclude that Houghtaling might have implicated Petitioner, which formed the basis for its decision to affirm the trial court's erroneous ruling. Indeed, Houghtaling would have explained that he refused to testify in 2003 because he knew that Petitioner had nothing to do with the Burrito Express shooting. (Ex. 21 at R. 6003, 6041-42.) The Appellate Court's conclusion to the contrary was therefore objectively unreasonable. *See Wiggins*, 539 U.S. 510 at 528.

### 3. The Trial Court Violated Petitioner's Right To Present A Complete Defense By Unfairly Curtailing Questions Regarding The Interrogation Techniques Used By Police When Questioning Houghtaling.

261. Petitioner attempted to elicit testimony from Wigman about the "John Reid" interrogation method (which encourages police to attempt to elicit corroborating information when a suspect confesses) and about what information was purposely withheld from the public in order to corroborate any confession. (Ex. 26 at R. 6883-85, 6929-30.) The purpose of this line of questioning was to establish that Houghtaling's confession was not reliable because the police did not use the most effective method for obtaining a truthful statement and that Houghtaling's purported confession did not contain any corroborating details. The trial court, however, sustained the State's objection on relevance grounds. (Ex. 26 at R. 6883.) The Appellate Court

found that the testimony sought was cumulative and thus held that the trial court did not abuse its discretion in excluding it. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 246.

262.    According to the Appellate Court, Wigman's testimony would have been cumulative because Petitioner also elicited testimony from Brogan about the "John Reid" interrogation method and what information about the Burrito Express shooting police made public. *Id.* Although Brogan, who interrogated Houghtaling in Omaha on May 12, 2001 (Ex. 23 at R. 6341), testified about the "John Reid" interrogation method (Ex. 23 at R. 6351-352), and described dependent and independent corroboration (the latter being where a suspect demonstrates knowledge of facts about a crime that police have kept secret from the public – in this case that was the pistol-whipping and Briseno's shout into the passing car), Wigman's testimony would not have been cumulative.

263.    Wigman was in charge of the crime scene investigation and knew *all* of the details that were released to the public, as well as those details that police intentionally held back. (Ex. 23 at R. 6271; Ex. 26 at R. 6886-87.) Wigman also testified that he had extensive training in police techniques and procedures and, in fact, travels around the country evaluating other police departments to ensure that their policies, procedures, and interrogation training meet national standards. (Ex. 22 at R. 6204-05; Ex. 23 at R. 6268-69.) Because of his expertise, Wigman's proffered testimony would have been particularly probative as to whether Houghtaling's May 2001 statement was improperly fed to him by the investigators or actually contained corroborating details and was likely to be truthful.

264.    This was particularly important to Petitioner's defense because the State's entire case rested on the reliability of Houghtaling's statement to police in May 2001. The exclusion of Wigman's testimony therefore violated Petitioner's right to present a complete defense. *See*

*Davis*, 415 U.S. at 315-16; *see also Thomas*, 273 F.3d at 1179-80 (holding that a limitation on direct examination about how police officer conducted criminal investigation contributed to denial of defendant's due process right to present a complete defense). Nor was Wigman's testimony cumulative. *See Moffet v. Kolb*, 930 F.2d 1156, 1162 (7th Cir. 1991) (granting *habeas* relief and holding that although additional evidence was consistent with evidence already in the record, it was not cumulative because it could have been essential to the defense).

## VIII. *HABEAS* IS WARRANTED BECAUSE THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED PETITIONER OF A FAIR TRIAL.

265. *Habeas* relief is also appropriate here because the trial court's errors in excluding important defense evidence (Part VII above), combined with its failure to exclude highly prejudicial and inadmissible evidence offered by the State (Part VIII.A below), so "infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

266. The Appellate Court acknowledged at least two errors – (1) the improper exclusion of impeachment testimony regarding Pardo's description of the green jacket (*see* Part VII.B.1), and (2) the admission of testimony from Weisenberger about his drug use, as well as drug use by Petitioner and Houghtaling (*see* Part VIII.A.3). *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 227-28, 250. The Appellate Court concluded, however, that these errors were harmless. (*Id*. at ¶¶ 227-28, 250.) But the Appellate Court failed to consider whether these two errors *taken together*, and taken along with all of the other errors described throughout this petition, deprived Petitioner of a fundamentally fair trial.

267. Because the Appellate Court failed to properly consider the issue, this Court should now consider the cumulative error issue *de novo*. *Harris*, 698 F.3d at 623. "Where the state courts [do] not reach a federal constitutional issue, 'the claim is reviewed *de novo*.'" *Id.*

(citing *Cone*, 556 U.S. at 472). This means that the court should review Petitioner's *habeas* claim under the pre-AEDPA standard, 28 U.S.C. § 2243, "under which we 'dispose of the matter as law and justice require.'" *Id.*

### A. The Trial Court Erred By Allowing The State To Introduce Highly Prejudicial And Irrelevant Evidence.

268. "An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence." *Bruton v. United States*, 391 U.S. 123, 132 n.6 (1968). When a state court admits evidence that is so prejudicial it renders the trial fundamentally unfair, due process provides a mechanism for relief. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-183 (1986); *see also Maurer v. Minn. Dep't of Corr.*, 32 F.3d 1286 (8th Cir. 1994). Here, the State was permitted to introduce the following highly prejudicial and inadmissible evidence: (1) an out-of-court statement made by McMullan, who did not testify at Petitioner's trial, that she saw Petitioner with a revolver – the same type of gun used in the attempted robbery (Part VIII.A.1); (2) Collett's out-of-court statements in which he pled guilty as an accomplice to the crime, apologized to Briseno's widow, but did not admit guilt, and allegedly repeated to police statements made by Petitioner (Part VIII.A.2); (3) the use of illegal drugs by Petitioner and Weisenberger (Part VIII.A.3); and (4) irrelevant and gruesome photos of Briseno's autopsy (Part VIII.A.4). Even if these errors are not so prejudicial as to merit relief on their own, when considered together and in conjunction with the errors described in Part VII, they resulted in a fundamentally unfair trial. (*See* Part VIII.B.)

### 1. The Admission Of McMullan's Incriminating Out-of-Court Statement That She Saw Petitioner With A Revolver Was Prejudicial Error.

269. In its opening argument, the State told the jury that McMullan participated in the Burrito Express robbery and drove "the getaway car" (Ex. 21 at R. 5756, 5768), but the State did

129

not call McMullan (it *could* not, given its concerns with her reliability)[16] and she did not testify. Detective Brogan, however, testified that McMullan told police that she saw Petitioner with a weapon similar to the one used in the crime. (Ex. 23 at R. 6380.) Specifically, Petitioner's counsel asked Brogan on cross-examination why, in May 2001, the police believed the firearm used was a revolver. (*Id.*) Brogan responded, "We believed it was a revolver based on statements made by Miss McMullan." (*Id.*) Petitioner's counsel immediately interrupted and withdrew the question. (*Id.*) The State insisted Brogan be allowed to finish his answer, and the trial court agreed. (*Id.*) Brogan then testified that "McMullan, for one, told us that she had seen Kenneth Smith with a revolver." (*Id.*) Defense counsel again objected and moved to strike the answer, but the trial court refused, stating that the testimony was given in response to defense questioning. (Ex. 23 at R. 6381.)

270. Brogan's answer to defense counsel's question was non-responsive and designed to place inadmissible evidence before the jury. Indeed, McMullan's statement to police that "she had seen Kenneth Smith with a revolver" had *nothing* to do with why the police believed, at that time, that a revolver was used in the crime – which was the question posed to Brogan. (Ex. 23 at R. 6380.) As Wigman testified and as Brogan himself later admitted, the police knew shortly after the crime that the shooter used a revolver, not an automatic, because there were no shell casings at the crime scene and a lack of casings is consistent with the use of a revolver. (Ex. 23 at R. 6282-85, 6381.) Moreover, by May 2001 – when McMullan allegedly made her statement to police (Ex. 23 at R. 6372-74) – the autopsy had already been performed and the bullet had been recovered. (Ex. 22 at R. 6246-47.)

---

[16] At Petitioner's Second Trial, the State planned to call McMullan (Ex. 15 at R. 4306), but after McMullan's counsel told the court that he did not believe McMullan could fulfill the requirements of her plea agreement requiring her to testify truthfully (Ex. 15 at R. 4309), the State announced that it would not call McMullan as a witness, stating that it had "concerns about what's going to be said, and [was] not calling her" (Ex. 15 at R. 4312).

271. McMullan's out-of-court statement severely prejudiced Petitioner's defense by placing before the jury a hearsay statement that Petitioner could not challenge because McMullan did not testify; the hearsay contained the highly inflammatory suggestion that Petitioner had a weapon similar to the one used to kill Briseno. But there was no such evidence in the record – or elsewhere, for that matter – that Petitioner was ever in possession of such a weapon – and certainly had there been such evidence, the State would have presented it to the jury.

272. Instead of addressing the effect of Brogan's improper testimony on Petitioner's case, the Appellate Court concluded that Petitioner was precluded from raising the issue on appeal because "defense counsel elicited the testimony." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 256. But the doctrine of invited error simply does not apply to what happened at Petitioner's trial; it only applies when the party induced the court to make the error or the party consented. *See People v. Swope* (*In re Swope*), 213 Ill. 2d 210, 217 (2004); *see also People v. Stephens*, 2013 IL App. Ct. (1st) 1210810-U ¶ 29. The record, as summarized above, shows that the Appellate Court's invocation of the invited error doctrine completely misses the mark. It simply does not apply in this situation.

273. This was a heavily contested case and the State's evidence was far from overwhelming. The injection of McMullan's out-of-court statement that she observed Petitioner with a gun matching the characteristics of the gun used in the crime – particularly given that the State introduced *no other evidence* of a gun, let alone a gun connected to Petitioner – easily could have tipped the scale in favor of a conviction. This was exactly "the sort of evidence likely to have a strong impact on the minds of jurors." *See Thomas*, 273 F.3d at 1181 (internal quotation marks omitted).

### 2. The Admission Of Collett's Out-of-Court Statements Was Prejudicial Error.

274.    In its opening argument, the State argued that Collett served as a lookout during the Burrito Express robbery.  (Ex. 21 at R. 5756.)  The State, however, did not offer any evidence supporting this theory.  Rather, over defense counsel's repeated objections, the State introduced evidence that Collett pled guilty to attempted robbery of the Burrito Express and received a five-year sentence.  (Ex. 23 at R. 6408.)  Also over objection, the State asked Collett about certain prior statements he made concerning the night of March 6, 2001.  (Ex. 23 at R. 6410, 6415-16, 6421.)  None of Collett's purported out-of-court statements, including his guilty plea, actually supported the State's theory that Collett was the "lookout," and by extension, that Petitioner was involved in the shooting; moreover, none of the statements was even admissible under Illinois law.  Their improper admission only confused the jury and allowed the State to paint Petitioner with guilt by association.  This prejudiced Petitioner's defense and deprived him of his due process right to a fundamentally fair trial.  *See Maurer*, 32 F.3d at 1286.

### a. The State Was Permitted To Introduce Collett's Out-of-Court Statements.

275.    After Collett testified that he had "no clue" who attempted to rob the Burrito Express, the State introduced his guilty plea as a prior inconsistent statement.  (Ex. 23 at R. 6406; Ex. 16 at R. 5200-01, 5207.)   Collett explained that he pled guilty based on his attorney's advice that he take a "plea of convenience" to avoid the possibility of a lengthy prison term.  (Ex. 23 at R. 6406-07, 6447-48.)   Next, the State read Collett's statement from his sentencing hearing in which he apologized to Briseno's family "for their loss."  (Ex. 23 at R. 6408-09.)  This, too, was ostensibly admitted as a prior inconsistent statement.  (*Id.*)  In that statement, Collett *did not admit responsibility* for the crime, and as Collett explained, he was

expressing sorrow for the family's grief, not personal remorse for committing the crime. (Ex. 23 at R. 6409.) But Collett never should have been in the position to explain what he meant by a statement made during his sentencing hearing, as the statement was highly prejudicial and inadmissible hearsay. (*See* Part VII.A.2 below.)

276. The State was also permitted to offer three additional statements that Collett purportedly made to police on May 12, 2001. The State asked Collett what he was doing on the night of March 6, 2001, to which Collett responded that he drove in a car with Petitioner, Houghtaling, and McMullan to McHenry, Illinois, and after arguing with Houghtaling, Collett got out of the car to "blow off steam." (Ex. 23 at R. 6413.) Collett walked to Weisenberger's house, but no one was home, so he walked to Cloud 9. (Ex. 23 at R. 6414.) The State asked whether "anything unusual occur[ed] as you were leaving Jimmy [Weisenberger]'s house?" to which Collett responded, "Not really that I perceived at the time, no." (Ex. 23 at R. 6415.) The following colloquy then ensued:

> Q.    Did you hear anything?
>
> A.    I believe I previously stated that I heard what sounded like a car backfiring.
>
> Q.    Okay. You heard a car backfiring. Okay.
>
> A.    That's what it sounded like.
>
> . . .
>
> Q.    Do you recall speaking to Detective Sgt. Brogan and Investigator Dan Kreassig . . . of the McHenry Police Department on May 12, 2001?
>
> . . .
>
> A.    I don't recall . . . I had to have, but I don't recall it.
>
> Q.    Did you tell the police . . . as you walked behind Burrito Express and up to the rear of Jimmy's backyard, you heard shots? Did you say that to the police?

A.     Possibly.

. . .

Q.     Did you have any conversation with the defendant Kenny Smith after you heard these shots about what happened at the Burrito Express?

A.     Not that I recall.

Q.     On May 12th of 2001, did you tell Detective Sgt. Brogan that when you got in JD's car, Smith said that some kids just robbed the Burrito Express?  Did you tell the police that?

. . .

A.     I possibly could have, sir.

Q.     You possibly could have been.  Well, is there a reason that you would have said that?

A.     I don't know.  I was 18 years old, sir.

(Ex. 23 at R. 6415-17.)

Q.     Did you have any conversation with the defendant at Jimmy Weisenberger house [*sic*] about what had occurred at the Burrito Express?

A.     No.  The only – the only time it was ever brought up was like what happened, what could have happened there, and we were watching the news and stuff to see what had happened, but we weren't seeing nothing.

Q.     On May 12th of 2001, did you tell Detective Sgt. Brogan that you asked Smith what happened at the Burrito Express and Smith stated "just had some fun?"

. . .

A.     Don't recall, but I probably said it if it's written down.

(Ex. 23 at R. 6421.)   The trial court overruled all of Petitioner's objections to this line of

questioning.  (Ex. 23 at R. 6415-17, 6421.)

134

### b. Collett's Out-Of-Court Statements Were Hearsay And Should Not Have Been Admitted.

277. Collett's out-of-court statements were inadmissible hearsay under Illinois law and their admission prejudiced Petitioner's defense and deprived him of his due process right to a fundamentally fair trial. *Donnelly*, 416 U.S. at 643. The statements were inadmissible hearsay under Illinois law for two reasons: they did not meet the requirements of 725 ILCS 5/115-10.1, and they were not proper impeachment because Collett's testimony did not affirmatively damage the State's case. *See People v. Cruz*, 162 Ill. 2d 314, 358-60 (1994). Illinois permits a witness's prior inconsistent statement to be admitted substantively when the statement, in relevant part, "(1) was made under oath at a trial, hearing, or other proceeding, or (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and . . . (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding." 725 ILCS 5/115-10.1. Under Illinois law, a party may impeach its own witness *only* if his or her testimony "affirmatively damages" the party's case or provides positive aid to defendant's body of evidence. *See Cruz*, 162 Ill. 2d at 359-61.

278. Collett's statements should only have come in as substantive evidence if the State established that: (1) each statement offered was *inconsistent* with Collett's testimony; (2) Collett had *personal knowledge* of the events described in each statement; *and* (3) Collett acknowledged making the statements. None of the statements met all three criteria.

279. Collett's apology to Briseno's family was not inconsistent because the apology contained no admission of guilt, as Collett only apologized "for their loss." (Ex. 23 at R. 6408-09.) Collett's trial testimony that he "heard what sounded like a car backfiring" was not

inconsistent with what he told police – Collett told police that "it sounded like a car backfiring and they said could it have been gunshots." (Ex. 23 at R. 6416.)

280.    Furthermore, Collett's statements that he heard Petitioner say "some kids just robbed the Burrito Express" and "just had some fun" were not admissible substantively because Collett did not have personal knowledge of these statements in the sense intended by the Illinois statute. To have personal knowledge sufficient to satisfy § 115-10.1, "the witness must have observed, and not merely heard, the subject matter underlying the statement." *People v. Bueno*, 358 Ill. App. 3d 143, 157 (2d Dist. 2005). Personal knowledge does not extend to a third party's statement if the testifying witness has no firsthand knowledge about what actually happened. *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (5th Dist. 2000); *People v. Coleman*, 187 Ill. App. 3d 541, 548-49 (4th Dist. 1989) (holding that statements overheard by a witness which consist mainly of a defendant's admissions or confessions are not admissible under § 115-10.1). Because Collett's statements to police were not based on Collett's first-hand knowledge, they should not have been admitted.

281.    In assessing this issue, the Appellate Court inexplicably concluded that Petitioner forfeited the argument that the statements were inadmissible under § 115-10.1 because Petitioner "failed to object to the testimony at trial or include the issue in his posttrial motion." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 207. This conclusion is belied by the record. Petitioner vigorously objected on multiple occasions to the admission of Collett's out-of-court statements, including prior to trial (Ex. 17 at R. 5204-05), before Collett took the stand (Ex. 23 at R. 6325-29), during the State's examination of Collett (Ex. 23 at R. 6410, 6415-18, 6421), and in Petitioner's post-trial motion (Ex. 6 at C. 4109-110, 4115-16). These objections were overruled. (Ex. 17 at R. 5207; Ex. 23 at R. 6329, 6415-18, 6421.)

282.    Moreover, the State argued at trial that the evidence was being offered for impeachment purposes because Collett had affirmatively damaged its case.  (Ex. 23 at R. 6326-27.)  But none of this evidence was admissible for impeachment purposes.  The State's case also is not "damaged" when its witness contradicts the State's opening argument; the testimony must contradict other *evidence*.  *Cruz*, 162 Ill. 2d at 359-61.

283.    In concluding that Collett affirmatively damaged the State's case, the Appellate Court again misstated the evidence.  Collett's direct testimony did not affirmatively damage the State's case because it did not contradict any other *evidence* at trial.  Not a single witness identified Collett or placed him at the Burrito Express.  Pardo testified that he did not see a third man during the attempted robbery of the Burrito Express.  (Ex. 22 at R. 6150.)  Houghtaling, in his August 2008 statement, told police that Collett had no knowledge of the crime.  (Ex. 21 at R. 6019.)  Further, Collett's testimony that he "had no clue" who committed the robbery could not have affirmatively damaged the State's case.  That the State told the jury in its opening statement that it expected the evidence to show that Collett served as a "lookout" during the attempted robbery of the Burrito Express is neither here nor there – particularly given that the State knew exactly what Collett would say when it called Collett to the stand.  (Ex. 21 at R. 5756.)

### 3.    The Admission of Evidence Of Drug Use By Petitioner And His Acquaintances Was Prejudicial Error.

284.    The State asked Weisenberger a number of questions about his past drug use that had nothing at all to do with any issue at trial.  (Ex. 24 at R. 6639-41.)  The State also asked Weisenberger whether Petitioner, Houghtaling, and Collett were smoking marijuana on March 6, 2001, which also had no bearing on any issue at trial.  (Ex. 24 at R. 6640-41.)  The trial court overruled Petitioner's objections to both sets of questions.  (Ex. 24 at R. 6639-40.)  The

Appellate Court held it was error to permit the testimony, but found the errors were harmless because the testimony was cumulative. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 250-51. The jury already heard Weisenberger testify that he had a "buzz" from consuming "at least 17 cans of beer," and heard Houghtaling's May 2001 statement in which he said: "We sat there. We drank a little bit. Uh, then we went outside, smoked a joint, and Kenny came up to me. It was like come with me. I want to go do something." *Id.*

285.     Contrary to the Appellate Court's conclusion, the evidence was not cumulative and these errors were prejudicial, particularly given this closely contested case. *See United States v. Green*, 648 F.2d 587, 589-91 (9th Cir. 1981). The admission of impermissible character evidence can affect the jury's perception of the defendant and undermine his due process rights. *Parle v. Runnels* ("*Parle II*"), 505 F.3d 922, 934 (9th Cir. 2007). In *Green*, for example, two defendants were tried on conspiracy charges and the state introduced evidence related to their prior drug use. 648 F.2d at 589-91. Although some of the evidence was relevant, the Ninth Circuit reversed the convictions because "much of the challenged evidence [about drugs] . . . did not address a contested issue" and "served only to inflame the jury . . . creat[ing] the risk of undue prejudice." *Id.* at 593.

286.     As in *Green*, the State's questions to Weisenberger had no probative value and only served to inflame the jury. Nor was the testimony cumulative. Weisenberger's testimony that he used cocaine, marijuana, and un-prescribed pills cannot reasonably be equated with drinking beer. (Ex. 24 at R. 6640.) Nor was Weisenberger's testimony that Petitioner was smoking marijuana cumulative to Houghtaling's statement that "we went outside, smoked a joint, and Kenny came up to me." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 251. Houghtaling's statement did not implicate Petitioner in the marijuana smoking, but rather suggests only that

Houghtaling was smoking marijuana when Petitioner approached him. The Constitution prevents the State from offering such evidence where it could have a "substantial and injurious effect or influence" on the jury. *Parle II*, 505 F.3d at 927 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### 4.    The Admission Of Photographs From Briseno's Autopsy Was Highly Prejudicial.

287.    Two of the State's exhibits (Ex. 102, People's Ex. 75; Ex. 108, People's Ex. 83) are gruesome autopsy photos of Briseno that were taken after the autopsy and do not depict what Briseno's body looked like after the crime. The cause of Briseno's death was never disputed and the coroner who performed the autopsy testified at trial. (Ex. 25 at R. 6841-53.) Petitioner objected to the introduction of these photos at his Second Trial; on appeal from that conviction, the Appellate Court acknowledged the gruesome nature of the photos (Ex. 176, *Kenneth Smith II* at 76-77), but concluded the photos were admissible to "aid . . . in the jury's understanding of how the bullet pierced an artery and caused blood to flow into other organs, which, in turn, caused Briseno to cough up blood. This was relevant to corroborate Pardo's testimony that Briseno coughed up blood after he was shot." *Id.* at 80. Petitioner objected again at the Third Trial and appeal, but the Appellate Court refused to consider the issue, citing the law of the case doctrine.[17] *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 253.

288.    The sole issue for the jury at trial was the identity of the shooter. The gruesome photos of the victim's disemboweled corpse completely lacked any probative value – they added nothing to the jury's deliberation because the jury should "consider only relevant and competent

---

[17] For each claim subject to *habeas* review, the court applying AEDPA reviews the last state court decision to address the claim on the merits. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Because the Illinois Appellate Court declined to address the autopsy photo issue on the merits during Petitioner's third appeal, *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 253, this Court must review the Appellate Court's decision on the issue from Petitioner's second appeal.

evidence bearing on the issue of guilt or innocence." *Bruton*, 391 U.S. at 132 n.6. The admission of "unduly prejudicial" autopsy photos render[ed] the trial fundamentally unfair." *Dawson v. Delaware.*, 503 U.S. 159, 179 (1992).

> **B.** **The Cumulative Effect Of The Trial Errors Deprived Petitioner Of A Fair Trial, And The Appellate Court's Conclusion To The Contrary Was An Unreasonable Application Of *Taylor v. Kentucky* And *Chambers v. Mississippi.***

289.   The United States Supreme Court has recognized that the cumulative effect of trial errors can deprive a defendant of his right to due process even if each of the errors does not, on its own, merit reversal. *Taylor v. Kentucky*, 436 U.S. 478, 488 n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness"); *Chambers*, 410 U.S. at 290 n.3 (holding that petitioner's claim rested on multiple trial errors and the cumulative effect of those errors frustrated fundamental fairness guaranteed by the Constitution). The errors in Petitioner's case were extensive. Indeed, both the State and the Appellate Court recognized some of the errors. *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 227-28, 250.

290.   As discussed above in Part VII, the trial court curtailed Petitioner's ability to present a complete defense by: (1) excluding significant evidence of the DeCicco Group's motive (Part VII.A.1); (2) excluding Hiland's confession to an attorney for the purpose of seeking legal advice regarding his involvement in the Burrito Express shooting (Part VII.A.2); (3) excluding evidence that would have contradicted Pardo's in-court identification of Houghtaling's green jacket as the green jacket worn by the robber without the gun (Part VII.B.1); (4) limiting Petitioner's cross-examination of Houghtaling for the purpose of demonstrating that his "confession" was not reliable (Part VII.B.2); and (5) limiting Petitioner's

cross-examination of Wigman about proper police interrogation techniques for the purpose of demonstrating that Houghtaling's "confession" was not reliable (Part VII.B.3).

291.    Not only did the trial court curtail Petitioner's defense, but it permitted the State to introduce inadmissible and highly prejudicial evidence:    (1) McMullan's out-of-court statement indicating that she saw Petitioner with a revolver (Part VIII.A.1); (2) Collett's hearsay statements about the evening of March 6, 2001 at his sentencing hearing (Part VIII.A.2); (3) Weisenberger's testimony regarding his past drug use and the alleged drug use by Petitioner on the night at issue (Part VIII.A.3); and (4) Briseno's gruesome autopsy photos (Part VIII.A.4). All of these errors prevented the jury from fairly evaluating whether the State proved Petitioner's guilt beyond a reasonable doubt.

### 1.    The Cumulative Effect Of Trial Errors May Result In A Fundamentally Unfair Trial.

292.    In *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000), relying on *Taylor*, the Seventh Circuit set forth a two-prong test for determining whether cumulative error during a defendant's trial denied him due process:    "(1) at least two errors were committed during the course of trial; [and] (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberations that they denied the petitioner a fundamentally fair trial."  *See also United States v. Benabe*, 436 F. App'x. 639 (7th Cir. 2011); *Anderson v. Sternes*, 243 F.3d 1049, 1055-57 (7th Cir. 2001).   A conviction must be reversed if the cumulative effect of multiple trial errors deprives the defendant of the right to a fundamentally fair trial conducted in accordance with due process.  *Chambers*, 410 U.S. at 290 n.3; *accord Thomas*, 273 F.3d at 1179-80.

293.    In *Thomas*, for example, the defendant was convicted of murder.  *Id*. at 1168.  The sole evidence against the defendant was testimony from an alleged "eyewitness" who implicated

the defendant, but the defense argued the "eyewitness" was the true perpetrator. *Id.* at 1168-69.

The Ninth Circuit granted *habeas* relief, concluding that the three errors at trial did not individually require reversal, but together, they violated the defendant's due process right to a fair trial: (1) the lead police investigator improperly testified to an out-of-court statement indicating the defendant fought with the victim on the day of the murder; (2) the state improperly asked the defendant about a prior bad act (an armed robbery); and (3) the trial court improperly limited defense counsel's cross-examination of the lead investigator regarding the fact that police had difficulty locating an alleged "eyewitness" after the murder. *Id.* at 1171-73, 1175-77. This evidence was vital to the defendant's right to present a complete defense because it served to impeach the state's only witness implicating the defendant and the combination of the errors prevented the defendant from undermining the state's case. *Id.* at 1179-80.

> **2.** **The Appellate Court's Decision Denying Petitioner's Cumulative Error Claim Should Be Reviewed *De Novo*, Or, In The Alternative, It Was An Unreasonable Application Of *Chambers* And *Taylor*.**

294.    The Appellate Court "rejected the majority of [Petitioner]'s claims on the merits, or concluded (as to two claims) that any error that may have occurred was harmless." *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶ 258. The Appellate Court further determined that "cumulatively, the record reveals that the trial, taken as a whole, was fair." *Id.*

295.    A state court decision is not made "on the merits" of a federal issue if the state court fails to address the federal claim. *See Harris*, 698 F.3d at 624. And when a state court decision is not made "on the merits," the standard of review is *de novo*. *Id*. Although the Appellate Court acknowledged two "harmless" errors, it failed to consider whether these errors were harmless *when combined* with each other and with the rest of the errors. Thus, *de novo* review is appropriate. *See Cone*, 556 U.S. at 472.

296.    Even under the more deferential standard of § 2254(d)(1), *habeas* relief is warranted because the Appellate Court's decision was an unreasonable application of *Chambers* and *Taylor*.  The Appellate Court simply found that "the trial, taken as a whole, was fair," but did not consider any of the relevant factors to a cumulative error argument.  *Alvarez*, 225 F.3d at 825.

297.    Petitioner easily satisfies the *Alvarez* test.  Indeed, the Appellate Court found there were two errors.  *Smith*, 2013 IL App. Ct. (2d) 120508-U ¶¶ 227-28, 250.  Even relying only on those two errors alone, *habeas* relief is appropriate.  The State's case against Petitioner was far from ironclad; rather, this was a hotly-contested case where the jury heard competing confessions from Houghtaling and the DeCicco Group.  Any evidence tending to prove or disprove any of those confessions was highly relevant and could have affected the jury's deliberations.  *See Thomas*, 273 F.3d at 1181.

298.    The only evidence implicating Petitioner was Houghtaling's recanted, out-of-court statements.  In support of Houghtaling's confession, the State relied on Pardo's in-court identification of Houghtaling's green jacket as *the* green jacket worn by the robber without the gun.  (Ex. 22 at R. 6249-50; Ex. 27 at R. 7017.)  The Appellate Court recognized that excluding Petitioner's proffered evidence that would have contradicted Pardo's description was in error, but the court failed to consider this error in light of the other errors at trial.  Similarly, the Appellate Court found that Weisenberger's testimony regarding his past drug use and the alleged drug use by Petitioner on the night at issue should have been excluded.  Had the jury heard evidence contradicting Pardo's in-court identification of the green jacket and not heard Weisenberger's testimony on the drug use, there is a significant likelihood that the result of the trial would have been different.  *See Thomas*, 273 F.3d at 1181.  When combined with the errors

143

that prevented Petitioner from demonstrating the DeCicco Group's guilt, these errors undoubtedly contributed to the jury's verdict against Petitioner. *See id.*

299.    Each error described herein individually warrants *habeas* relief.    But the Appellate Court's decision to uphold Petitioner's conviction despite the cumulative effect of the constitutional and state evidentiary errors, also violated his constitutional right to due process. *Taylor*, 436 U.S. at 488 n.15; *Chambers*, 410 U.S. at 290 n.3.    Therefore, *habeas* relief is appropriate here.

## CONCLUSION

For the forgoing reasons, the Court should grant Petitioner a writ of *habeas corpus* under 28 U.S.C. § 2254(d), directing (1) that his conviction and sentence be vacated with prejudice to any retrial, or, in the alternative, (2) that his conviction and sentence be vacated and he be promptly retried.

Dated:  January 13, 2015                    Respectfully submitted,

                                            KENNETH SMITH


                                            By:    /s/ David Jiménez-Ekman
                                                    David Jiménez-Ekman

                                            David Jiménez-Ekman
                                            Anne P. Ray
                                            Katharine R. Ciliberti
                                            JENNER & BLOCK LLP
                                            353 North Clark Street
                                            Chicago, Illinois  60654-3456
                                            (312) 222-9350