**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENNETH SMITH | ) |
| | ) |
| Petitioner, | ) |
| | )    No. 15-cv-00271 |
| v. | ) |
| | )    Judge Andrea R. Wood |
| DEANNA BROOKHART, Acting Warden, | ) |
| Lawrence Correctional Center, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Following his third trial, Petitioner Kenneth Smith was convicted of first-degree murder and attempt armed robbery arising out of a March 6, 2001, attempted robbery of a restaurant that resulted in the murder of its owner, Raul Briseno. Smith was sentenced to sixty-seven years' imprisonment on the first-degree murder conviction, along with a concurrent seven years' imprisonment sentence on the attempt armed robbery conviction. The Illinois Appellate Court ("Appellate Court") affirmed his convictions and the Illinois Supreme Court denied his petition for a writ of certiorari. Smith has filed the present petition for a writ of habeas corpus (Dkt. No. 1), under 28 U.S.C. § 2254(d), arguing that the Appellate Court unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), in finding that there was sufficient evidence supporting his convictions. Alternatively, Smith asserts that the Appellate Court violated his constitutional right to present a complete defense and his rights under the Sixth Amendment's Confrontation Clause when it affirmed certain trial court evidentiary rulings. For the reasons that follow, Smith's habeas petition is granted on the basis of the evidentiary errors, and his convictions and sentence are vacated.

## I.       The Burrito Express Robbery

On March 6, 2001, two masked men entered a Burrito Express restaurant in McHenry, Illinois and attempted to rob the restaurant. The restaurant's owner, Raul Briseno, resisted the robbery along with his employee Eduardo Pardo. Briseno grabbed a knife and he and Pardo chased the masked men out of the restaurant. As the chase continued outside of the restaurant, the masked man wearing a green jacket slipped on a patch of ice, thereby allowing Pardo to catch him. Pardo then attempted to drag the masked man in the green jacket back toward the Burrito Express. In response, the second masked man began shooting. One of his shots hit Briseno, who ultimately died as a result of the wound. The two masked men fled the scene of the crime.

Just over two months later, Justin Houghtaling was arrested in Omaha, Nebraska in connection with the Burrito Express shooting and interrogated by the police. During his interrogation, Houghtaling gave a statement that implicated himself and Smith in the shooting. Based on that statement, Smith was indicted on May 31, 2001. Also indicted were Smith's purported accomplices Houghtaling, David Collett, and Jennifer McMullan. Houghtaling pleaded guilty on November 14, 2001. He received a twenty-year sentence of imprisonment in exchange for his testimony against Williams, McMullan, and Collett. In a trial featuring Houghtaling's testimony, McMullan was convicted of first-degree murder and attempt armed robbery and received a sentence of twenty-seven years' imprisonment. On the basis of his lawyer's advice, Collett took a "plea of convenience" in order to avoid a lengthy prison term.

---

[1] When reviewing a habeas petition, the court "must accept the factual findings of the state trial and appellate courts as true because they are entitled to a presumption of correctness." *Ford v. Ahitow*, 104 F.3d 926, 928 (7th Cir. 1997). Therefore, the facts here are taken predominantly from the Appellate Court's decision affirming Smith's conviction. *See People v. Smith*, No. 2-12-0508, 2013 WL 2382284 (Ill. App. Ct. May 29, 2013) (unpublished Ill. Sup. Ct. Rule 23 order). However, certain additional facts have been taken from the trial record to provide further context to the Appellate Court's findings of fact.

## II.    Smith's First Two Trials

Smith was first tried in 2003. When the State called Houghtaling to testify, he invoked his Fifth Amendment right against self-incrimination. Consequently, the trial court declared Houghtaling unavailable and permitted the State to introduce Houghtaling's testimony from McMullan's trial. Ultimately, Smith was found guilty of first-degree murder and attempt robbery. He successfully appealed the convictions on the basis of the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), which held that a testimonial statement of a witness absent from trial cannot be admitted under the Confrontation Clause of the Sixth Amendment if the defendant did not have a prior opportunity to cross-examine the absent witness. The case was remanded for a new trial.

At the second trial, Houghtaling did testify. On direct, Houghtaling stated that he and Smith were the two masked men that attempted to rob the Burrito Express. Houghtaling stated that he was the man wearing the green jacket and Smith was the man with the gun. After Smith shot Briseno, Houghtaling and Smith ran to a car where McMullan was waiting with Collett in the rear seat. The group then drove to their friend James "Jimmy" Weisenberger's home where they remained through the night. However, on cross-examination, Houghtaling was asked about his agreement with the State's attorney. Then, without any further prompting, Houghtaling recanted his testimony and stated that the story he told on direct was not true. He asserted that the State was forcing him to admit to a crime so that it could convict Smith for a crime that he did not commit. On re-direct, Houghtaling was impeached with the statement he gave following his arrest in Omaha.

In addition, Smith sought to implicate a different group of individuals in the crime. According to Smith, the crime was committed by Russell "Rusty" Levand, his girlfriend Susanne

"Dallas" DeCicco, and her cousin Adam Hiland (collectively, the "DeCicco Group"). When DeCicco and Hiland were called to testify, they denied their involvement in the shooting. Yet, when Smith sought to introduce evidence of their prior confessions, the court barred Hiland's confession entirely and only admitted portions of DeCicco's confession. Once again, Smith was found guilty on both counts. Yet, the convictions were reversed and remanded again on appeal, in part because of the trial court's refusal to allow Smith to impeach Hiland with a prior inconsistent statement.

### III.    Smith's Third Trial

The convictions that form the basis of the present habeas petition were handed down following Smith's third trial. According to the State's theory of the case, Smith and Houghtaling were the two masked men that entered the Burrito Express and attempted to rob it. After a knife-wielding Briseno, along with Pardo, chased them out of the restaurant, Houghtaling slipped on a patch of ice. Pardo was able to catch up to Houghtaling, seize him, and begin dragging him back to the restaurant. This caused Smith to begin shooting. One of his shots struck and killed Briseno. Smith and Houghtaling then fled to McMullan's waiting car, which also contained Collett. Smith again defended himself by pointing to the DiCecco Group as the true perpetrators.

### A.    The Pre-Trial Proceedings

Before the third trial, Smith sought leave to admit evidence concerning Briseno's drug-dealing activity at the Burrito Express. This evidence would have gone to the DiCecco Group's motive for robbing the Burrito Express. He made three live proffers on this issue. In addition, Smith sought to exclude the testimony of Houghtaling and Collett.

Smith sought to introduce the testimony of Patrick Anderson. Anderson would testify that he knew Briseno well and bought cocaine from him through "Serge," an employee who worked in Briseno's restaurants. Among Anderson's customers was Levand, whom he also counted as a friend. Smith first became aware of Anderson after he sent Smith's defense counsel a letter dated December 29, 2011. In that letter, Anderson stated that shortly before Briseno's murder, he and Levand went to the Burrito Express to buy cocaine. Prior to the purchase, Anderson told Levand that Briseno kept large amounts of money and cocaine at the Burrito Express. Following the murder, Anderson recalled hearing rumors about the DeCicco Group's involvement. Then, sometime during the summer of 2011, Anderson and Levand were incarcerated together in the McHenry County jail. After Anderson told Levand that he had reason to believe that Levand had a motive to shoot Briseno, Levand confessed to his involvement in the crime.

The State offered to stipulate that Anderson would testify in accordance with the letter. However, the court was concerned that the letter raised hearsay issues. In response, Smith's defense counsel argued that any hearsay testimony would be used only to show Levand's knowledge of Briseno's drug-dealing rather than for the truth of any matters asserted. Nonetheless, the trial court excluded Anderson's testimony because it would be hearsay and also was "highly suspect" given that Anderson only came forward ten years after the fact. It further ruled that the letter was insufficient to establish the DiCecco Group's motive because there was "no close connection to the drugs and to this crime for which the defendant is on trial." (App. to Habeas Pet. ("App."), Ex. 17 at R005216, Dkt. No. 1-6.)

Anderson also sought to testify why he did not come forward prior to December 2011 with this information. He would have said Levand only first confessed to him in the summer of 2011

when they were incarcerated in the same jail. Once he obtained the confession, Anderson felt compelled to come forward because he had previously been wrongly accused of a crime and, if someone had information to help him, he would have wanted that person to come forward as well. He wrote the letter to Smith's defense counsel only after his attempts to alert authorities through a "tip line" proved fruitless. While Anderson would be permitted to testify at trial regarding Levand's confession, he was barred from testifying about Levand's knowledge of Briseno's drug dealing activities at the Burrito Express and why he did not tell anybody sooner about Levand's confession.

### ii.     *Officer Guillermo Quinones Proffer*

Smith also sought to introduce the testimony of Officer Guillermo Quinones, an undercover operative with Lake County, Illinois' Metropolitan Enforcement Group. Quinones would have testified that while he was working on an undercover drug investigation, he made multiple visits to a restaurant owned by Briseno. Those visits occurred less than six months before Briseno was shot. During one of the visits, Quinones spoke to Briseno about Briseno's cocaine dealing, and Briseno offered to sell cocaine to Quinones. At some point, Quinones did purchase drugs from Briseno and his associate Sergio Salinas. The trial court excluded this testimony as it ruled that it did not have a close enough connection with the crime.

### iii.     *Detective Richard Solarz Proffer*

Finally, Smith sought to introduce the testimony of Detective Richard Solarz, who was a K-9 handler. Detective Solarz would have testified that the day after the shooting, he conducted a search of the Burrito Express with a narcotic-sniffing dog. During the search, the dog detected the possible presence of narcotics inside a desk drawer and a cabinet in the Burrito Express. This testimony was also excluded because it did not have a close enough connection with the crime.

*iv. Houghtaling's and Collett's Testimony*

The State indicated its intention to call Houghtaling and Collett to testify. In response, Smith sought to exclude the testimony, as the State knew that both men would deny that Smith was involved. Rather, the State was only calling them in order to introduce their out-of-court statements implicating Smith. The trial court overruled Smith's objections.

**B.     The State's Evidence at Trial**

*i.     Eduardo Pardo's Testimony*

Eduardo Pardo testified that he worked as a cook at the Burrito Express. He was at work on March 6, 2001, when, at 7:15 p.m., two men wearing black masks that left only their eyes uncovered entered the restaurant. One of the men carried a gun. At the time, Briseno and Pardo were working in the back of the restaurant and there were no customers or any other individuals inside. The man with the gun entered the back of the restaurant first and pointed the gun at Briseno and Pardo. Pardo, who spoke limited English, did not understand what the man with the gun said. Briseno raised the knife he had been using to prepare food and chased the two men out of the restaurant. Pardo was close behind in pursuit.

At some point during the chase, Pardo testified that he observed Briseno stop and talk to someone in a passing car, but he was unable to hear what Briseno said. For a period, Pardo lost sight of both masked men. When he regained visual contact with one of the men, he observed that the man was wearing a green jacket. That man was not the man carrying the gun. After the masked man in the green jacket slipped and fell backwards on a patch of ice, Pardo was able to catch up to him. He then removed the man's mask. Although it was dark outside, Pardo testified that he got a good look at the man's facial features. Pardo alerted Briseno that he had apprehended one of the masked men. Briseno directed Pardo to take the man back to the Burrito Express and

call the police. Holding the man in the green jacket from behind, Pardo began to walk him back toward the restaurant. Briseno rejoined Pardo at this point. Then, the man with the gun reappeared, raised his mask to just above his eyebrows, and fired two shots in Briseno and Pardo's direction. The man with the gun then came closer to Briseno and Pardo and began shooting again. Pardo testified that he heard Briseno make an "aah" sound and saw him spit blood from his mouth. However, Pardo was unable to see if Briseno spit blood on the man wearing the green jacket. After seeing Briseno spit up blood, Pardo released the man in the green jacket from his grasp and ran back to the Burrito Express to call the police.

While Pardo was calling the police, he observed Briseno holding the man in the green jacket in front of him and using him as a human shield as the man with the gun kept shooting. After completing the call, Pardo came back outside. Both masked men had fled the scene. Briseno was left face down on the ground. Pardo observed a substantial amount of blood coming from Briseno's mouth. Notably, Pardo never saw a third man.

Later that evening, Pardo spoke with the police and described the faces of the two masked men. The resulting images showed clean-shaven young males. At trial, Pardo was shown People's Exhibit 66 (Ex. 96, Dkt. No. 1-12), which was the green jacket Houghtaling wore the night of the crime. When asked whether the green jacket looked like the one worn by one of the masked men, Pardo replied in the affirmative. Yet, when Pardo first spoke with the police, he described the jacket as having some black, but only around the collar area. By contrast, Houghtaling's jacket only had a small black patch just below the collar but did have numerous areas of black elsewhere on the jacket. Moreover, Pardo told the police that the green jacket had no pockets and no zipper going up the front of the jacket. Houghtaling's jacket had both of these features. On cross-examination, Pardo could not recall the description he gave to police the night of the shooting. He

testified that he told the police the truth, but he was also scared at the time. Smith later called the officer who took Pardo's statement the night of the shooting in order to perfect his impeachment of Pardo's identification of the green jacket. However, when Smith asked about how Pardo described the jacket in his police interview, the State objected and the trial court sustained the objection.

Despite seeing both the shooter and the man in the green jacket's uncovered faces, Pardo was never able to identify Smith or Houghtaling as being involved in the shooting. Indeed, while working with the sketch artist, and then on a separate occasion two days after the shooting, Pardo was shown a photographic lineup—a lineup that contained Smith, Houghtaling, and Collett's photos. He did not identify any photo as an individual involved in the shooting.

### ii. Lieutenant Gary Wigman's Testimony

The McHenry police department officer in charge of the crime scene was Lieutenant Gary Wigman. At trial, he testified that police officers went over the crime scene "with a fine tooth comb," using metal detectors and magnets to search for the murder weapon or bullet casings. (App., Ex. 22 at R006219–20, Dkt. No. 1-9.) Nonetheless, the police were unable to recover any potential murder weapon that they could link to Smith or Houghtaling. Nor did they recover any physical evidence tied to Smith or his alleged accomplices.

While observing Briseno's autopsy, Wigman noted a laceration and abrasion on Briseno's upper forehead. He testified that, pursuant to the John Reid interviewing technique,[2] some information concerning the investigation was withheld from the public. This was done to assess the credibility of the individuals who came forward to the police with information about the crime. In this instance, the police withheld the fact that Briseno had sustained a head wound and

---

[2] Wigman testified that John Reid is a school in the Chicagoland area that "teaches investigators how to properly interview people." (App., Ex. 26 at R006882, Dkt. No. 1-11.)

that Pardo had seen Briseno yelling into a passing car. That information was withheld from the public until it was disclosed in testimony at McMullan's 2002 trial. By contrast, the public was informed that the men wore ski masks and that Briseno struggled with one of the men in the parking lot. Smith attempted to question Wigman on the John Reid method of interrogation, but the trial court sustained the State's objection on relevance grounds because Wigman did not conduct the relevant interviews in which the method was used.

Wigman also testified why the police believed that the shooter used a revolver. An automatic firearm ejects bullet casings after firing, whereas a revolver does not. Having found no bullet casings in the vicinity of the shooting, the police concluded that the shots came from a revolver.

When asked whether the police received information concerning the DeCicco Group's possible involvement, Wigman confirmed that they did. He said he received a call on November 16, 2001 from Vicki Brummett, Dallas DeCicco's mother, who said she believed that she possessed the gun used in the Burrito Express shooting. The police recovered a .22-caliber revolver from Brummett's home and sent it to the state police for testing. That revolver matched the characteristics of the gun used in the shooting. During his testimony, Wigman conceded that none of the physical evidence collected at the crime scene was connected to Smith or any of his purported accomplices.

### iii.    Forensic Testimony

Several forensic witnesses testified at trial. First, Joanne McIntyre, an Illinois State Police firearms expert, testified that the bullet from Briseno's body was a .22-caliber long rifle bullet with six lands and grooves. She was able to fire ten test shots with the revolver recovered from Brummett, examine the bullets she fired, and compare them with the bullet recovered from

Briseno's body. Based on her tests, McIntyre testified that she could not exclude the Brummett gun as having fired the bullet that killed Briseno, although she was unable to conclude that it was the murder weapon.

The forensic pathologist that performed Briseno's autopsy testified about his findings. He stated that there was a laceration on Briseno's head that was consistent with being pistol whipped with the barrel of a gun. The injury was not consistent with a fall. A forensic scientist with the Illinois State Police that specialized in latent fingerprint examination testified that the fingerprints lifted from the Burrito Express door and a set of door knobs did not match the standards provided by Smith, Houghtaling, Collett, and McMullan.

<i>iv.    Justin Houghtaling's Testimony</i>

Over Smith's objection, (renewed after being overruled at pre-trial proceedings), the State called Houghtaling to testify. In his direct testimony, Houghtaling denied that he and Smith were involved in the shooting. When asked what time he, Smith, Collett, and McMullan went to the Burrito Express on March 6, 2001, Houghtaling testified that they never went to the restaurant on that date. He further stated that he had only known Smith for about three weeks prior to March 6. Houghtaling knew Smith because Smith was dating McMullan at the time, and McMullan lived across the street from Houghtaling.

Houghtaling testified that on the night of March 6, Smith and McMullan came to Houghtaling's house and picked him up. They then went to pick up Collett. Together, the group traveled to McMullan's friend's house in Wisconsin because McMullan wanted to borrow her friend's laptop computer. They then returned to McHenry, where they stopped at a "head" shop known as Cloud 9. From there, they went to Smith's friend Jimmy Wiesenberger's house, where they remained the rest of the night.

In response to Houghtaling's denial of involvement, the State asked him whether he had pleaded guilty to first-degree murder. Houghtaling admitted that he had, and that he was sentenced to twenty years' imprisonment in connection with the Burrito Express shooting. Then, over Smith's objection, the State admitted evidence of Houghtaling's prior inconsistent statements.

*a)*      *Houghtaling's May 12, 2001 Interrogation in Omaha, Nebraska*

A transcript from Houghtaling's May 12, 2001 interrogation in Omaha was read into the record, and the jury heard the audio. Houghtaling testified that he was high on hallucinogenic drugs at the time. During the interrogation, Houghtaling told the police that on the night of March 6, 2001, he, Smith, McMullan, and Collett were drinking at Weisenberger's house behind the Burrito Express. While Smith and Houghtaling were smoking a joint outside, Houghtaling recalled Smith saying something similar to "come with me, I want to go do something." (App., Ex. 137 at 1, Dkt. No. 1-19.) Houghtaling then followed Smith to the Burrito Express.

The interviewers then began asking Houghtaling a series of leading questions regarding face coverings. One asked him if he wore a ski mask, to which Houghtaling replied that he could not remember. Following up, the interviewer asked if Houghtaling had his face concealed. Houghtaling replied that he did. Houghtaling agreed when asked if he concealed his face with some kind of hat. The question was then refined to "[w]ith a mask that goes over the face?" to which Houghtaling replied in the affirmative. (*Id.* at 2.)

Houghtaling said that Smith entered the Burrito Express first. He stated that only Smith was carrying a gun, and the gun was "a little .22." (*Id.* at 3.) When asked who was in the restaurant upon their entry, Houghtaling replied "[s]ome dude behind the counter and a few other people, nah, I I can't remember." (*Id.* at 3.) Smith then went up to a man behind the counter and

demanded money. In response, Houghtaling stated that the owner grabbed a knife and chased him and Smith outside. He was unsure of the size of the knife, describing it as not "little but it was not huge like a regular filet knife or something." (*Id.* at 4.) The knife wielded by Briseno was in fact a large butcher knife, a fact that the interviewers knew at the time.[3] Then, the interviewers asked Houghtaling if anybody other than the owner was chasing them, and Houghtaling replied "not that I know of." (*Id.*) Houghtaling was unable to describe how he was grabbed and held during the course of his escape. He did say that once he heard gunfire, "the dude let go of me and I ran. I was scared."[4] (*Id.* at 5.) Again, Houghtaling was asked if there was an additional person chasing him and Smith. He replied "That could be, I can't, it happened so long ago and I don't remember. I'm not a hundred per cent [sic] positive, but it could be." (*Id.* at 6.)

After he fled, the interviewers asked if anybody was waiting in a getaway car for Smith and Houghtaling. Houghtaling said he did not recall escaping to a car, and instead he believed that they all met back at the house. Later, he stated that upon further thought, he and Smith did run to a getaway car after the shooting, and that McMullan and Collett were in the car. One of the interviewers suggested that the four then went to Cloud 9. Houghtaling agreed. When they arrived at Cloud 9, Houghtaling stated that Collett went inside and the others waited in McMullan's car. The interviewers informed Houghtaling that witnesses placed him at Weisenberger's house following the shooting, which Houghtaling confirmed. He also said that Smith planned the robbery. He explained that they discussed the robbery in the car on the way to McHenry, as well as at Weisenberger's house.

---

[3] An officer who reported to the scene of the crime in the immediate aftermath of the shooting testified that he observed a "large butcher knife, approximately six inches long" lying next to Briseno's body. (App., Ex. 21 at R005781, Dkt. No. 1-8.)

[4] This was contradicted by Pardo's testimony that after he released the unarmed man in the green jacket and went inside to call 911, Briseno used that man as a human shield, while the armed man continued shooting.

The interviewers asked about Houghtaling's attire that night. They asked him if he had borrowed someone's jacket, to which he replied that he borrowed a green jacket from Collett. Houghtaling further stated that he did not see a wound on Briseno's forehead. When asked to describe the gun used to shoot at Briseno, Houghtaling said that it "looked like a revolver." (*Id.* at 18.) Yet, he was unable to explain the difference between a revolver and an automatic. After one of the interviewers drew pictures of a revolver and an automatic, they asked him to pick the one depicting a revolver. Houghtaling selected the automatic.

> b)      *Houghtaling's April 3, 2002 Testimony at Jennifer McMullan's Trial*

Also introduced was Houghtaling's testimony at Jennifer McMullan's trial. He testified that his testimony was uncoerced and made of his own free will. On the day of the shooting, Houghtaling stated that he and Smith discussed the robbery at Houghtaling's house. There, Smith gave Houghtaling a ski mask. They put those masks on prior to entering the Burrito Express.

Houghtaling testified that Smith entered the Burrito Express first and he was carrying a gun in his hand. There were two people inside the restaurant, none of them customers. Smith aimed his gun at Briseno and demanded that he give them money. Instead of complying, Briseno picked up a knife and chased Smith and Houghtaling outside. As he ran away, Houghtaling slipped and was grabbed by Briseno and Pardo. The two then dragged him back to the restaurant. While he was seized, one of the men grabbed his mask. Shots were then fired. Houghtaling could see Smith firing the shots. After the last shot was fired, Houghtaling testified that he could feel a jerk. Briseno then fell, and Pardo ran to the restaurant. When he was released from Briseno's grasp, Houghtaling fled. Upon meeting up with McMullan and Collett, McMullan suggested that they go to Cloud 9 for an alibi.

Houghtaling also testified at Smith's second trial. On direct, Houghtaling stated that he and Smith put on masks and entered the Burrito Express at around 7:21 p.m. Upon entry, a gun-wielding Smith announced that the restaurant was being robbed. Briseno then picked up a knife and chased Smith and Houghtaling outside. During the chase, Houghtaling slipped on ice, which allowed Briseno and Pardo to catch up with him and grab him. Briseno and Pardo began wrestling with Houghtaling. As Houghtaling attempted to escape, Pardo put a knife to his throat.[5] At this point, Smith started shooting. Houghtaling then felt a jerk and was released from both Briseno and Pardo's grasp. He ran to McMullan's car, where both McMullan and Collett were waiting for him. Smith was not with them at this point, and Houghtaling testified that he was not aware where he went. Yet, Houghtaling also testified that when he returned to McMullan's car, he asked Smith whether he was "fucking out of your mind," to which Smith replied, "I did what I had to do." (App., Ex. 21 at R005879–80.) The group then went to Weisenberger's house and stayed there overnight. Houghtaling stated that he was wearing a green jacket that night.

Immediately on cross-examination, Houghtaling recanted his entire direct testimony, other than the fact that he wore a green jacket the night of March 6, 2001. He stated that he had been forced to lie "because [the State] want[s] to convict Kenny Smith for a crime he didn't commit, none of us committed." (App., Ex. 13 at R003474–75, Dkt. No. 1-4.) He also reported that the State threatened to revoke his plea agreement if he did not give testimony inculpating Smith. Moreover, he stated that he learned the details he testified to from newspaper articles and discovery. On redirect, Houghtaling conceded that he had not negotiated any plea with the State at the time of his Omaha interrogation.

---

[5] Houghtaling's testimony that Briseno and Pardo wrestled with him and that Pardo put a knife to his throat does not match Pardo's own testimony from the third trial.

*d)*    *Justin Houghtaling's Cross-Examination at the Third Trial*

During cross-examination, Houghtaling testified that neither he nor Smith was involved in the shooting or the attempted robbery. He also claimed that he was high on hallucinogenic drugs during his May 12, 2001 Omaha interrogation. While much of the interrogation was taped, Houghtaling spoke with the police roughly fifteen minutes before the tape recorder was turned on. During this time, Houghtaling told the officers he had taken drugs that day. In addition, the officers (falsely) informed Houghtaling that Smith, McMullan, and Collett had already been charged and given statements. They promised Houghtaling that if he told them what happened, they would help him out. Once they turned the tape recorder on, the officers began asking Houghtaling a number of leading questions.

As to the facts that Houghtaling recounted in his police interview, Houghtaling testified that he learned those facts through newspaper articles and word of mouth. However, when Smith attempted to ask additional questions about where he learned each specific fact he recounted in the interview, the State objected on the basis of hearsay and foundation. The trial court sustained the objection. It did allow Smith to explain that Houghtaling would have testified that he learned the following items from press or word of mouth prior to his Omaha interrogation:

> That the police thought that the shooting was about 7:20 p.m.; that the police thought that there were two young men involved. The police thought that one man had a handgun; that the police thought that both went into the store; that the police thought that both were wearing black ski masks with eye holes; that the police thought that Mr. Briseno was in the Burrito Express with one employee; that the police thought that Mr. Briseno was using a butcher knife at the time; that the police thought masked men ordered Briseno to give them money.
>
> . . .
>
> That the police thought that Mr. Briseno and the employee chased two men out of the restaurant; that the police thought that Mr. Briseno caught one of the masked men outside the restaurant; that the police thought Mr. Briseno struggled with one of the masked men in the parking lot; that the police thought Mr. Briseno was shot

by another masked man. I would also ask Mr. Houghtaling whether he understood that the possibility that Mr. Briseno had been pistol whipped was in the public, and he would testify that he understood that was not in the public.

(App., Ex. 21 at R006039–40.) Despite defense counsel submitting as evidence news articles that were published about the Burrito Express shooting prior to Houghtaling's Omaha interrogation reflected the relevant facts he recounted in that interrogation, the court reiterated that it would sustain the objection. It insisted that for each fact from the interrogation, Houghtaling must supply details as to what newspaper or person he learned the fact from and when he learned that fact in order for his testimony to be admissible.

In addition, Houghtaling stated that prior to his testimony in McMullan's trial, he prepared with representatives from the State, who refreshed his recollection. Moreover, when he testified at Smith's second trial, he had access to police and forensic reports. And due to his recantation on cross-examination, Houghtaling was charged with perjury and voluntarily pleaded guilty to that charge and was sentenced to an additional term of five-and-a-half years' imprisonment. He recognized that he could again be charged with perjury after his testimony at Smith's third trial, but he said "I'm tired of lying. The truth has to come out sooner or later." (*Id.* at R006028–29.)

Smith also sought to elicit testimony from Houghtaling that he was called to testify against Houghtaling in the first trial but refused because Smith was not involved in the shooting. The State objected on relevance grounds and the trial court sustained the objection.

> v.    *Detective Sergeant William Brogan's Testimony*

William Brogan was a detective sergeant with the McHenry Police Department and was one of the officers who interrogated Houghtaling in Omaha. Brogan stated that he did not ask Houghtaling if he was on drugs that day but testified that he showed no signs of being under the influence. On cross-examination, Brogan testified regarding his training in the John Reid

interrogation technique. A John Reid interview seeks to elicit information to corroborate a confession, which can take two forms: (1) independent corroboration where the subject supplies information unknown to the investigator that can be verified (*i.e.* the location of an unrecovered murder weapon); or (2) dependent corroboration, which involves a suspect demonstrating knowledge of facts about a crime that the police have withheld from the public. However, Brogan testified that Houghtaling supplied police with no facts that provided either independent or dependent corroboration of his confession in the Omaha interrogation.

Brogan also testified about the information that the police released to the public. The publicly disclosed information included that: the shooting occurred at 7:20 p.m. at the Burrito Express, two men were involved and one had a handgun, the two men wore black ski masks with eyeholes; Briseno and Pardo were in the restaurant at the time of the robbery attempt; the masked men demanded that Briseno give them money; Briseno and Pardo chased the men out of the restaurant; Briseno wielded a knife as he chased the men; during the pursuit, Briseno caught one of the masked men; while Briseno was struggling with the man he caught, the other masked man shot him. Not publicly disclosed was the wound on Briseno's head and the fact that Briseno had yelled something to a passing car.

In addition, Brogan testified that in Omaha, the police had spoken to Houghtaling for fifteen minutes before they began recording the interview. During this fifteen-minute period, Houghtaling denied his involvement in the shooting until police falsely told him that Smith, McMullan, and Collett had been charged, and that Houghtaling could help himself if he gave a statement. He further admitted that much of Houghtaling's statement was first suggested through the use of leading questions asked by the other interrogator. He also conceded that investigators should avoid the use of leading questions.

vi.     *David Collett's Testimony*

During pre-trial proceedings, Smith's objection to David Collett's testimony was overruled. He renewed his objection when the State called Collett at trial. Again, the trial court overruled the objection. On direct, Collett testified that he had "no clue" who attempted to rob the Burrito Express. (App., Ex. 23 at R006406, Dkt. No. 1-9.) When asked why he pleaded guilty to being involved in the robbery, Collett testified that it was a "plea of convenience." (*Id.* at R006407.) He also stated that his lawyer advised him that the reduced charge offered to him in exchange for his plea could reduce his term of imprisonment or cause him to avoid it altogether. Then, over Smith's objection, the State was allowed to introduce a statement directed at Briseno's widow that Collett gave at his sentencing hearing:

> I'd just like to say that I'm—no, no apology, nothing I can possibly say can help the victims with what they're dealing with, but I can offer my apologize—apology. I really—if I would have known that any of this would have happened, I really would have tried to do something to stop it, but, honestly, I mean, I really didn't think anything like that would have happened—was going to happen. If the judge, if your Honor, if you see fit to grant me probation, I will follow through with it completely and to the Court's satisfaction. I would just like to apologize again to the victims for their loss. Thank you.

(*Id.* at R006408–09.) Collett admitted making this apology but denied that it was because he was remorseful for what he did. Instead, the apology was only for the grief that Briseno's widow was going through.

On the evening of March 6, 2001, Collett explained that he was with Smith and Houghtaling. He had only known Smith for a couple of months at that point. McMullan picked the three of them up and drove them to Wisconsin to pick up a laptop from McMullan's friend. On the drive back to McHenry, Houghtaling and Collett got into an argument because Houghtaling would not return his green jacket. McMullan pulled the car over and Collett exited the car. He then walked to Weisenberger's house. When nobody was home, Collett walked to

Cloud 9. While he was walking, he heard a noise that sounded like a car backfiring. Surveillance video showed Collett entering Cloud 9 at 7:38 p.m. and leaving at 7:44 p.m. After leaving, he got into McMullan's car. In the car were McMullan, Smith, and Houghtaling. He observed no evidence that Smith and Houghtaling had just been involved in a bloody crime. Together, they drove to Weisenberger's house where they remained through the night. Collett testified that he never discussed the Burrito Express incident with Smith, Houghtaling, or McMullan.

Over Smith's objection, the State asked Collett about a statement he made to police on May 12, 2001. It asked whether he told the police that he heard gunshots as he was walking behind the Burrito Express and up to Weisenberger's backyard. Collett said that it was possible that he said this, but it was taken out of context. Rather, he said that while it sounded like a car backfiring, it could have been gunshots. He was not sure as he had never heard a gunshot before. Collett was also asked whether he told police on May 12, 2001 that when he got into McMullan's car, Smith told him that some kids robbed the Burrito Express. Collett admitted that he possibly could have told police that. Finally, he was asked about his May 12, 2001 statement to the police that, when the group was at Weisenberger's house, Collett asked Smith about what happened at the Burrito Express and Smith responded, "just had some fun." (*Id.* at R006421.) He stated that he probably said that if that was what was written down.

### C.    Smith's Defense at Trial

At the conclusion of the State's case, Smith moved for a directed verdict, arguing that the evidence failed to prove Smith was guilty beyond a reasonable doubt. That motion was denied. In his defense, Smith sought to demonstrate that the State had no evidence linking him or his purported accomplices to the crime scene. More importantly, Smith introduced evidence that implicated the DeCicco Group in the crime.

### i. *McHenry Police Department Officers' Testimony*

Detective Richard Solarz interviewed Houghtaling at the McHenry police station on March 7, 2001. Houghtaling wore the green jacket to the station. Solarz testified that he did not observe any blood stains on the jacket or any signs that Houghtaling had been involved in a shooting or struggle. Sergeant Michael Brichetto of the McHenry County Major Investigations Assistance Team testified that he interviewed Pardo on March 8, 2001. He showed Pardo a photo array that included photos of Smith, Collett, Weisenberger, and Houghtaling. Pardo could not point to any photographed individual as being involved in the incident.

### ii. *James "Jimmy" Weisenberger's Testimony*

Jimmy Weisenberger was the man resided in the home where Smith, Houghtaling, McMullan, and Collett spent the night of March 6, 2001. They arrived at Weisenberger's home sometime after the police arrived at the scene of the crime at the Burrito Express. Before their arrival, Weisenberger observed police activity around the Burrito Express. When the four arrived, he observed Houghtaling wearing a green jacket. He did not see any blood or scratches on any of them. When he rode with Collett in McMullan's car to buy beer, he did not see any blood, masks, bullets, or a gun in the car. On cross-examination, Weisenberger was asked over Smith's objection whether he had used any drugs in the past, and whether Smith, Houghtaling, and Collett were smoking marijuana on the night of March 6, 2001. He responded that he smoked marijuana as a teenager and tried other drugs, and that Smith, Houghtaling, and Collett were smoking marijuana at his house that night.

### iii. *Patrick Anderson's Testimony Regarding Rusty Levand's Confession*

Patrick Anderson lived in McHenry in 2001 and was friends with Rusty Levand. He also knew Levand's then-girlfriend Dallas DeCicco. While incarcerated in the McHenry County jail in

July of 2011, Anderson reconnected with Levand, who was a fellow inmate. Levand eventually told Anderson of his involvement in the Burrito Express shooting. He stated that he and DeCicco's cousin, Adam Hiland, attempted to rob the restaurant. When Briseno chased them out of the restaurant and grabbed Hiland, Levand fired his gun over his shoulder and struck Briseno. Briseno bled from his wound onto Hiland. After Hiland called for help, Levand ran over to Hiland and Briseno and hit Briseno over the head with his gun. Levand and Hiland then fled to DeCicco's car and the three drove to Levand's mother's house to clean up. There, they also burned the masks and the clothing they were wearing and unsuccessfully attempted to clean up the bloody backseat of DeCicco's car. Several months later, Levand stole DeCicco's car and burned it somewhere in Wisconsin.

iv.    *Susanne "Dallas" DeCicco's Confessions*

a)    *DeCicco's 2005 Confession to the Police in Quincy*

Dallas DeCicco participated in a videotaped interview with Sergeant Doug Vandermaiden of the Quincy, Illinois Police Department. Vandermaiden was called to testify. He stated that he was a patrol officer with the Quincy Police Department in November of 2005. In that capacity, he first came into contact with DeCicco after he suspected her of retail theft. However, he soon came to believe that she had some involvement in the Burrito Express shooting.

In the interview, DeCicco stated that she, her boyfriend Levand, and her cousin Hiland had committed the crime. It occurred the day her sister went into labor, which she said was March 5, 2001. The DeCicco Group went to the hospital, but DeCicco sent Levand and Hiland to her mother's house to get the maternity bag. Levand and Hiland drove DeCicco's car and were gone for one-and-a-half hours, even though the trip should have taken no longer than thirty minutes. When the two returned, they were acting funny. After departing the hospital, the DeCicco Group

went to DeCicco's biological father's house. There, Levand and Hiland started going through her car's trunk. Inside the trunk was a revolver wrapped in a towel. She identified the gun as her stepfather, David Brummett's revolver. Then, Levand and Hiland left, talking about snatching purses or robbing somebody for money. After twenty minutes, DeCicco got in her car and began looking for them. She found them near the Burrito Express where she saw them run into the restaurant, and then run back out followed by two men who worked there. As the four of them ran across the street and in front of her car, one of the men turned around and yelled something into DeCicco's car.

DeCicco continued to drive and returned to her father's house. While she was in the driveway, she heard six gunshots. Soon thereafter, Levand and Hiland ran out from the woods behind the house. Hiland's face was covered in blood and he had a cut on his hand. The two got into DeCicco's car and she drove them away. Levand threw the gun on the back seat, and Hiland tried to clean it. The DeCicco Group then drove to Levand's grandmother's house and disposed of either a scarf or gloves. Then, they drove to DeCicco's mother Vicki Brummett's house. There, Hiland put their soiled clothes in a bag and burned them the next day. Hiland and Levand cleaned the gun and pulled Briseno's hair from it. While at Brummett's home, Levand told DeCicco that one of the men at the Burrito Express threw a knife at him and Hiland, at which point the two ran out of the restaurant. Levand also recounted that one of the employees caught Hiland and dragged him across the parking lot. That is when Levand panicked and began shooting. His final shot hit Briseno, at which point Levand heard Briseno let out a groan and saw him spit up blood on Hiland. Briseno continued to attempt to fight back. He raised his knife and struggled with Hiland until Levand came up and hit Briseno on the head. DeCicco told her sister about the incident. Her sister told their mother. In turn, their mother called the police, who subsequently collected the

gun. DeCicco stated that she did not contact the police because she was fearful that Levand and Hiland might physically retaliate against her. Months later, DeCicco's car was stolen. She said that Levand and Hiland took her car and drove it to Wisconsin where they burned it due to the bloodstains on the back seat. By stipulation, Smith introduced evidence showing that DeCicco's car was found on June 27, 2001, in Racine, Wisconsin. The car had been completely burned and destroyed.

*b)*   *DeCicco's 2006 Confession*

About two months later, DeCicco again confessed; this time to Sergeant Virgil Schroeder of the Illinois State Police. Schroeder testified that in January 2006, he and a partner interrogated DeCicco, who at that time was incarcerated for retail theft. They interviewed her at the State's request.

During this confession, DeCicco stated that the shooting occurred on either March 5 or 6, 2001. She mentioned for the first time that Levand and Hiland both wore masks when they entered the Burrito Express. When later asked why Levand or Hiland had to clean blood off his face despite wearing a mask, DeCicco stated that Levand wore a mask and Hiland wore a scarf over his face. She also stated that Hiland had Briseno's blood on his face and the blood dripped onto his shirt. DeCicco was asked how she knew that Levand and Hiland had a gun when they were at her biological father's house. She stated that she saw them looking through her car's trunk but did not actually see the gun. Instead, she only saw the gun later, both when Levand and Hiland entered the restaurant and then when Levand ran toward her car.

DeCicco specifically pointed out to her interrogators that Briseno was hit in the head with a gun. After this confession, the officers told DeCicco that they did not believe her story and offered to give her an out if she recanted. Instead, she insisted that "it happened and I'm willing to

step forward." She offered to take a polygraph. She further related that Hiland told her that he saw an attorney because he was fearful of being prosecuted after Brummett turned over the weapon used to commit the crime to police.

c)    *DeCicco's Confession to Her Mother*

Vicki Brummett, DeCicco's mother was called to testify. She stated that on March 6, 2001, she returned home from the hospital where her other daughter had given birth. On her way home, she saw police around the Burrito Express. Upon arriving home, she saw DeCicco, Levand, and Hiland in the basement. Before the shooting, Hiland did not have scratches on his body. But now he had scratches on his hands and knees. When asked whether anybody in her household owned a firearm, Brummett stated that her husband owned a handgun that he kept in the bedroom closet wrapped in a blue towel. Sometime in November 2001, she turned that gun over to the police.

Also around November 2001, DeCicco confessed her involvement in the Burrito Express shooting to Brummett. Brummett testified that DeCicco told her that the night of March 6, 2001, DeCicco had driven to pick up Levand and Hiland and found them standing outside the Burrito Express. She watched them run inside, and subsequently run out. One of the men who ran out after Levand and Hiland ran in front of DeCicco's car and yelled for her to call the police. DeCicco said she then drove home. DeCicco also told her mother that the gun used in the shooting belonged to Brummett's husband. In addition, DeCicco mentioned that one of the men was hit in the head with the gun, which left a crack in the barrel. At the time, the fact that Briseno had a head wound resulting from a being hit with a gun was not public information.[6]

---

[6] Wigman testified that at the time he obtained the Brummett gun in November 2001, the issue of Briseno's head injury had not appeared in the press or otherwise been publicly disclosed. (App., Ex. 26 at R006922.)

*d)     DeCicco's Confessions to Her Friends*

Three of DeCicco's friends were called to testify regarding confessions that DeCicco made to them. Brittany Tyda was a childhood friend of DeCicco's who testified that DeCicco confessed to her about the Burrito Express shooting in October 2001. Tyda had invited DeCicco and Levand to her apartment. There, DeCicco tearfully told Tyda about the shooting. Specifically, she told Tyda that she saw Levand and Hiland attempt to rob the Burrito Express. When a knife-wielding store manager grabbed Hiland, Hiland yelled for Levand's help. Levand responded by shooting the manager.

During that same visit, Tyda heard DeCicco arguing with Levand. At some point in the argument, DeCicco told Levand that if he went to the police about DeCicco writing bad checks, she would tell the police that he shot someone. Within a year of the shooting, Tyda spoke with the police about DeCicco's confession.

DeCicco also confessed to her sister (and Hiland's cousin), Elizabeth Schwartz. Schwartz testified that DeCicco had visited her in the hospital on March 6, 2001, the day after she had given birth to her daughter. About three weeks later, DeCicco told Schwartz that Hiland had been involved in the shooting at the Burrito Express. Schwartz told her mother about DeCicco's confession. She further testified that in the week following the shooting, she noticed cuts on Hiland's hands and bruises on his arm.

Sometime around Christmas 2005, DeCicco confessed to her half-sister, Carly Rexford. While DeCicco was at Rexford's home, she told Rexford that she had confessed to the police that she had been involved in the Burrito Express shooting. Specifically, she said that Hiland and Levand took her stepfather's gun and used it during an attempted robbery of the restaurant. However, during an altercation between Briseno and Hiland, Levand shot Briseno. DeCicco also

told Rexford that Levand had threatened to punish her if she ever told anybody that she was involved in the crime. Rexford testified that when she visited Schwartz at the hospital on March 6, 2001, DeCicco was there as well.

v.     *Adam Hiland's Confessions*

a)     *Hiland's Confession to R. Daniel Trumble*

A friend and former roommate of Hiland, R. Daniel Trumble, was called to testify about confessions Hiland made to him. Over the summer of 2002, Hiland had three conversations with Trumble in which he confessed to being involved in the Burrito Express shooting. During the first conversation, Hiland was drinking with Trumble when he told Trumble that the wrong people were arrested for the shooting. Trumble testified that Hiland confessed that he was involved in the shooting along with Levand and DeCicco. While the three of them had only intended to rob the restaurant, the situation "had gone wrong" after one of the restaurant workers pulled a knife. (App., Ex. 25 at R006735, Dkt. No. 1-10.) As a result, Levand shot him. Trumble further stated that Hiland was shaking and crying during the confession.

Following this initial confession, Trumble advised Hiland to speak to a defense attorney. Trumble testified that he accompanied Hiland to see an attorney and was present when Hiland confessed to the attorney. However, the State objected to Trumble's testimony regarding the visit to the attorney on relevance grounds. Smith's counsel made an offer of proof that Trumble would testify that he arranged a meeting with an attorney named Ed Edens. Hiland and Trumble met with Edens at a restaurant in 2002, and Hiland made inculpatory statements to the attorney in Trumble's presence. Edens then told Hiland that he should not come forward because other arrests had been made in connection with the shooting. The court sustained the State's objections and permitted Trumble to testify only that he heard Hiland confess again. It did not allow Trumble to

make any reference to the lawyer or the circumstances surrounding that meeting. Accordingly, Trumble testified that a few days after Hiland's first confession, he had a second conversation about the shooting with Hiland at a restaurant. Hiland was sober and repeated the confession he gave earlier. Then, on the drive home from the restaurant, Hiland explained that since someone else was arrested he was not going to turn himself in. Trumble never went to the police with this information.

### b) *Hiland's Confession to Gina Kollross*

Hiland also confessed to his adoptive sister, Gina Kollross. Kollross testified that Hiland once lived with her, and that she also knew DeCicco and Levand. She stated that a few days after the shooting, she noticed that Hiland's hands were bandaged. When she asked him what happened, he said he slipped on some icy stairs. Then, a week or two later, Hiland told Kollross that he and Levand had attempted to rob the Burrito Express. When the owner chased them with a knife and targeted Hiland's arm and hand, Levand shot the owner in order to free Hiland.

### c) *Hiland's Confession to Charlene McCauley*

Hiland's birth sister, Charlene McCauley, testified that she lived with Hiland, DeCicco, Levand, and Schwartz at the Brummett residence in March 2001. McCauley stated that on occasions, the DeCicco Group would pick the lock to enter the Brummetts' bedroom. The day after the shooting, McCauley said she saw Hiland with bandages on his forearm. He told her that he had slipped on icy stairs.

Shortly before Christmas 2001, McCauley testified that Hiland confessed his involvement in the Burrito Express shooting to her. Hiland told her that the DeCicco Group was at DeCicco's father's house and smoking crack in the garage on the night of the shooting. When they ran out of drugs, they decided to rob the Burrito Express to obtain more money. However, after Levand and

Hiland went inside, the owner and an employee chased them out of the restaurant and continued to pursue them outside. One of the men grabbed Hiland and struggled with him. Levand shot the man. Following his confession, McCauley testified that Hiland appeared depressed, ashamed, and relieved.

### d) *Hiland's Confession to Elizabeth Schwartz*

In addition to testifying that DeCicco confessed to her, Elizabeth Schwartz also stated that her cousin, Hiland, confessed to her. His confession occurred two or three months after the shooting while Schwartz and Hiland were in a van outside a restaurant near the Burrito Express. Hiland resisted exiting the van, became fidgety, irritable, and panicked. Schwartz looked at Hiland and said "[s]he wasn't lying, was she?" (App., Ex. 25 at R006781.) Hiland asked what she meant, and Schwartz responded that DeCicco had told her that he had been involved in the Burrito Express shooting. An angry Hiland replied that DeCicco "is a fat fucking bitch and she can't keep her mouth shut. She needs to keep her mouth shut." (*Id.*)

The two then drove away. During the drive, Hiland told Schwartz that the DeCicco Group had been smoking crack the night of the shooting. After they ran out of drugs, Hiland and Levand decided they would rob the Burrito Express. DeCicco dropped Hiland and Levand off at the restaurant. The two went inside but were chased out by two men. Schwartz testified that one of them got ahold of Hiland and tried to stab him with a knife. During the ensuing struggle, Hiland grabbed the knife and cut his hand. Levand then shot the man with the knife and ran up and hit him in the head with the gun. She later clarified that she did not remember if Levand hit Briseno with the gun first, or if he shot him first. DeCicco then picked up the two afterwards. Schwartz reported seeing Hiland with cuts and scrapes the week following the shooting. She also conceded that her sister, DeCicco, was not always truthful with others.

### D. The State's Rebuttal

The State sought to rebut Smith's evidence showing that it was the DeCicco Group, rather than Smith, Houghtaling, Collett, and McMullan that were involved in the shooting. Each member of the DeCicco Group was called to testify.

#### i. *Rusty Levand's Testimony*

Levand testified to his relationship with Patrick Anderson. He stated that Anderson is an acquaintance and confirmed that they were incarcerated together in the McHenry County jail from June 6 through June 11, 2011. However, Levand denied confessing to Anderson and denied being present at the Burrito Express on the night of the shooting.

#### ii. *Dallas DeCicco's Testimony*

The State called DeCicco. At the outset of her testimony, she confirmed that she had convictions for retail theft, obstruction of justice, and possession of prescription medication. She also acknowledged that she had dated Levand for a few years. DeCicco then stated that she lied to the Quincy police in November 2005. She said that she believed the police would let her go on the shoplifting charges if she provided them with a confession in a murder. It did not cross her mind that confessing her involvement in a murder could potentially increase the time she was incarcerated. DeCicco explained away her confession to the Illinois state police, stating that "[i]t just somehow made sense to me that if I just lied a little longer, I'd be able to get out and deal with it later." (App., Ex. 26 at R006958.) As to her other confessions to family, DeCicco testified that the story was initially a joke between her and her sister, Schwartz. Moreover, she told the story to her mother because she was a heroin addict and thought if she confessed her involvement in the shooting, she could get money for drugs. DeCicco was not asked about and did not explain the reason for her other confessions to her friends.

In addition, DeCicco provided no explanation as to how she learned of the unreleased details of the crime. DeCicco stated that while she followed details of the shooting in the news, she denied having read police reports relating to it. Over Smith's objection, the State impeached DeCicco with a statement from her testimony in an earlier proceeding in which she said she saw police reports.

### iii. Adam Hiland's Testimony

At the time of the trial, Hiland was in custody for fleeing and eluding the police. He also had numerous other convictions including attempted burglary, possession of a controlled substance, and aggravated battery. The State did not ask Hiland about his involvement in the Burrito Express shooting or attempted robbery. Instead, it simply asked whether Hiland had ever been cut with a knife on his hands or arms, to which Hiland answered in the negative. While Hiland did have a scar on his hand, he testified the scar came from a recent incident where he was injured running from the police.

## IV.     The Verdict and Smith's Appeal

On February 29, 2012, following twenty-one hours of deliberation over three days, the jury returned a verdict of guilty on both the first-degree murder count and the attempt robbery count. The jury concluded that Smith personally discharged the gun that killed Briseno. On April 26, 2012, Smith was sentenced to sixty-seven years' imprisonment on the first-degree murder charge along with a concurrent seven years' imprisonment sentence for attempt armed robbery.

Smith appealed, arguing that the State did not have sufficient evidence for a jury to find that he was guilty beyond a reasonable doubt of the charged crimes. In addition, Smith challenged several of the court's rulings excluding certain defense evidence, arguing that those exclusions violated his constitutional right to present a complete defense. He also challenged other

evidentiary rulings as violating his Sixth Amendment Confrontation Clause rights and his Fourteenth Amendment due process right to a fair trial. The Appellate Court rejected all of Smith's challenges and affirmed both convictions.

## DISCUSSION

Smith now seeks federal habeas relief under 28 U.S.C. § 2254(d). That statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), does not allow an individual in custody pursuant to a state court judgment to obtain a writ of habeas corpus unless

> the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In the present matter, Smith only seeks relief pursuant the first subsection of § 2254(d). Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law when "the state court applies a rule different from the governing law set forth in Supreme Court cases." *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011) (internal quotation marks and alterations omitted). Alternatively, a state court decision is an "unreasonable application" of clearly established federal law where "the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case." *Id.* (internal quotation marks and alterations omitted). "The focus of the reasonableness inquiry is on whether the state court's application of clearly established federal law is ***objectively unreasonable***, not whether it applied clearly established federal law correctly." *Id.* In undertaking the AEDPA analysis, the habeas court considers "the decision of the last state court to rule on the

merits of the petitioner's claim." *Id.* Here, with one exception,[7] that is the most recent decision of the Appellate Court. *See People v. Smith*, No. 2-12-0508, 2013 WL 2382284 (Ill. App. Ct. May 29, 2013) (unpublished Ill. Sup. Ct. Rule 23 order).

## I. Sufficiency of the Evidence

Smith first challenges the Appellate Court's decision affirming his convictions as contrary to, and an unreasonable application of, the United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979). In essence, he claims that there was insufficient evidence for a jury to find him guilty beyond a reasonable doubt. Under AEDPA, habeas relief may be granted "only if the Illinois Appellate Court applied the *Jackson* standard unreasonably to the facts of [the] case." *Jones v. Butler*, 778 F.3d 575, 581–82 (7th Cir. 2015).

In *In re Winship*, 397 U.S. 358, 364 (1970), the United States Supreme Court confirmed that the Constitution requires that an accused be protected against conviction unless his guilt is proven beyond a reasonable doubt. Then, in *Jackson v. Virginia*, 443 U.S. at 321, the Supreme Court held that *Winship* makes clear that a state prisoner has a cognizable federal habeas claim when he alleges that the evidence in support of his state conviction was insufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt. The Supreme Court emphasized, however, that a habeas court is not to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318–19 (internal quotation marks omitted). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

---

[7] As discussed below in Section II.C.i.d, the Appellate Court last addressed the merits of the admission of Briseno's autopsy photos on Smith's appeal of the verdict in his second trial.

The Seventh Circuit has since clarified that a jury verdict cannot be overturned for insufficiency of the evidence unless "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010). Moreover, the reviewing court must defer to the jury's credibility determinations. *United States v. Duran*, 407 F.3d 828, 839 (7th Cir. 2005). Even when raised on a direct appeal, the standard of review when a defendant challenges the sufficiency of the evidence supporting his conviction has appropriately been described as "a daunting one." *Huddleston*, 593 F.3d at 601 (internal quotation marks omitted).

Smith has made a compelling argument that the jury had insufficient evidence to find him guilty beyond a reasonable doubt. Indeed, the State had no forensic evidence inculpating Smith, nor was he affirmatively identified by the sole eyewitness to the crime. The only physical evidence the State presented connecting Smith to the crime was the green jacket worn by Houghtaling that Pardo identified as the same one worn by the masked man without a gun. Instead, the State's main evidence of Smith's guilt came in the form of Houghtaling's since-recanted confessions during the Omaha interrogation, McMullan's trial, and Smith's second trial. The most obvious problem with that confession is that Houghtaling no longer stands by it. Indeed, at Smith's second trial, Houghtaling set out a story incriminating Smith and then immediately admitted its falsity on cross-examination and further asserted that the State forced him to lie to convict Smith for a crime he did not commit. By the time he recanted, there was no benefit to Houghtaling to lie; he had already pleaded guilty and been sentenced for his supposed role in the shooting. And his recantation came at great personal cost to Houghtaling because by doing so, he admitted to perjury. That admission resulted in him being sentenced to an additional five-and-a-

half years in prison. Those circumstances suggest that his recantation is far more reliable than his supposed confessions.

Moreover, there are reasons to doubt the reliability of Houghtaling's previous confessions. During the Omaha interrogation, Houghtaling testified that he was under the influence of drugs. A recording of that interrogation lends credence to his claim, as he sounds confused and disoriented, and takes long pauses before answering questions. Houghtaling further testified that the police obtained his cooperation by lying to him that Smith, McMullan, and Collett had already been charged and given statements. One of his interrogators, Brogan, confirmed that testimony. Houghtaling's Omaha interrogation also occurred two months after the murders, giving him ample opportunity to learn about the facts of the murder and recite a story that accorded with those facts. *See Ticey v. Peters*, 8 F.3d 498, 503 (7th Cir. 1993) ("[I]f a significant amount of time passes between a crime and a statement, a greater opportunity exists for a witness to fabricate a story and an identification."). Indeed, not a single fact Houghtaling recounted in that Omaha police interview was unknown to the public. Many other facts he recounted were wrong. For example, he said there were a few other people at the Burrito Express when he and Smith entered, when in fact Briseno and Pardo were the only people there. And Houghtaling also claimed that only Briseno was chasing him and Smith even though Pardo has consistently stated that he joined Briseno in chasing the masked men as well. Furthermore, the interrogating officers used leading questions to adduce many of the correct facts.

Despite the apparent unreliability of Houghtaling's Omaha statement, the State used it to form the core of its case against Smith and his purported accomplices. This alone casts doubt on the reliability of Houghtaling's subsequent testimony at McMullan's trial and Smith's second trial. Yet that is not the only reason the reliability of his subsequent testimony should be

questioned. Most significantly, Houghtaling had an incentive to lie because by promising to testify against Smith and McMullan, he received a reduced twenty-year sentence instead of a maximum sixty-year sentence. Furthermore, for his trial testimony, he had the benefit of reviewing nearly everything in the State's file, such as police reports and witness statements, allowing him to tailor his story to be consistent with the available evidence.

While the Court agrees with Smith that the prior inconsistent statements—and the State's primary evidence—suffer a troubling lack of reliability, it cannot agree that the Appellate Court erred in affirming the admission and use of those statements. As an initial matter, the Court cannot overturn even an erroneous state evidentiary ruling on habeas review when it does not result in the denial of a specific constitutional right. *See Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001). While it is true that the Seventh Circuit has established a test for evaluating whether the admission of a witness's prior inconsistent statement violates due process and has applied it in the habeas context, *see Ticey*, 8 F.3d 498, it did so in a case decided before AEDPA. AEDPA now requires that the decision be contrary to or an unreasonable application of federal law as determined by the Supreme Court. And Smith cannot point to an equivalent Supreme Court decision. *See United States ex rel. Wilson v. McAdory*, No. 00 C 1957, 2004 WL 524435, at *5 (N.D. Ill. Mar. 10, 2004) ("Wilson points to no Supreme Court precedent that clearly establishes that it violates due process to admit into evidence the prior inconsistent statements of witnesses who change their stories at trial when those witnesses are available for cross-examination by the defendant. Indeed, Supreme Court precedent suggests just the opposite."). Moreover, Smith is incorrect when he asserts that for *Jackson* purposes, a guilty verdict cannot be based solely on a prior inconsistent statement. Rather, so long as a prior inconsistent statement is reliable, it can, by itself, support a conviction. *Ticey*, 8 F.3d at 503–04. While Smith persuasively contests the

reliability of Houghtaling's prior inconsistent statements, he does not challenge the constitutionality of their admission. Absent some constitutional grounds for doing so, this Court cannot overturn on collateral review the state court's finding that the testimony was reliable and therefore admissible—no matter how questionable that ruling may have been. The cases Smith cites to as showing that a court can overturn a conviction based on a single prior inconsistent statement were heard on direct review and thus not subject to AEDPA's highly deferential standard of review. *See United States v. Orrico*, 599 F.2d 113 (6th Cir. 1979) (direct appeal); *United States v. Bahe*, 40 F. Supp. 2d 1302 (D.N.M. 1998) (motion for judgment of acquittal).

Not only does Smith point out numerous flaws in the State's main evidence against him, he points to persuasive evidence that the DeCicco Group committed the crime for which he was convicted. Specifically, all three members of the DeCicco Group each independently confessed to their involvement in the events of the evening of March 6, 2001. DeCicco and Hiland, in particular, confessed their involvement multiple times. DeCicco confessed to at least six people over the course of five years, including twice to the police. Hiland confessed to at least four people over a two-year period. And a fellow inmate reported that Levand confessed his involvement over ten years later while the two were incarcerated together. Importantly, their confessions contained non-public facts concerning the crime that police had withheld in order to corroborate potential confessions. For example, DeCicco knew both that Briseno yelled something into a passing car and that one of the masked men hit Briseno on the head with his gun. Similarly, Hiland stated that Levand had hit Briseno on the head with his gun. On the other hand, none of Houghtaling's confessions supplied these details.

Furthermore, there were other details concerning the DeCicco Group that are consistent with the physical evidence and testimony in the case. Pardo testified that one of the masked men

had slipped and fallen on ice during the pursuit. And two individuals who had encountered Hiland in the days following the shooting observed that his hands and forearms were bandaged, and another noticed that he had cuts and scrapes on his body. By contrast, Weisenberger, who had seen Smith, Houghtaling, Collett, and McMullan on the night of the crime, testified that he saw no blood or scratches on any of them. Both Levand and DeCicco's confessions also provided explanations as to the lack of physical evidence. Specifically, each explained that the DeCicco Group had burned their bloody clothes and that DeCicco's car was taken to Wisconsin and burned. Notably, DeCicco's car was, in fact, found in Wisconsin where it had been destroyed by burning.

In the Court's view, the evidence of the DeCicco Group's involvement is highly compelling if not conclusive. At the very least, the Court is confounded as to how that evidence could not give a rational jury reasonable doubt as to Smith's guilt. Especially in combination with the exceedingly thin evidence supporting Smith's convictions, the Court is concerned that a miscarriage of justice has occurred here. Yet, Smith faces the twin obstacles imposed by *Jackson* and AEDPA. Unfortunately, there are situations where "judges will . . . encounter convictions that they believe to be mistaken, but they must nonetheless uphold." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). Such is the case here. So long as the record is not "devoid of evidence" of a habeas petitioner's guilt, the Court reads the governing Supreme Court and Seventh Circuit precedent as constraining it from weighing the evidence or second guessing the jury. *United States v. Smith*, 576 F.3d 681, 686 (7th Cir. 2009). Here, the jury had evidence in the form of Houghtaling's recanted confession along with one additional piece of evidence linking Smith to the crime—the green jacket worn by Houghtaling and identified by Pardo as the same green jacket worn by one

of the masked men. Accordingly, the Court must deny Smith's habeas petition to the extent it argues that his convictions were based on insufficient evidence.

## II.       Evidentiary Challenges

As an alternative to the reversal of his convictions, Smith asks that this Court vacate his convictions so that he can be retried. According to Smith, such habeas relief is warranted because the Appellate Court affirmed the exclusion of certain evidence in violation of his due process right to present a complete defense. In addition, the Appellate Court incorrectly found that the trial court did not violate his rights under the Confrontation Clause of the Sixth Amendment by limiting his cross-examination of certain witnesses. Even if those errors were harmless, Smith argues that, considered together, they deprived him of his right to a fundamentally fair trial.

### A.       Exclusion of Evidence Bearing on the DeCicco Group's Involvement

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Accordingly, the Supreme Court has held that, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment," criminal defendants are guaranteed "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks and citations omitted). At the same time, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Yet, that latitude has limits. *Id.* Thus, where an evidentiary rule infringes on a criminal defendant's right to present a complete defense and is "arbitrary or disproportionate to the purposes [it is] designed to serve," the rule must yield. *Id.* at 324–25 (internal quotation marks omitted).

Smith argues that the trial court violated his right to present a complete defense when it excluded testimony that would have supported his defense that the DeCicco Group committed the crime. Part of the right to present a complete defense is the ability for a defendant to submit evidence showing that someone else committed the crime. *Id.* at 327. Smith contends that the trial court violated his right by excluding testimony probative of the DeCicco Group's connection to and motive for robbing the Burrito Express, as well as testimony showing that Hiland confessed his involvement to an attorney.

As an initial matter, the Court must resolve whether it reviews the exclusion of testimony *de novo* or under AEDPA's standard of review. AEDPA's highly deferential standard of review only applies to federal claims that were "adjudicated on the merits in State court proceedings." *See* 28 U.S.C. 2254(d); *Cone v. Bell*, 556 U.S. 449, 472 (2009). Where the state court does not reach the merits of a federal constitutional issue, AEDPA's standard of review gives way and the federal claim is reviewed *de novo. Cone*, 556 U.S. at 472. Specifically, the court is to "dispose of the matter as law and justice require." *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (quoting 28 U.S.C. § 2243). However, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Moreover, AEDPA deference "does not require the state court to have expressly considered federal law, much less to have cited to Supreme Court precedent." *Makiel v. Butler*, 782 F.3d 882, 905 (7th Cir. 2015).

Here, Smith argues that *de novo* review is warranted because the Appellate Court only addressed state evidence law and cited to state cases in affirming the evidentiary exclusions. Yet, this is not entirely true, as the Appellate Court made explicit reference to *Chambers v.*

*Mississippi*, 410 U.S. 284, in affirming the exclusion of certain testimony. *See Makiel*, 782 F.3d at 905 (declining to review state court decision *de novo* where the state court cited *Chambers*). Furthermore, "there are circumstances in which a line of state precedent is viewed as fully incorporating a related federal constitutional right." *Johnson v. Williams*, 568 U.S. 289, 298 (2013). And many of the state court cases cited by the Appellate Court in denying Smith's evidentiary challenges address the constitutional right to present a complete defense, and some explicitly incorporate *Chambers*. *See, e.g.*, *People v. Cruz*, 643 N.E.2d 636, 650 (Ill. 1994); *People v. Neely*, 540 N.E.2d 931, 933 (Ill. App. Ct. 1989). While the Appellate Court did not explicitly address all Smith's federal claims, it did enough such that it should be presumed to have done so. *See Lee v. Avila*, 871 F.3d 565, 571 (7th Cir. 2017) ("We've explained that under *Richter* and *Williams*, the state courts must be given the benefit of the doubt when their opinions do not cover every topic raised by the *habeas corpus* petitioner." (internal quotation marks omitted)). Consequently, AEDPA's standard applies.

i.    *Exclusion of Testimony Regarding Briseno's Drug Dealing*

The trial court excluded testimony from Anderson and two law enforcement officers that would have shown that Briseno was a drug dealer who kept drugs and cash at his restaurant and that Levand knew of that fact, because the testimony did not have a close enough connection with the crime. The Appellate Court affirmed the exclusions, finding that the proffered evidence did not bolster the admitted evidence because it was not entirely consistent with that evidence and would have confused the jury as to the proper focus of the trial.

The Court finds that the Appellate Court's conclusion that evidence of Briseno's drug dealing activities did not bolster Smith's evidence of the DeCicco Group's involvement was unreasonable. Briseno's drug dealing was highly probative in establishing a motive for the

DeCicco Group to rob the Burrito Express and bolsters the motive evidence that had been admitted. As the Appellate Court recognized, the admitted evidence "reflected that the DeCicco [G]roup had been doing drugs on the day of the shooting, ran out of drugs, and allegedly decided to go out and commit a crime to obtain cash so that they could purchase more drugs." *Smith*, 2013 WL 2382284, at *34. Incredibly, the Appellate Court found that the admitted testimony that members of the DeCicco Group were considering stealing money to buy drugs was not consistent with the proffered testimony concerning the presence of drugs at Burrito Express because the DeCicco Group sought only to steal money so they could later buy drugs. Of course, it should be obvious that people who are seeking to steal money for the express purpose of buying drugs would find a restaurant that they believed to contain both money and drugs to be an extremely attractively target. Yet, the Appellate Court defied reason and logic in essentially concluding that the DeCicco Group was willing to steal money to purchase drugs but could not possibly have contemplated cutting out that middle step and just stealing the drugs.

Indeed, the presence of drugs at the Burrito Express is highly probative motive evidence for the DeCicco Group. Their ultimate goal was to obtain drugs. Based on the admitted evidence, the jury could as easily conclude that the DeCicco Group would snatch a purse as they would rob a restaurant. The excluded testimony that Briseno sold drugs from the Burrito Express and one of the DeCicco Group knew it would have bolstered the narrative link bringing together the DeCicco Group, their desire for drugs, and the robbery of the Burrito Express. *See Old Chief v. United States*, 519 U.S. 172, 187 (1997) ("Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. This persuasive power of the concrete and particular is often

essential to the capacity of jurors to satisfy the obligations that the law places on them."). Even crediting the Appellate Court's explanation that the DeCicco Group simply was looking for money, Anderson would have testified that he told Levand that Briseno kept large amounts of cash at the Burrito Express. And, given their knowledge that Briseno dealt drugs from the Burrito Express, the DeCicco Group likely would have believed that they would find more money there than at the average restaurant. *Cf. United States v. Lawrence*, 788 F.3d 234, 242 (crediting expert testimony that large amounts of cash are associated with drug trafficking); *United States v. Sewell*, No. 11-CR-35-TLS, 2013 WL 6237986, at *8 (N.D. Ind. Dec. 3, 2013) (noting that large amounts of cash is evidence consistent with large-scale drug dealing). Faced with a man sentenced to 67 years in prison on an extremely thin evidentiary basis, the Appellate Court's conclusion that this evidence was not relevant was unreasonable.

Further, the Court cannot find that the risk of confusing the jury by directing its attention to Briseno's drug dealing justifies the exclusion of important evidence regarding the DeCicco Group's motive to rob the Burrito Express. First, the Court is not convinced that such testimony carries a significant risk of directing the jury's focus away from the murder and to Briseno's drug dealing. Indeed, the Appellate Court makes no attempt to even explain how that the excluded evidence could induce the jury to decide the case on an improper basis. The primary issue before the jury was whether Smith, Houghtaling, McMullan and Collett or the DeCicco Group committed the crime. Briseno's drug dealing goes to that issue and would not induce the jury to deviate from "their true task: deciding defendants' guilt or innocence." *United States v. Trent*, 863 F.3d 699, 705 (7th Cir. 2017). In addition, the Appellate Court seemed to disparately apply the evidentiary rules in a way that substantially disfavored Smith. *See Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016) (noting that a court cannot exclude evidence "in an arbitrary manner in the

case at hand. Arbitrariness might be shown by a lack of parity between the prosecution and defense"). Whereas the trial court excluded evidence of Briseno's drug dealing, it admitted evidence concerning Smith's drug use. While the Appellate Court found that the admission of evidence concerning Smith's drug use was harmless error, it then inconsistently insisted that the highly probative evidence of Briseno's drug dealing was so powerful that it would confuse the jury as to the issues in the case. Such disparate rulings underscore how the Appellate Court unfairly favored the prosecution and undermined Smith's ability to present a complete defense.

Moreover, it was unreasonable for the Appellate Court to conclude that the exclusion was harmless error that did not substantially prejudice Smith because the testimony would have been cumulative of admitted testimony regarding the DeCicco Group's various confessions. "When reviewing a state-court judgment in a habeas corpus proceeding, we ask whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Rhodes v. Dittman*, 903 F.3d 646, 665 (7th Cir. 2018) (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)). For an error to have a substantial influence on the jury's verdict it is not enough that there was a "reasonable possibility that the error was harmful." *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (internal quotation marks omitted). Rather, the defendant must actually be prejudiced by the error. *Id.* The Appellate Court failed to recognize the important ways in which the proffered testimony bolsters the narrative surrounding the DeCicco Group's confessions by providing further context for their motive. The admitted confession evidence did not supply a motive for robbing the Burrito Express. And without such evidence, the jury was left to wonder exactly why either the DeCicco Group or Smith and his friends would believe that a burrito restaurant with no customers at dinner time would be a lucrative target for a robbery. Smith should have been able to introduce the testimony to complete his narrative of the DeCicco Group's actions and present a complete

defense. His inability to do so leaves this Court with a "grave doubt about whether [the] error of federal law had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2198 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). Thus, the Appellate Court's conclusion that there was no constitutional violation on account of the exclusion was an unreasonable application of *Holmes*, *Crane*, and *Chambers*.

ii.     *Exclusion of Testimony Regarding Hiland's Confession to a Lawyer*

While the trial court allowed Trumble to testify that Hiland confessed to him, it sustained the State's objection to Trumble's testimony that he was present when Hiland repeated the confession to a defense attorney. Specifically, it allowed Trumble to testify that he heard Hiland confess again but prevented Trumble from testifying that it was in front of a criminal defense attorney. The Appellate Court affirmed the exclusion, finding that the fact that the confession was made in front of an attorney did not imbue the confession with trustworthiness.

The Appellate Court's decision was based on its application of Illinois case law finding inadmissible as hearsay an extrajudicial declaration by a declarant that he committed a crime rather than the defendant on trial, and the attendant exception admitting such hearsay where justice requires. *See, e.g.*, *People v. Bowel*, 488 N.E.2d 995, 999 (Ill. 1986). Yet, as the Appellate Court recognized, there are no hard and fast requirements for against-penal-interest hearsay to be considered reliable. *See People v. House*, 566 N.E.2d 259, 289 (Ill. 1990). Moreover, the Illinois case law relies heavily on the Supreme Court's decision in *Chambers v. Mississippi*. And the Supreme Court's core holding in that case was that where testimony was critical to the accused's defense and "constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302. Yet, that is exactly what the Appellate Court did here to exclude the fact that Hiland

confessed in front of a defense attorney. It mechanistically applied a single factor for reliability it derived from one Illinois case, *People v. Human*, 773 N.E.2d 4, 11 (Ill. App. Ct. 2002), to insist that the information must make it more likely that Hiland would be prosecuted and refused to entertain Smith's contentions as to why the fact that the confession occurred in front of a defense attorney made it more reliable.[8]

Although the fact that Hiland confessed in front of an attorney might not have made it more likely that he would be prosecuted, the Court nonetheless finds that it provides important context to his confession and enhances its reliability. In asking the jury to disregard the DeCicco Group's various confessions, the State sought to convince the jury that each member was simply lying. And certainly, a jury could believe that confessions to friends and family could simply be the tall tales of drug addicts or attempts to prove their toughness. Indeed, at one point, the State suggested that Hiland confessed to his sister McCauley in an attempt to convince her to give him money for drugs. (App., Ex. 25 at R006762–64.) However, the fact that Hiland sought out a defense attorney tends to show how seriously he took the legal jeopardy he was facing on account of the acts to which he confessed. That Hiland took the affirmative step to seek out legal counsel adds important context to that particular confession and enhances its credibility. Thus, the Appellate Court was simply wrong to conclude that the fact that Hiland confessed to a defense attorney did not enhance the credibility of the confession.

---

[8] The Appellate Court's citation to cases applying the against-penal-interest exception to the rule against hearsay to justify its affirmance of the exclusion of the fact that Hiland confessed in front of an attorney is particularly non-sensical given that the actual fact of confession was admitted. Yet, the exception concerns the admissibility of the confession rather than the details that render it reliable. Specifically, "[w]here there are sufficient indicia of trustworthiness" of the confession, it may be admissible under the exception. *House*, 566 N.E.2d at 289. Thus, under the Appellate Court's logic, the trial court could reach the paradoxical conclusion that the fact of the confession was trustworthy enough to be admitted even though pertinent contextual details surrounding the confession did not imbue the confession with trustworthiness such that they were relevant.

Even if the trial court erred in preventing Trumble from testifying that Hiland confessed to a defense attorney, the Appellate Court stated that the error would have been harmless. It reasoned that the jury had already heard from DeCicco that Hiland had spoken to an attorney out of fear of being prosecuted for his role in the Burrito Express shooting. Omitted from DeCicco's testimony was the fact that Hiland confessed his involvement to the attorney. It should be obvious that one who fears prosecution would seek legal counsel regardless of whether he actually committed the crime of which he is accused. The fact that Hiland confessed to that attorney provides critical detail as to the purpose of his meeting with an attorney that DeCicco's testimony did not supply. Moreover, the Appellate Court's erred in conflating corroborative testimony with cumulative testimony. "[T]estimony of additional witnesses cannot automatically be categorized as cumulative and unnecessary." *Crisp v. Duckworth*, 743 F.2d 580, 585 (7th Cir. 1984). While DeCicco provided only a hearsay recollection of the fact, Trumble's excluded testimony would have been direct testimonial evidence that Hiland sought legal counsel for his involvement in the Burrito Express robbery. These two independent sources, taken together, strengthen the factual assertion that Hiland, in fear of legal jeopardy, actually sought out a defense attorney. And evidence that adds significant weight and credibility to evidence already in the record is not merely cumulative. *See Washington v. Smith*, 48 F. Supp. 2d 1149, 1164 (E.D. Wis. 1999). In preventing Smith from eliciting from Trumble that he witnessed Hiland confess in front of an attorney, the trial court hindered Smith's ability to present a complete defense. The Appellate Court's conclusion to the contrary was an unreasonable application of clearly established federal law.

### B.     Limitations on Cross-Examination

The Sixth Amendment to the United States Constitution gives an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. A criminal defendant's confrontation rights include more than simply "being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Rather, the Supreme Court has held that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* at 315–16 (internal quotation marks omitted). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. Of course, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Under the Confrontation Clause, an opponent is guaranteed "an ***opportunity*** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* Still, the cross-examiner must be sufficiently able to "delve into the witness' story to test the witness' perceptions and memory" and also be "allowed to impeach, i.e., discredit, the witness." *Davis*, 415 U.S. at 316.

### i.     *Impeachment of Pardo's Identification of Green Jacket*

Smith contends that his Confrontation Clause rights were violated because he was not allowed to pursue a line of questioning on cross-examination that would discredit Pardo's in-court identification of the green jacket linking Houghtaling and, in turn, Smith, to the Burrito Express shooting. During his trial testimony, Pardo was shown the green jacket that Houghtaling wore the night of the crime. The jacket, which was submitted into evidence, was predominantly green with

small areas of black on the front, and had a green collar, three large front pockets, a front zipper with a flap covering it, and black elbow patches. Pardo testified that the jacket appeared to be the same jacket that was worn by the masked man without the gun.

On cross-examination, Pardo was asked about a description of the green jacket he gave to the police in the immediate aftermath of the shooting. Just hours after the shooting, Pardo described the jacket as having black around the collar and stated that it did not have pockets or a zipper. Yet, at trial, Pardo stated he could not recall giving such a description. In order to perfect the impeachment, Smith called the officer to whom Pardo had described the jacket that night. That officer was prepared to confirm that Pardo had described the jacket as having dissimilar features to the jacket submitted into evidence. However, the trial court precluded Smith from asking the officer questions regarding Pardo's earlier description of the jacket. The Appellate Court did not even try to defend the trial court's decision to disallow such questioning, and instead simply held that any error was harmless.

The trial court's decision to preclude Smith from perfecting his impeachment of Pardo's identification of the green jacket based on its erroneous interpretation of a state evidentiary rule clearly violated Smith's rights under the Confrontation Clause. The trial court seemed to think that Pardo's description of the jacket on the night of the shooting was not inconsistent with his trial testimony because Pardo did not deny his description that night, but simply stated he could not recall it. Of course, he did identify a jacket at trial that had several features inconsistent with the description he gave on the night of the shooting. A past description of the jacket as having green around the collar and no pockets and zipper is certainly inconsistent with a later identification of a jacket with none of those features. *See People v. Martinez*, 810 N.E.2d 199, 210 (Ill. App. Ct. 2004) ("The prior testimony need not directly contradict testimony given at trial to

be considered 'inconsistent,' and is not limited to direct contradictions but also includes evasive answers, silence, or changes in position." (citations omitted)). Neither the Appellate Court nor the State argue otherwise. Thus, the trial court deprived Smith of an opportunity to effectively cross-examine Pardo regarding his identification of the jacket by preventing him from perfecting his impeachment of Pardo's identification based on its misapplication of Illinois' rules of evidence. Without the officer's testimony, Pardo's identification was not fully impeached. *See United States v. Rivas*, 831 F.3d 931, 934 (7th Cir. 2016) ("A Sixth Amendment violation occurs when cross-examination limitations . . . deny the defendant the opportunity to elicit testimony that would be relevant and material to the defense." (internal quotation marks omitted)); *United States v. Scott*, 145 F.3d 878, 888 (7th Cir. 1998) ("In determining whether the Sixth Amendment is implicated in a cross-examination denial, we focus on whether there was sufficient information presented to the jury for its appraisal of the witness."). At most, the jury learned that Pardo could not recall his previous description of the jacket. But it did not learn that the jacket he described that night actually varied in a significant manner from the jacket submitted into evidence at trial.

While implicitly conceding error, the Appellate Court nonetheless concluded that the trial court's error was harmless. The harmless error analysis applies when a court has denied a defendant an opportunity to impeach a witness in violation of the Confrontation Clause. *Van Arsdall*, 475 U.S. at 684. In undertaking the harmless error analysis in a Confrontation Clause case, courts consider a variety of factors, including:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*

Here, the Appellate Court found that the trial court's error was harmless beyond a reasonable doubt. In reaching that conclusion, it failed to address any of the factors courts look to in determining whether a Confrontation Clause violation is harmless. Instead, it simply stated that the discrepancies between Pardo's earlier description of the jacket and the jacket submitted to the jury were minor. The Court disagrees with the characterization of those inconsistencies as minor. While Pardo told the police that the jacket had black just around the collar area, Houghtaling's jacket submitted into evidence had an entirely green collar. The Appellate Court dismissed the inconsistency by pointing out a small black patch underneath the collar. However, a small black embellishment underneath the back of the collar hardly equates to black around the collar. In addition, the Appellate Court excused Pardo's earlier failure to observe a zipper by noting that the zipper on Houghtaling's jacket was obscured by a flap. That conclusion is more justifiable, although the flap itself quite visibly divides the jacket in the same manner as a zipper. Finally, the Appellate Court simply ignores the fact that Pardo previously stated that the green jacket had no pockets in the front even though the jacket viewed by the jury had three large and easily visible front pockets. Thus, the jacket seen by the jury had at least two significant deviations from the jacket Pardo described to police.

The Appellate Court further asserted that the jury was made aware of inconsistencies in Pardo's identification of the jacket because on direct examination Pardo described a green jacket, but the jurors viewed the jacket and saw areas of black. Furthermore, the Appellate Court noted that in his closing statement, Smith argued that Pardo could not recall whether he told the police that the jacket had zippers or pockets and therefore had put the issue of Pardo's lack of memory before the jurors. Both these contentions simply highlight the Appellate Court's critical analytical error. The issue was not simply about Houghtaling's imperfect memory. Rather, it was about the

fact that his memory of the jacket at trial—almost eleven years after Burrito Express shooting—was inconsistent with his description given just hours after the shooting. And the jury never learned of that inconsistency. The excluded testimony would have directly called Pardo's trial identification of the green jacket into question by highlighting how it materially differed from his near-contemporaneous description of the jacket to police.

Applying the *Van Arsdall* factors demonstrates the substantial and injurious influence the trial court's error had on the jury verdict. First, as the sole available eyewitness to the crime, Pardo's testimony was undeniably critical to the prosecution's case. Similarly, his testimony was not cumulative because Pardo was the only person who could describe the green jacket worn by the masked man without a gun to the jury. And not only was there no evidence corroborating Pardo's identification of Houghtaling's green jacket worn as the same one worn by one of the masked men, but the trial court excluded the only available evidence contradicting Pardo's testimony when it prohibited Smith from perfecting his impeachment. Thus, Smith was effectively prevented from impeaching the only eyewitness testimony linking Houghtaling, and therefore Smith, to the scene of the crime.

Finally, and most critically, the Court must consider the strength of the prosecution's case. As explained above, the prosecution's case against Smith was extremely weak. Its primary evidence in support of Smith's guilt were Houghtaling's recanted confessions and the green jacket. And Pardo's identification of the green jacket worn was key to tying Houghtaling and Smith to the scene of the crime. In turn, that link easily could have led the jury to believe Houghtaling's confession over the DeCicco Group's various confessions. But without the perfected impeachment, "the jury was left without key facts relevant to" evaluating the credibility of Pardo's trial identification. *Rhodes*, 903 F.3d at 667; *see also Van Arsdall*, 475 U.S. at 680

(holding that there is a violation of the Confrontation Clause when a "reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination"); *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) ("A rigorous cross-examination may bring to light a variety of reasons to doubt a witness's testimony, ranging from innocent failures in perception and memory to biases, prejudices, or ulterior motives, or outright inconsistencies and falsehoods."). In a case built on a legally sufficient but extremely weak evidentiary foundation, the trial court's erroneous exclusion of admissible impeachment testimony had a substantial injurious effect on the jury's deliberations to Smith's great prejudice. Consequently, the Appellate Court's conclusion that the trial court's error was harmless was an unreasonable application of clearly established federal law.

### ii.     Limitation on Houghtaling's Cross-Examination

The trial court limited Houghtaling's cross-examination in two ways. First, it precluded Smith from asking Houghtaling questions about how he learned of basic facts concerning the shooting that he supplied in his recanted confessions. It also sustained the State's objections to questions seeking to elicit testimony concerning Houghtaling's refusal to testify at the first trial. Smith argues that by affirming the trial court's limitations, the Appellate Court violated his rights under the Confrontation Clause.

The jury did hear Houghtaling testify that, prior his Omaha interrogation, he had learned details of the Burrito Express shooting from newspaper articles and word of mouth. When Smith began to ask about where Houghtaling learned each discrete fact he disclosed during that interview, the State objected and the trial court sustained its objections due to lack of foundation. The trial court insisted that, for each fact, Houghtaling needed to supply which newspaper or person he learned the fact from. Given the passage of time, Houghtaling was not able to supply

such detail and consequently Smith abandoned this line of questioning. The Appellate Court agreed with the trial court's decision to exclude the testimony for lack of foundation.

This Court finds that the Appellate Court did not unreasonably apply *Davis* and *Van Arsdall* in foreclosing Smith from questioning Houghtaling as to where he learned each individual fact he supplied in his first confession. Judges are permitted to impose reasonable limits on cross-examination. *Van Arsdall*, 475 U.S. at 679. This particular limitation was not unreasonable. The jury heard Houghtaling testify generally that he learned about the crimes from the press and word of mouth. Furthermore, it learned during trial that each of the facts that Houghtaling set forth in his confession was publicly known at the time, a point that Smith emphasized in his closing argument. Allowing Houghtaling to testify how he learned each fact he disclosed to the police would not significantly add to what the jury already knew. Thus, there was no Sixth Amendment violation because the trial court's limitation did not prevent Smith from eliciting testimony that was relevant and material to his defense. *See Rivas*, 831 F.3d at 934.

Smith further argues that the Appellate Court committed a clear factual error in affirming the trial court's exclusion of Houghtaling's testimony that he refused to testify at Smith's first trial because Smith was innocent. The Appellate Court concluded that Houghtaling's decision not to testify does not necessarily reflect that he would have exculpated Smith. Instead, Smith may well have inculpated him. In response, Smith says that the Appellate Court's conclusion is belied by Smith's offer of proof that Houghtaling would testify that the reason for his refusal to testify is because he believed that neither he nor Smith was involved in the Burrito Express shooting.

The Appellate Court determined that Houghtaling's testimony was a prior consistent statement used to corroborate his testimony at the third trial and thus was only admissible to rebut an accusation that Houghtaling was motivated to lie or his testimony was of recent fabrication.

*See People v. Smith*, 841 N.E.2d 489, 504–505 (Ill. App. Ct. 2005) ("A witness's prior consistent statement is admissible only to rebut a charge or inference that he was motivated to lie or that his testimony was of recent fabrication, so long as he made the prior statement before either the motive arose or the alleged fabrication was made."). In observing that Houghtaling may well have inculpated Smith at the first trial, the Appellate Court was simply explaining its conclusion that Houghtaling's invocation of the Fifth Amendment was not necessarily corroborative of his testimony at the third trial. That conclusion was not unreasonable, as Houghtaling's explanation of his refusal to testify at Smith's first trial—made almost eight years after the fact—does not irrefutably establish the substance of what his testimony at the first trial would have been. As an additional basis for affirming the trial court, the Appellate Court explained that Houghtaling's testimony was inadmissible because Smith failed to establish that Houghtaling did not have the same motivation to lie at the first trial as he did at the third trial. Presumably, Houghtaling's motive to lie at Smith's most recent trial was to protect Smith, and there is no reason to believe that the same motive did not exist when he refused to testify at the first trial. Consequently, excluding Houghtaling's testimony about his refusal to testify at Smith's first trial was reasonable. And given all the other testimony and evidence the jury heard concerning Houghtaling's belief in Smith's innocence, this limitation on cross-examination did not violate the Sixth Amendment.

   *iii.*   *Limitation on Wigman's Cross-Examination*

   During Wigman's testimony, Smith attempted to ask questions regarding the John Reid interrogation method. His purpose for this line of questioning was to show that Houghtaling's first confession was unreliable and did not contain any corroborating details. The trial court excluded the testimony as irrelevant because Wigman was not the officer who interrogated Houghtaling in Omaha. In affirming, the Appellate Court also noted that the testimony would have been

cumulative since the officer that did interview Houghtaling, Brogan, was cross-examined concerning the John Reid method.

The Court agrees that the excluded testimony was cumulative. While Wigman may have been able to add additional details not elicited from Brogan, Smith fails to explain what exactly Wigman would add to Brogan's testimony or how any additional information would have been more than marginally relevant. The Sixth Amendment guarantees only the "opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679. Here, Smith had the opportunity to cross-examine a witness regarding the John Reid method. The fact that he was unable to engage in a similar line of questioning with another witness, by itself, does not amount to a Sixth Amendment violation.

### C. Cumulative Error

In addition to the previously identified constitutional errors, Smith argues that there were several other trial errors that, taken together, deprived him of his due process right to a fair trial. Normally, "[b]ecause a state trial court's evidentiary rulings . . . turn on state law, these are matters that are usually beyond the scope of federal habeas review." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). Such errors are only cognizable by a habeas court when the "erroneous evidentiary rulings were so prejudicial that they compromised the petitioner's due process right to a fundamentally fair trial." *Anderson*, 243 F.3d at 1053 (internal quotation marks omitted). The Supreme Court has held that trial errors that, when considered alone, were harmless may nonetheless violate the due process guarantee of fundamental fairness when considered cumulatively. *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978). In the Seventh Circuit, a habeas court may consider whether the cumulative effect of a trial court's harmless errors violated a

defendant's due process rights. *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000) ("Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law.").[9]

Smith asserts that his cumulative error claim is subject to *de novo* review rather than AEDPA deference. Specifically, he says that while the Appellate Court recognized two harmless errors, it failed to adjudicate his cumulative error claim on the merits because it did not consider whether the errors were still harmless when considered collectively. Smith is incorrect, as the Appellate Court explicitly stated that "[l]ooking at the matters cumulatively, the record reveals that the trial, taken as a whole, was fair." *Smith*, 2013 WL 2382284, at *52. And while it cited only state law cases, those cases contained no indication or state law procedural principles suggesting the federal issue was not also decided. As a result, the Court will apply AEDPA deference to Smith's cumulative error claim.

### i.    Additional State Court Evidentiary Errors

In undertaking its cumulative error review, Smith asks the Court to consider not only the trial court's errors of constitutional significance, but also four additional errors predicated on the misapplication of Illinois evidentiary rules.[10] Thus, the Court will first consider whether those

---

[9] Not all Circuits accept that cumulative error is cognizable on habeas review. *See Dixon v. Hardy*, No. 10 C 06727, 2013 WL 5518902, at *6 (N.D. Ill. Oct. 4, 2013) (noting that the Fourth, Sixth, and Eighth Circuits do not recognize cumulative error claims as cognizable in habeas proceedings). In *Alvarez*, the Seventh Circuit recognized as much but declined to consider the issue because neither party raised it. Notwithstanding this caveat, the Seventh Circuit has subsequently treated *Alvarez* as standing for the proposition that a claim of cumulative error is cognizable in habeas proceedings. *See Anderson*, 243 F.3d at 1055.

[10] Normally, the rule is that errors that are purely errors of state evidence law cannot be the basis for habeas relief. *Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003). While it seems incongruous then for a federal court to review the merits of a state court's evidentiary rulings as part of a cumulative error claim, Seventh Circuit precedent suggests that it is permissible. *See Anderson*, 243 F.3d at 1053–55. In any case, to the extent such rulings are not reviewable even when determining cumulative error, the State has failed to raise that argument and therefore it is waived. *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005).

additional evidentiary rulings were in fact erroneous before undertaking its cumulative error review.

### a)      Weisenberger's Testimony About Drug Use

Over Smith's objection, the trial court allowed Smith's friend Jimmy Weisenberger to testify about his own drug use and that Smith, Houghtaling, and Collett were smoking marijuana the night of the shooting. Both the State and the Appellate Court concede that this decision was an error. Nonetheless, the Appellate Court agreed with the State that the error was harmless, as it was cumulative of a statement Houghtaling made during his Omaha confession that he was smoking a joint the night of the shooting with his purported accomplices. Because the court's evidentiary ruling was concededly an error, the Court will consider it in the cumulative error analysis.

### b)      Brogan's Testimony Repeating Hearsay from McMullan

During cross-examination, Smith asked Sergeant Brogan, the lead detective investigating the Burrito Express shooting, why he believed the weapon used in the shooting was a revolver. In response, Brogan stated that the police "believed it was a revolver based on statements made by Miss McMullan." (App., Ex. 23, at R006380.) At that point, Smith attempted to withdraw the question. However, the State objected, and the trial court instructed Brogan to finish his response. Brogan proceeded to testify that "Miss McMullan, for one, told us that she had seen Kenneth Smith with a revolver." Smith objected to the testimony, but the trial court overruled the objection because it was in response to Smith's own question.

Smith argues that Brogan's testimony was non-responsive and designed to place inadmissible evidence before the jury. He contends that the State declined to call McMullan because of concerns about her truthfulness and therefore it should not have been allowed to bring

her statements favorable to its case through Brogan. However, the Appellate Court affirmed the admission of that testimony, finding that Smith had invited the error.

Under the invited error doctrine, a defendant is barred "from claiming error in the admission of improper evidence where the admission was procured or invited by the defendant." *People v. Harvey*, 813 N.E.2d 181, 192 (Ill. 2004). Here, the Appellate Court held that because Smith elicited Brogan's testimony through his cross-examination, Smith invited the error. The Illinois Supreme Court has held that the State is "not responsible for the questions asked by the defense counsel on cross-examination nor the answers thereto given by the State's witness." *People v. Burris*, 273 N.E.2d 605, 610 (Ill. 1971). And courts have applied the doctrine where a defendant's question on cross-examination elicits improper testimony that otherwise would be excludable. *See, e.g.*, *People v. Gray*, 520 N.E.2d 93, 97 (Ill. App. Ct. 1988) ("It would be, of course, improper for the State to elicit evidence of a defendant's election to remain silent after receiving the *Miranda* warnings. However, here the information was given as an answer to a question by defense counsel during cross-examination." (citation omitted)). The Appellate Court did not err in finding that the doctrine applied to Brogan's testimony regarding McMullan's statement. Smith cannot ask a question and then withdraw it when he realizes that he is receiving an answer that is unhelpful or even detrimental to his case. For this reason, the admission of McMullan's statement will not be included in the cumulative error analysis.

c)      *Collett's Statements*

Smith contends that the Appellate Court erred in affirming the admission of several out-of-court statements made by Smith's purported accomplice, David Collett. In particular, Smith asserts that the trial court should not have allowed the admission of Collett's guilty plea based on

his alleged role in the Burrito Express shooting, his apology to Briseno's family at his sentencing hearing, and three statements he made to police regarding events on the night of the shooting.

Each contested statement was admitted under Illinois' prior inconsistent statement exception to the rule against hearsay. In Illinois, a prior inconsistent statement is not rendered inadmissible by the hearsay rule and may be admitted as substantive evidence if

> (a) the statement is inconsistent with [the witness's] testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
>
> (1) was made under oath at a trial, hearing, or other proceeding, or
>
> (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
>
> . . .
> (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding . . . .

725 ILCS 5/115-10.1. A statement that fails to meet any of the above criteria can still be used for impeachment purposes. *Id.* However, a prior inconsistent statement is only admissible to impeach a party's own witness where the witness's testimony "does 'affirmative damage' to the party's case." *People v. McCarter*, 897 N.E.2d 265, 278 (Ill. App. Ct. 2008).

The Appellate Court held that Smith had forfeited any challenge to the substantive admission of Collett's prior inconsistent statements because he conceded in his post-trial motion that the statements met the requirements of 725 ILCS 5/115-10.1. Smith denies any such forfeiture and asserts that the record shows that he made multiple objections to the admission of the statements. It is true that Smith did object to the admission of the statements. However, at trial, the basis for his objections was that Collett had not affirmatively damaged the State's case

and therefore his inconsistent statements were inadmissible for impeachment. And where a party makes a specific objection, he "waive[s] all grounds not specified." *People v. Eyler*, 549 N.E.2d 268, 289 (Ill. 1989). Nonetheless, in his post-trial motion, Smith explained that "the State's sole purpose for calling [Collett] was to impeach [him] with [his] prior statements," and those statements were hearsay that "would have been inadmissible except as impeachment." (App., Ex. 6 at C004109, Dkt. No. 1-1.) Although Smith primarily challenged the admissibility of the statements for impeachment, implicit in his assertion that the statements could be admissible only for impeachment was an objection to their substantive use as well. Thus, the Appellate Court was incorrect to find that Smith forfeited any challenge to the substantive use of the statements.

Despite its finding of forfeiture, the Appellate Court nonetheless conducted plain error review of Smith's challenges to the substantive admission of Collett's prior inconsistent statements and concluded that the trial court had committed no error in admitting them. This Court analyzes each challenged statement in turn.

First, while Smith states that Collett's guilty plea was improperly admitted, he does not make an argument as to why it is not admissible under 725 ILCS 5/115-10.1. The fact that Collett testified that it was a plea of convenience makes no difference. A prior inconsistent statement "does not have to directly contradict the testimony given at trial to be considered 'inconsistent.'" so long as the statement "has a tendency to contradict the trial testimony." *People v. Zurita*, 693 N.E.2d 887, 891 (Ill. App. Ct. 1998). "Inconsistencies may be found in evasive answers, silence, or changes in position." *Id.* Thus, Collett pleading guilty to his role in the Burrito Express shooting certainly is inconsistent with his trial testimony that he had "no clue" who attempted to rob the Burrito Express.

Next, Smith argues that Collett's apology to Briseno's widow at his sentencing hearing was not inconsistent because he did not admit his guilt. It is true that Collett's apology did not directly admit guilt, but a direct admission was not necessary for the statement to be deemed inconsistent. At the very least, the apology had the tendency to contradict his testimony that he had no knowledge concerning the shooting. While the apology is undoubtedly open to interpretation, the Appellate Court could reasonably conclude that the trial court did not abuse its discretion by finding that Collett's apology was not for Briseno's widow's grief, but for his role in causing the grief. *See id.* ("The determination of whether a witness's prior testimony is inconsistent with his present testimony is left to the sound discretion of the trial court."). Moreover, by saying during his apology that "if I would have known that any of this would have happened, I really would have tried to do something to stop it," Collett at least implicitly suggests some knowledge. Again, the language is open to multiple interpretations, but one reasonable interpretation is that Collett confessed that he was sufficiently involved in the crime such that he was in the position to stop it.

Finally, Smith challenges several statements Collett made to police two months after the shooting. At trial, Collett said on the night of the shooting he was walking to Cloud 9 when he heard a noise that sounded like a car backfiring. By contrast, in his statement to police, Collett described hearing gunshots. Smith argues that Collett's statement to the police was taken out of context. What he said was that he heard what sounded like a car backfiring and then answered in the affirmative when the police asked whether the sound could have been gunshots. The Appellate Court found that it did not matter that the police first suggested the possibility that the sound could be gunshots. What mattered is that Collett agreed. And by not mentioning in his testimony at trial the possibility that the sound could have been gunshots, Collett's answer could be deemed

sufficiently evasive such that the trial court did not abuse its discretion in deeming his statement to police inconsistent.

In addition, Collett told the police that shortly after the shooting, Smith told him that some kids robbed the Burrito Express. And when Collett asked Smith what happened at the Burrito Express, Smith replied "just had some fun." Smith argues that those statements were not substantively admissible because they do not meet the personal knowledge requirement of 725 ILCS 5/115-10.1. "For the personal knowledge requirement to be satisfied, the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement." *McCarter*, 897 N.E.2d at 276 (internal quotation marks omitted). However, personal knowledge requires that "the witness must have observed the events being spoken of, rather than simply hearing about them afterwards." *Id.* Here, Smith contends that Collett's statements failed to meet the personal knowledge requirement because he was simply recounting what Smith told him. The Appellate Court found that its decision was controlled by an Illinois Supreme Court precedent finding admissible as a prior inconsistent statement a witness's statement in which she recounted hearing the defendant confess to the crime during the course of an argument with a third person. *See People v. Thomas*, 687 N.E.2d 892, 902–03 (Ill. 1997). Instead of requiring the witness to have personal knowledge of the underlying crime, the Illinois Supreme Court simply held it sufficient that the witness saw "the argument between defendant and [the third person] and her statement described and narrated the event." *Id.* at 902. While the Appellate Court noted that other Illinois appellate courts have uniformly disagreed that *Thomas* established a rule that personal knowledge encompasses not just what a witness has seen but what he has been told, *see People v. Morgason*, 726 N.E.2d 749, 753–54 (Ill. App. Ct. 2000), it nonetheless felt itself bound by the *Thomas* precedent. On habeas review, where courts generally

do not revisit purely state law evidentiary issues, this Court does not believe it appropriate to wade in on the disagreement between appellate courts concerning the impact of *Thomas*. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). For present purposes, it is enough that the Appellate Court's decision was grounded in Illinois Supreme Court precedent.

In addition, the Appellate Court also concluded that the contested statements were admissible for impeachment because Collett's trial testimony affirmatively damaged its case. "For witness testimony to be affirmatively damaging, it must do more than fail to support the State's position; it must give 'positive aid' to the defendant's case, for instance, by being inconsistent with the defendant's guilt under the State's theory of the case." *McCarter*, 897 N.E.2d at 278. Here, Collett's testimony that he had no clue who robbed the Burrito Express affirmatively damaged the State's case. The State's theory of the case was that Collett acted as a lookout while Smith and Houghtaling robbed the restaurant. That theory was supported by Houghtaling's Omaha confession and his testimony at Smith's second trial, where he stated that Collett and McMullan were waiting in the car to which Smith and Houghtaling fled immediately after the shooting. By testifying that he had no knowledge of who was involved in the shooting, Collett went further than simply giving the State an answer that did not support its theory of the case; he also contradicted important evidence in support of its theory. *See People v. Amato*, 471 N.E.2d 928, 930 (Ill. App. Ct. 1984) ("No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury."). Moreover, it positively aided Smith's case because it lent credence to his

insistence that he, Collett, Houghtaling, and McMullan were not involved in the shooting. Consequently, Collett's statements were properly admitted for impeachment.

### d)    Briseno's Autopsy Photographs

Smith also complains that the Appellate Court erred by affirming the trial court's admission of graphic autopsy photos of Briseno's body. The photos were introduced into evidence at Smith's second trial over his objection. On appeal from that conviction, the Appellate Court agreed that the photos were gruesome, but they were nonetheless relevant to corroborate Pardo's testimony that Briseno coughed up blood after being shot. At his third trial, Smith again objected to the introduction of the photos into evidence. However, the trial court overruled his objection and the Appellate Court again affirmed, this time finding that the law of the case doctrine precluded it from revisiting the issue.

This Court reviews the Appellate Court's decision in the appeal from the second trial, as it is the last court to address the merits of the issue. *See Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006) (noting that on habeas review, the "relevant state court decision is that of the last state court to address the claim on the merits"). Generally, "[t]he decision of whether a jury should be allowed to see photographs of a decedent is a decision that rests within the sound discretion of the trial judge." *People v. Chapman*, 743 N.E.2d 48, 69 (Ill. 2000). And in a murder case, admitting photographs of the victim is proper where they are submitted "to prove the nature and extent of the injuries." *Id.* That is exactly the purpose for which Briseno's autopsy photos were admitted. Thus, there is no basis for finding that the Appellate Court erred in concluding that the trial court did not abuse its discretion in allowing the jury to see the photos.

ii.    *Whether the Cumulative Errors Denied Smith a Fair Trial*

To succeed on a cumulative error claim, a habeas petitioner must establish two elements: "(1) at least two errors were committed in the course of the trial; [and] (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Alvarez*, 225 F.3d at 824. Here, the first element of a cumulative error claim has been satisfied. Already, the Appellate Court conceded two errors arising from the trial court's decision to prevent Smith from perfecting his impeachment of Pardo's identification of the green jacket and its admission of Weisenberger's testimony about his past drug use and Smith's use of marijuana on the night of the shooting. This Court has further found that the trial court committed two more errors of a constitutional magnitude by excluding testimony regarding Briseno's drug dealing and Hiland's confession to a defense lawyer. (It also found that the trial court's error in preventing Smith from perfecting his impeachment of Pardo to be an error of constitutional magnitude.) Accepting each of the four errors as harmless,[11] the Court now must determine whether, taken together, the errors deprived Smith of a fundamentally fair trial.

The due process guarantee of a fundamentally fair trial entitles a defendant a fair trial, but not a perfect one. *Alvarez*, 225 F.3d at 825. When considering the significance of evidentiary errors, "a court must examine 'the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case.'" *Anderson*, 243 F.3d at 1053 (quoting *Alvarez*, 225 F.3d at

---

[11] While the Court holds that each of the three constitutional errors identified above in Section II.B were not harmless and therefore standing alone warrant a new trial, it will treat them as harmless for the purpose of its cumulative error analysis.

825). At the same time, a habeas court should "be careful not to magnify the significance of errors which had little importance in the trial setting." *Alvarez*, 225 F.3d at 825. Relief is warranted only where the court is "firmly convinced that but for the errors, the outcome of the trial probably would have been different." *Id*

As discussed above, the trial court's evidentiary errors significantly impaired Smith's ability both to introduce important evidence in his defense, and also to impeach evidence critical to the State's case. The constitutional errors in particular were far from minor. Testimony concerning the DeCicco Group's knowledge of Briseno's drug dealing was critical in establishing why the DeCicco Group targeted the Burrito Express. Without the evidence, the jury was faced with confessions on both sides but no clear motive for either to specifically target the Burrito Express. Had the jury heard the excluded testimony, it would have bolstered the credibility of the DeCicco Group's confessions. In particular, Smith argued that the evidence showed that the DeCicco Group ran out of drugs and were looking for money to buy more. Had the jury heard that members of the DeCicco Group previously learned that Briseno kept drugs and money at the Burrito Express, it very well could have believed that individuals looking for money for drugs would be drawn to rob a restaurant that they believed was a source of both. Such motive evidence could have tilted the scales for a jury weighing the credibility of DeCicco Group's many confessions against Houghtaling's confessions. Further, the jury did not learn that Hiland confessed in front of a defense attorney. The fact that Hiland sought out legal counsel could have bolstered the reliability of his confession because it would have tended to show that he believed he was in real legal jeopardy and his confession was not simply empty bluster. Ultimately, the trial hinged in large degree upon which set of confessions the jury believed. And the trial court's erroneous exclusion of motive evidence was compounded by the exclusion of evidence bearing on

the trustworthiness of the confession of one member of the DeCicco Group, such that in conjunction they were not harmless but in fact deprived Smith of a fundamentally fair trial.

Those errors were only further magnified by the trial court's erroneous limitation of cross-examination. Another important piece of evidence tying Smith to the crime was Pardo's identification of Houghtaling's green jacket as the same one worn by the masked man without the gun. Yet, immediately after the shooting, Pardo described a different green jacket than the one submitted to the jury. Thus, the trial court excluded both evidence that would bolster exculpating evidence while limiting Smith from properly impeaching a witness as to important inculpating evidence. The combined effect of these erroneous exclusions significantly weakened Smith's defense.

In addition, the trial court admitted prejudicial evidence concerning a defense witness's drug use. That witness testified to seeing Smith, Houghtaling, Collett, and McMullan just after the shooting and observing no blood or scratches on their bodies. Then, he rode in the purported getaway car and did not observe any blood, masks, bullets, or a gun in the car. The witness's testimony tended to show that Smith and his friends were not involved in the Burrito Express shooting. Yet, the jury might have discounted his testimony due to the fact that he had previously used drugs. *See United States v. Galati*, 230 F.3d 254, 262 (7th Cir. 2000) ("Frequently, evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." (internal quotation marks omitted)). Similarly, his testimony that Smith used marijuana the night of the crime may well have inflamed the jury against him. *See Brinkley v. Santiago*, No. 11 C 6282, 2013 WL 12309671, at *2 (N.D. Ill. July 11, 2013) (excluding evidence of a party's use of alcohol and marijuana because it would "raise the danger of unfair prejudice in the jury because of distaste for substance abusers"). While the testimony by itself likely did not

have a decisive impact on the jury's verdict, when combined with the three constitutional errors, its admission further tipped the scales of justice against Smith.

Given the weakness of the prosecution's case against Smith, the combined effect of the four evidentiary errors had a highly significant effect. The Court has already explained the various weaknesses of the State's evidence against Smith. And due to the trial court's evidentiary errors, Smith was deprived of important opportunities to cast additional doubt on the State's case against him. Nor were the errors directed to minor or ancillary matters. Rather, they affected core components of both the State's case and Smith's defense. Viewing these errors cumulatively in light of the entire record, this Court concludes that, but for the errors, Smith probably would have been acquitted. The Appellate Court's conclusion to the contrary was an unreasonable application of *Taylor v. Kentucky*.

***

In sum, the Appellate Court affirmed three trial court errors that violated Smith's constitutional rights. Specifically, the Appellate Court's decision improperly affirmed evidentiary exclusions that violated Smith's right to present a complete defense and his right to engage in effective cross-examination. Although the trial court's errors were not harmless, even if they were, when evaluated cumulatively they deprived Smith of his right to a fundamentally fair trial. For that reason, Smith's petition for habeas corpus is granted and his convictions and sentence are vacated, subject to the State's decision to retry him.

**CONCLUSION**

For the foregoing reasons, Smith's petition for a writ of habeas corpus (Dkt. No. 1) is granted due to evidentiary errors that violated his constitutional rights. This Court accordingly orders that the State either initiate proceedings to retry Smith within 120 days or release him from custody immediately. The Clerk is directed to enter Judgment in favor of Smith.

ENTERED:

Dated: March 10, 2020

Andrea R. Wood
United States District Judge